# 20-1978

## United States Court of Appeals

*for the*

## Second Circuit

SHLOMO YEHUDA RECHNITZ,

*Petitioner-Counter-Defendant-Appellee,*

– v. –

EPHRAIM KUTNER and JONATHAN KUTNER,

*Respondents-Cross-Defendants-Appellants,*

GREYSTONE FUNDING CORP.,

*Respondent-Third-Party-Pliantiff-Cross-Claimant-Counter-Claimant,*

CLARITY CAPITAL PARTNERS, LLC, HARBORVIEW CAPITAL
PARTNERS, LLC

*Third-Party-Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME II (A201-345)

| | |
|---|---|
| ANDREW J. LEVANDER | MICHAEL H. MCGINLEY |
| DECHERT LLP | DECHERT LLP |
| Three Bryant Park | Cira Centre |
| 1095 Avenue of the Americas | 2929 Arch Street |
| New York, NY 10036 | Philadelphia, PA 19104 |
| 212-698-3500 | 215-994-4000 |

*Attorneys for Respondents-Appellants Ephraim Kutner and Jonathan Kutner*

# TABLE OF CONTENTS

*Page*

## VOLUME I

Docket Sheet for Case No. 1:20-cv-1607-KAM-VMS
(Original Action), as of November 9, 2020 ................................. A-1

Complaint and Petition to Confirm Arbitration Award and for an
Order of Attachment in Aid of Arbitration, dated
March 30, 2020 (Dkt. 1) ............................................... A-12

Civil Cover Sheet (Dkt. 1-1) ....................................... A-41

Order to Show Cause for Attachment in Aid of Arbitration, dated
March 31, 2020 (Dkt. 10) ............................................ A-43

First Letter Motion to Correct Order on Motion to Show Cause, dated
March 31, 2020 (Dkt. 11) ............................................ A-46

Proposed Order to Show Cause (Dkt. 11-1) ............................... A-48

Amended Order to Show Cause for Attachment in Aid of Arbitration,
dated April 1, 2020 (Dkt. 12) ....................................... A-54

Notice of Motion to Confirm Attachment in Aid of Arbitration, dated
April 6, 2020 (Dkt. 16) ............................................. A-57

Declaration of Shlomo Rechnitz in support of Motion to
Confirm Attachment in Aid of Arbitration, dated April 6, 2020
(Dkt. 16-1) ........................................................ A-59

Exhibit A – Complaint and Petition to Confirm Arbitration
Award and for an Order of Attachment in Aid of Arbitration,
dated March 30, 2020 (Dkt. 16-2)................................. A-67

i

Exhibit B – Letter from Rabbi Yochanan Bechhofer on behalf of Ephraim and Jonathan Kutner, dated on or about August 21, 2018 (Dkt. 16-3) ........................................................ A-96

Exhibit C – Email from David Weldler to Rabbi Dovid Cohen, dated March 9, 2020 (Dkt. 16-4) ................................................. A-102

Exhibit D – Arbitration Award relating to Mezzanine Loan Dispute, dated March 11, 2020 (Dkt. 16-5) ................................ A-105

Declaration of Ephraim Kutner, dated May 20, 2020 (Dkt. 36-1)......... A-113

Exhibit A – Joint Venture Agreement, dated December 24, 2014 (Dkt. 36-2).................................................... A-131

Exhibit B – Email to Ephraim Kutner from Shlomo Rechnitz, dated February 25, 2018 (Dkt. 36-3)........................................... A-138

Exhibit C – Letter from David Weldler to Rabbi Dovid Cohen, dated August 20, 2020 (Dkt. 36-4)............................................... A-140

Exhibit D – Email from David Weldler to Rabbi Dovid Cohen and Ephraim Kutner, dated October 4, 2018 (Dkt. 36-5)............. A-141

Exhibit E – Email from David Weldler to Rabbi Dovid Cohen and Shlomo Rechnitz, dated October 26, 2018 (Dkt. 36-6)......... A-143

Exhibit F – Proposed Arbitration Award (Dkt. 36-7) .................. A-145

Exhibit G – Email from David Weldler to Rabbi Dovid Cohen and Ephraim Kutner, dated October 29, 2018 (Dkt. 36-8)........... A-148

Exhibit H – Proposed Arbitration Award (Dkt. 36-9).................. A-150

Exhibit I – Letter from Rabbi Yochanan Bechhofer to Rabbi Dovid Cohen, dated October 30, 2018 (Dkt. 36-10) ......... A-159

Exhibit J – Email from David Weldler to Rabbi Dovid Cohen,
Ephraim Kutner, and Jonathan Kutner, dated November 1, 2018
(Dkt. 36-11) ................................................................. A-160

Exhibit K – Arbitration Award, dated November 5, 2018
(Dkt. 36-12) ................................................................. A-162

Exhibit L – Confidential Settlement Communication
(Dkt. 36-13) ................................................................. A-171

Exhibit M – Email from David Weldler to Rabbi Dovid Cohen,
dated February 17, 2020 (Dkt. 36-14)........................................ A-173

Exhibit N – Din Torah Asks (Dkt. 36-15).................................... A-175

Exhibit O – Screenshot of Microsoft Word (Dkt. 36-16) ............ A-176

Exhibit P – Letter from Rabbi Dovid Cohen to Shlomo
Rechnitz and Ephraim Kutner, dated February 20, 2020
(Dkt. 36-17) ................................................................. A-177

Exhibit Q – Email from David Weldler to Rabbi Dovid Cohen,
dated March 9, 2020 (Dkt. 36-18)............................................. A-178

Exhibit R – Proposed Arbitration Award (Dkt. 36-19)............... A-182

Exhibit S – USPS Tracking for package delivered
November 13, 2018 (Dkt. 36-20) .............................................. A-191

Exhibit T – Email from Ephraim Kutner to Shlomo Rechnitz,
dated March 1, 2020 (Dkt. 36-21)............................................. A-195

Exhibit U – Email from Ephraim Kutner to Shlomo Rechnitz,
David Weldler, and Jonathan Kutner, dated March 3, 2020
(Dkt. 36-22) ................................................................. A-197

Exhibit V – Email from David Weldler to Ephraim Kutner,
Jonathan Kutner, and Shlomo Rechnitz, dated
March 3, 2020 (Dkt. 36-23)................................................... A-199

iii

## **VOLUME II**

Declaration of Shlomo Rechnitz in support of Attachment, Petition
to Confirm, and in Opposition to Cross-Motion to Vacate
Arbitration Award, dated May 28, 2020 (Dkt. 42) ..................... A-201

Declaration of Victor Lipnitsky CPA in Connection with Petition to
Confirm Arbitration Award, dated May 27, 2020 (Dkt. 42-1) .... A-215

Declaration of David Weldler in support of Attachment, Petition to
Confirm, and in Opposition to Cross-Motion to Vacate
Arbitration Award, dated May 28, 2020 (Dkt. 43) ...................... A-226

    Exhibit A – Email from Devora Pinson to David Weldler,
    dated April 2, 2020 (Dkt. 44) ........................................ A-243

    Exhibit B – Email from Ephraim Kutner to Shlomo Rechnitz,
    dated February 25, 2018 (Dkt. 45) ............................... A-249

    Exhibit C – Email from Ephraim Kutner to David Weldler and
    Jonathan Kutner, dated June 7, 2018 (Dkt. 45-1) ........................ A-252

    Exhibit D – Schedule 1 Spreadsheet (Dkt. 45-2) ......................... A-255

    Exhibit E – Email from David Weldler to Morris Goldstein,
    dated September 5, 2017 (Dkt. 45-3) ........................................... A-256

    Exhibit F – Email from David Weldler to Ephraim Kutner,
    dated August 16, 2018 (Dkt. 45-4)............................................. A-257

    Exhibit G – Email from David Weldler to Ephraim Kutner
    (Dkt. 45-5) .................................................................................. A-258

    Exhibit H – Handwritten Letter and Exhibits from David
    Weldler to Victor Lipnitsky, CPA (Dkt. 46) ............................... A-260

    Exhibit I – Letter from Rabbi Dovid Cohen, dated
    August 22, 2018 (Dkt. 46-1) ...................................................... A-266

Exhibit J – Handwritten letter to David Weldler, Ephraim
Kutner, Jonathan Kutner, and Shlomo Rechnitz, dated
August 30, 2018 (Dkt. 46-2) ....................................................... A-267

Exhibit K – Email from David Weldler to Rabbi Dovid Cohen
and Shlomo Rechnitz, dated October 26, 2018 (Dkt. 46-3)......... A-268

Exhibit L – Email from David Weldler to Efrem Schwalb,
dated October 30, 2018, forwarding letters from Rabbi
Yochanan Bechhofer (Dkt. 46-4) ................................................. A-273

Exhibit M – Arbitration Award, dated November 5, 2018
(Dkt. 46-5) ................................................................................... A-277

Exhibit N – Email from David Weldler to Efrem Schwalb,
dated February 20, 2020, forwarding February 17, 2020 email
(Dkt. 46-6) ................................................................................... A-286

Exhibit O – Letter from Rabbi Cohen to Shlomo Rechnitz
and Ephraim Kutner, dated February 20, 2020 (Dkt. 46-7)......... A-288

Exhibit P – Email from David Weldler to Efrem Schwalb,
dated March 1, 2020, forwarding email from Rabbi Yochanan
Bechhofer to Rabbi Dovid Cohen, Shlomo Rechnitz, and David
Weldler, dated February 29, 2020, (Dkt. 46-8) ........................... A-289

Exhibit Q – Email from Rabbi Yochanan Bechhofer to Rabbi
Dovid Cohen, dated March 1, 2020 (Dkt. 46-9) ......................... A-295

Exhibit R – Email from David Weldler to Rabbi Dovid Cohen,
dated March 9, 2020 (Dkt. 46-10)................................................ A-297

Notice of Appeal, dated June 23, 2020 (Dkt. 49)................................... A-308

Transcript of June 3, 2020 telephone conference before the
Hon. Kiyo A. Matsumoto (Dkt. 51) ............................................ A-310

UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
SHLOMO YEHUDA RECHNITZ,

                     Petitioner/Plaintiff,

      v.

EPHRAIM KUTNER, JONATHAN KUTNER and
GREYSTONE FUNDING CORP.,

                 Respondents/Defendants.
----------------------------------------------------------------X

Case No. 20-cv-1607 (KAM)(VMS)

**DECLARATION OF SHLOMO
YEHUDA RECHNITZ IN SUPPORT
OF ATTACHMENT, PETITION TO
CONFIRM, AND IN OPPOSITION
TO CROSS-MOTION TO VACATE
ARBITRATION AWARD**

        I, SHLOMO YEHUDA RECHNITZ, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

        1.    I am the petitioner/plaintiff in this action.  I submit this Declaration in support of the Petition to confirm the arbitration award issued by Rabbi Cohen on March 11, 2020 (the "Award"), the motion for an attachment in aid of arbitration, and in opposition to the cross-motion filed by the Kutners to vacate the Award directing the proceeds of the settlement of a lawsuit between the Kutners and Greystone Funding Corp. (the "Greystone Lawsuit") to be paid to Petitioner.  I have personal knowledge of all the facts set forth herein and if called to testify could and would truthfully testify to the following.

        2.    I participated in the arbitration proceeding between Ephraim Kutner and Jonathan Kutner, on the one hand (collectively, the "Kutners") and myself before Rabbi Dovid Cohen, commencing on August 14, 2018 (the "Arbitration").   Both prior to and subsequent to the Arbitration's commencement, I was involved in a number of settlement negotiations with the Kutners.  In this regard, I am intimately familiar with: (a) the parties' dispute, including the matters subsumed and their scope; (b) the parties' negotiations; and (c) the scope of dispute submitted to Rabbi Cohen.

3.      The Kutners essentially make two arguments in opposition to the Petition, and in support of their cross-motion to vacate the Award.  The first is the false assertion that the only dispute submitted by the parties to Rabbi Cohen related solely to the mezzanine loans.[1]  In fact, the dispute submitted to Rabbi Cohen unquestionably included the mezzanine loans, the funding of the Greystone Lawsuit and attendant issues, as well as other moneys that I provided to the Kutners.

4.      The second argument they raise in support of their position is they were not afforded an opportunity to present evidence in defense of the claims raised against them.  This assertion is also false.  In fact, as detailed below, they disregarded all of Rabbi Cohen's orders, which among other things, frustrated the forensic review process that Rabbi Cohen had ordered, and then refused to appear for any hearing relating to the resolution of the parties' rights to the proceeds of the settlement of the Greystone Litigation.  The Kutners did argue to Rabbi Cohen that the parties had settled all of the issues that I was seeking to arbitrate, but Rabbi Cohen rejected that argument based on the documents submitted by the Kutners as stated in the Award.  The Kutners never argued to Rabbi Cohen that the dispute concerning the Greystone Lawsuit was beyond the scope of the arbitration.  Nor could they because that argument was invented by them in connection with this action and is false.

5.      As detailed below, each of the Kutner's arguments is conclusively disproven based on contemporaneous documents, witness testimony and statements made by the Kutners and their agents.

---

[1] The declaration of Ephraim Kutner is filled with false and intentionally scandalous statements and mischaracterizations.  However, I address herein only the false statements that are pertinent to the motions before the Court.  It should not be construed as an admission that anything in his declaration is true, including his slanderous accusation of a kickback demand.

**I.      The Greystone Lawsuit Dispute Was Unquestionably Submitted to Arbitration**

6.      The Kutners' claim that the parties' dispute with respect to the Greystone Lawsuit was not submitted as part of the Arbitration is unquestionably false.  As set forth below, the evidence demonstrating the fallacy of this assertion includes, among other things: the parties' historical communications giving rise to the dispute, the broad arbitration agreement signed by the parties, the documents presented at the August 14, 2018 hearing, the discussions at the August 14, 2018 hearing, and communications by the Kutners and their agents in connection with the Arbitration.

**A.      Events Leading Up to the Arbitration**

7.      The history of the Greystone Lawsuit dispute between the parties provides important context leading up to the August 2018 hearing.  Prior to 2015, I agreed to loan funds to the Kutners to finance a lawsuit against Greystone on the condition that: (a) any recovery first go to pay me back; and (b) after I recovered all funds advanced, without interest, the remainder would be divided 30 percent to me and 70 percent to the Kutners.  The Kutners were in charge of managing the day to day aspects of the Greystone Lawsuit, but they agreed to apprise me of the cases' progress.

8.      By mid-2017, I had total outstanding loans to the Kutners in the amount of $15,613,960.  This included more than $3.7 million towards the Greystone Lawsuit, even though no depositions had yet commenced.  Subsequently, the Kutners had significantly diminished the flow of financial information they were providing to me with regard to all of our dealings.  We had also come to learn about business expenses purportedly incurred by the Kutners, which we believed to be exorbitant and highly inappropriate.

9.      Sometime in 2017, without more information about the use of all of the funds that we had provided to the Kutners and the direction of the lawsuit, among other things, I did not believe

further funding of the lawsuit was proper.  We received e-mails from the Kutners and a Harborview

Capital employee requesting additional funds for the lawsuit, but refused to do so without coming

to a resolution regarding how all of the money provided to the Kutners was used, how we were

going to be repaid, information about profits and loss and how they were going to be divided for:

the mezzanine loans; Greystone lawsuit; and other moneys provided to the Kutners.  (*See* Exhibit

A to Declaration of David Weldler, filed herewith).

      10.   As a result of their continued substantial expenditures and decreasing transparency,

by late 2017 and early 2018, I became concerned that the Kutners had misappropriated and/or

failed to properly account for certain monies.  Accordingly, I became concerned, among other

matters, that the Kutners would not repay the money that I provided to fund the mezzanine loans

and/or the Greystone lawsuit, as well as other monies.  These concerns have proven well founded,

because, since the settlement of the Greystone lawsuit, the Kutners recovered approximately $1.4

million, while I have not received any of the money I provided to them to fund the Greystone

Lawsuit.

      11.   These tensions are reflected in email correspondence dated February 25, 2018, a true

and correct copy of which is attached as Exhibit B to the Weldler Decl.  Specifically, on February

25, 2018, I sent an email to Ephraim Kutner, voicing frustrations at Kutner's failure "to repay

every penny that you [Kutner] owe."  I demanded that the Kutners come to a deal with him "to

give me what's legally mine, every penny you stole from me, by 10:00 PM TONIGHT (EST) . .

.pay every dollar you owe!! plus all my attorneys fees, plus everything you slipped into different

categories to fool me plus late pay interest charges," otherwise I threatened to inform others of the

Kutners' misconduct which would have far-reaching ramifications.

      12.   That the Kutners fully understood that I was asserting claims relating to the funding

of the Greystone Lawsuit is confirmed by Ephraim Kutners' response which was received less than 15 minutes after I sent my email:

> I tried calling you upon receipt of your email below. It is unfortunate that you have resorted to such words and feelings. . . . You were the one that pushed me to leave Steve and fight for what you felt was right. For you to say the shocking words below is extremely hurtful. **You insisted upon investing in my case and lawsuit and you were the one who came up with attorneys we should use and the strategies we were going to implement. You decided to invest in my case on your own volition. You created the structure and the percentages we both agreed to and were to split upon the closing of the case. The terms that you suggested and agreed to were for you to receive the amount of monies spent first on legal fees then to split the difference with you receiving 35% and me receiving 65%. We just discussed this again less than a week ago when I was in your house at your request.**

(*Id.*)

13.     The tension proved to be vexing.  Eventually, it became clear that the dispute could not be resolved by the parties, without a form of third-party adjudication.  The Kutners and I self-identify as Orthodox Jews who are obligated as a matter of religious law (*i.e. halachah*) to submit our financial disputes to a Rabbinical Court (otherwise known as a "*beis din*") or a single Rabbinic arbitrator for resolution, rather than proceeding in a secular court without advance permission from a beis din or Rabbinic authority.

14.     We advised the Kutners to select any rabbinic authority of their choice and that I would agree to submit the parties' dispute, which included among other issues, issues of accounting of funds related to the Greystone Lawsuit.  They selected Rabbi Dovid Cohen who is a well-known and respected Rabbinic judge who lives in Brooklyn.  I agreed to that choice.

**B.     The Arbitration and the Arbitration Agreement**

15.     On August 14, 2018, the Kutners, David Weldler and I appeared before Rabbi Cohen. We had a discussion explaining that we were coming to him to resolve claims relating to all of the moneys that we had provided to the Kutners; these moneys included funds which they used to lend

to others, to fund a lawsuit, and for other purposes.  Rabbi Cohen asked whether the parties were seeking for him to mediate or arbitrate the dispute between them, after explaining the difference between non-binding mediation and binding arbitration.  Both sides orally agreed that we would arbitrate the dispute by binding arbitration.

16.    The oral agreement was reduced to writing as reflected in the arbitration agreement which was drafted by Rabbi Cohen.  The agreement to arbitrate provides in full:

> Shlomo Yehuda Rechnitz (SYR) on his own, and as a partner in Harborview Capital LLC and Jonathan and Ephraim Kutner (JEK) on their own, and as partners in the above company, have come to me to adjudicate a dispute.

(Exhibit 2 to Petition).

17.    The Kutners contend that the arbitration agreement was intended to cover only the money that Rechnitz provided for the mezzanine loans.  The Kutners are well aware that this assertion is false.  First, as demonstrated by multiple emails, the Greystone Lawsuit dispute was one of the central issues that we were fighting about when we appeared before Rabbi Cohen. Harborview was sending us emails seeking additional funds for the litigation and we were demanding an accounting, information, transparency and a determination of the pro-rata split of any recovery before agreeing to their requests.  The Greystone Lawsuit was a matter that was at the center of the tension between the parties.  There obviously was not going to be finality if the issues concerning the Greystone Lawsuit was not resolved.

18.    Moreover, in connection with the agreement to arbitrate we had discussed with Rabbi Cohen that there was in excess of $10 million of outstanding funding that I gave to the Kutners, which included the money used to fund the Greystone Lawsuit, plus other moneys that were owed.

19.    The use by Rabbi Cohen of the word "dispute" had nothing to do with limiting the issue to be resolved in the arbitration to mezzanine loan issues.  The dispute between the parties

related to several different issues, no different than a court action can and frequently does encompass several claims between parties.

20.   The use of the word "dispute" by its terms broadens, not limits, the agreement between the parties to not exclude any matters of dispute between the parties, and that was what was intended.

21.   The Kutners also argue that the arbitration agreement did not relate to Rechnitz's funding of the Greystone Lawsuit because Grove Let LLC and Strategic Legal Partners LLC were not parties to the arbitration agreement.  However, the Kutners and I signed the arbitration agreement and we were authorized as the owners and agents of all of the relevant companies, and represented the interest of all companies that are relevant to the issues that were in dispute between us.

22.   Moreover, much of the money to fund the Greystone Lawsuit was provided directly to Ephraim Kutner, not some other company of his, and Kutner himself was a party to the joint venture relating to the Greystone Lawsuit, and he signed the arbitration agreement personally.

C.   **Documentary Evidence From the Arbitration**

23.   Aside from evidence of the parties' dispute leading up to the arbitration and prior to the signing of the arbitration agreement, immediately after we signed the arbitration agreement, issues relating to the Greystone Litigation dispute were discussed at the arbitration.  I first gave an overview the history of the parties' financial relationships and raised concerns about financial improprieties he believed the Kutners had committed.  David Weldler then presented financial details regarding my dispute and claims against the Kutners, including associated dollar figures with the parties' various relationships.  These figures, which were reflected on a financial schedule which Weldler presented at that time to Rabbi Cohen and the Kutners included our understanding

of the sums I had funded for the Greystone Lawsuit.  (*See* <u>Exhibit D</u> to the Weldler Decl.).  The yellow highlighted portion of the schedule is the moneys that were provided by me through my wholly owned companies, SR Capital and YTR Capital, to the Kutners (either to Ephraim Kutner directly, to his attorneys at Abrams, Fensterman, and/or to entities under his control) to fund the Greystone Lawsuit.

24.     Rabbi Cohen then asked the Kutners about the alleged financial improprieties. They acknowledged the charged conduct.

25.     At the arbitration hearing, Rabbi Cohen ruled that the parties should submit detailed financial information regarding all of the funds that were at issue, including relating to the Greystone Lawsuit, for a forensic accounting before Victor Lipnitsky, CPA.

26.     Following further discussions at the hearing, we asked Rabbi Cohen for a ruling that we should be able to control the mezzanine loans because I had funded those loans completely. Rabbi Cohen ruled that since there was no dispute that all of the money advanced on account of the mezzanine loans had been funded by me, that I should be entitled to control the mezzanine loans and that the Kutners were required to notify the borrowers that I controlled the loans and that all payments of principal were to go to me or my designee and interest should be placed in escrow.

27.     At the hearing, Rabbi Cohen also instructed the Kutners to provide me directly with financial information about the status of all of the parties' financial dealings.

28.     The Kutners did not object that my presentation of the claims, which included issues relating to the Greystone Lawsuit, exceeded the scope of what the parties had agreed to arbitrate. Nor did they contend that the sole subject in dispute was the mezzanine loans.

29.     As demonstrated above, resolution of the parties' relationship with respect to the Greystone :Lawsuit was submitted to Rabbi Cohen for resolution.  The Kutners required a final

resolution of "all" issues between the parties, including the parties' respective entitlements.  I was

seeking an accounting of the moneys that had been funded and how they were used, a ruling as to

the amounts that were owed by the Kutners and whether continued funding of the lawsuit was

required, and more control over the lawsuit and/or settlement.

## II.     The Kutners Were Afforded An Opportunity to Present Evidence to Rabbi Cohen, But Declined to Participate

30.     As discussed above, at the August 14, 2018 arbitration hearing, Rabbi Cohen made

several oral rulings including requiring the Kutners to turn over control of the mezzanine loans

and provide financial information to Rechnitz, the appointment of Victor Lipnitsky as a forensic

accountant, and requiring the parties to cooperate with Mr. Lipnitsky.  A written order appointing

Lipnitsky and requiring cooperation with him was issued by Rabbi Cohen on August 22, 2018.

31.     On August 30, 2018, Rabbi Cohen advised the parties again that he expected them to

fully cooperate with Mr. Lipnitsky or it would adversely impact further decisions in the arbitration.

Rabbi Cohen wrote "any 'coverup' or claim of loss or displacement of the material he wants shall

be a detriment in my final conclusion."  (*See* Exhibit J to Weldler Decl.)

32.     Despite these rulings, the Kutners did not comply with Rabbi Cohen's directives in

any respect.  They refused to cooperate with Mr. Lipnitsky.  (*See* Lipnitsky Decl. filed herewith).

They refused to sign a direction letter regarding the mezzanine loans which Weldler had provided

to them.  They did not place interest payments received in connection with the mezzanine loans in

escrow.  They did not provide us with the requisite financial information for any of the parties'

financial relationships.

33.     Because the Kutners refused to cooperate regarding turning over documents and

information to the forensic accountant or us, on October 26, 2018, on notice to the Kutners, we

asked Rabbi Cohen to issue a written award formalizing the rulings that he made concerning the

mezzanine loans that he issued orally at the August 14, 2018 hearing, and provided a proposed order.  (*See* Exhibit K to Weidler Decl.).

34.    On October 30, 2018, through their rabbinic lawyer, the Kutners asked Rabbi Cohen for another hearing at which time they would bring evidence refuting "all of Mr. Rechnitz's claims." Notably, the letter did not limit the parties' dispute to a single claim regarding the mezzanine loans, but references my "claims" in the plural. (*See* Exhibit L to Weidler Decl.).

35.    On November 5, 2018, Rabbi Cohen issued an award memorializing the rulings he had previously made concerning the mezzanine loan dispute at the August 14, 2018 hearing.  The Kutners were to send out a direction letter to the mezzanine loan borrowers advising them that the loans were being transferred to Rechnitz.  All payments on the loans would be made directly to me, with interest payments to be held in a separate account by me until the principal I had provided was fully repaid.  That award expressly states that the mezzanine loan issue was "the first discrete issue that the parties presented to me for a ruling" and that Rabbi Cohen "retain[ed] jurisdiction concerning the other business disputes between the parties."  (*See* Exhibit M to Weidler Decl. pp. 1, 3).

36.    Thereafter, we engaged in more than a year of settlement negotiations with the Kutners concerning all of the issues in dispute between the parties, including issues relating to the Greystone Lawsuit, and attempted to obtain voluntary compliance by the Kutners with Rabbi Cohen's ruling concerning the mezzanine loans issue.

37.    In mid-2019, the Greystone Lawsuit was settled for $8 million.  I was instrumental in negotiating and obtaining that settlement, which was considered a favorable settlement by the Kutners.  Contrary to the claim of the Kutners, there was never an agreement that if the Kutners allowed me to participate in the settlement negotiations or if they agreed to settle for $8 million, I

would agree to forego my contractual right to receive the funds that I had provided to finance the lawsuit before any profits were split between the parties.  There were ongoing discussions about different possible arrangements with respect to the settlement payments that were to be received by Greystone, but those were all part of negotiating and arriving at a comprehensive final agreement between the parties to resolve all of the issues that were in dispute which never occurred.

38.    In May 2019, the Kutners received an initial payment of $500,00 and then they began receiving monthly settlement payments of $150,000 from Greystone thereafter.  None of those payments were forwarded to me.  Additionally, the Kutners did not comply with Rabbi Cohen's November 5, 2018 ruling.  They did not send out the direction letter to the mezzanine loans borrowers, and settlement negotiations between the parties broke down.  Although there were times when the parties were close to an agreement to resolve their dispute, no agreement was ever reached.

39.    As a result, on February 17, 2020, we emailed Rabbi Cohen on notice to Ephraim Kutner and asked Rabbi Cohen to reconvene the arbitration so that he could issue a new award on the mezzanine loan issue to, among other things, allow Rechnitz to send the direction letter to the mezzanine loan borrowers on behalf of the Kutners, and to issue rulings on the other business issues between the parties including the Greystone Lawsuit.  (*See* Exhibit N to Weldler Decl.).

40.    On February 20, 2020, Rabbi Cohen sent an email advising the parties that we were being summoned to complete the arbitration and setting a date to appear for March 1, 2020 at 4:00pm.

41.    On February 29, 2020, the Kutner's rabbinic advocate Mr. Yochanan Bechoffer, responded to Rabbi Cohen's summons on behalf of the Kutners and indicated that they did not

intend to participate in any further arbitration.  Significantly, Bechhoffer did not claim (as the Kutners now argue in their papers to this Court) that Rabbi Cohen did not have authority to continue the arbitration because the only issue that was subject to arbitration was the dispute about the mezzanine loans which had been already decided.  Instead, he argued that the arbitration was unnecessary because the parties had long ago come to a binding and already partially implemented agreement on all of the issues that Bechhoffer admitted were previously submitted to arbitration in August 2018.  (*See* Exhibit P to Weldler Decl.).

42.  The purported agreement attached to the Bechhoffer letter on its face was not a binding agreement between the parties as reflected in some of the back and forth comments which revealed disagreements on several material points, and settlement negotiations continued for more than a year following the purported email agreement.  However, the Bechhoffer letter is important because the first issue referenced in the email attachment is a discussion about the Greystone Lawsuit.  In other words, contrary to their position before this Court, the Kutners conceded that the dispute regarding the Greystone Lawsuit was before Rabbi Cohen, but they argued it had been already settled.  Because the parties had allegedly settled their original dispute, Bechhoffer argued that a new arbitration agreement was needed, and the Kutners were unwilling to participate in such an arbitration before Rabbi Cohen.  (*Id.*)

43.  On March 1, 2020, Mr. Bechhoffer reiterated the Kutner's position that the parties had settled their dispute, and that therefore they believed any continuation of the arbitration was improper.  Once again, Mr. Bechhoffer never advised Rabbi Cohen that the issues that Rechnitz sought to arbitrate were beyond the scope of the arbitration.  (*See* Exhibit Q to Weldler Decl.).

44.  On March 9, 2020, by email to Rabbi Cohen on notice to the Kutners, we asked Rabbi Cohen to issue an award with respect to the Greystone Lawsuit settlement.  Although our records

showed that I had contributed more than $3.7 million to fund the Greystone Lawsuit, the Kutners claimed that $650,000 of that amount was a personal loan to Ephraim Kutner not used for the lawsuit.  We asked that Rabbi Cohen issue an award providing that I was entitled to $3,071,009 representing the funds that were provided to the Kutners to finance the lawsuit, plus $1,328,697 representing my 30 percent share of the recovery after taking into account the $3 million that I had provided and $500,000 that the Kutners claimed they had spent to pay for the lawsuit. Additionally, we asked that the remainder of any Greystone Settlement payment be paid to me to cover millions that I am owed by the Kutners with respect to the other loans that were made to the Kutners and amounts that are owing from the Kutners that remain unpaid.  A proposed order was also submitted to Rabbi Cohen.  (*See* Exhibit R to the Weldler Decl.).

45.     The Kutners did not respond to the submission.  They did not file an objection to Rabbi Cohen arguing that the only dispute before Rabbi Cohen was the mezzanine loans issue. They did not disagree with the amount that I claimed I had provided to fund the Greystone Lawsuit, or the calculation of the amounts owed in connection with the Greystone lawsuit.

46.     On March 11, 2020, Rabbi Cohen rejected the arguments made by Bechhoffer and issued the Award that is the subject of this Petition.

47.     In March 2020, more than nine months after I was supposed to be receiving all of the settlement payments made by Greystone, in an attempt to coverup their misappropriation of my money, I was advised that the Kutners had contacted Greystone to advise that it should start sending 50 percent of the monthly settlement payments to me.  This instruction from the Kutners only came after the Kutners learned that they were being summoned to appear before Rabbi Cohen. To date, they have received approximately $1.4 million, and I have received nothing.

A-214

I declare under the penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

Executed:    May 28, 2020
              Los Angeles, California

                                     SHLOMO YEHUDA RECHNITZ

UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SHLOMO YEHUDA RECHNITZ,

                                Petitioner/Plaintiff,

        v.

EPHRAIM KUTNER, JONATHAN KUTNER and
GREYSTONE FUNDING CORP.,

                       Respondents/Defendants.
-------------------------------------------------------------------X

Case No. 20-cv-1607 (KAM)(VMS)

**DECLARATION OF VICTOR
LIPNITSKY CPA IN CONNECTION
WITH PETITION TO CONFIRM
ARBITRATION AWARD**

I, VICTOR LIPNITSKY, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746,

as follows:

1.    I am a forensic accountant who was selected by Rabbi Dovid Cohen in August 2018

to provide forensic accounting services in connection with an arbitration between Shlomo Yehuda

Rechnitz ("Petitioner") and Ephraim and Jonathan Kutner (the "Kutners"). I submit this

declaration in connection with the application by Petitioner to confirm the arbitration award issued

by Rabbi Cohen and in response to the cross-motion to vacate filed by the Kutners.

2.    As background, I am a certified public accountant registered with the State of

Maryland under registration number 39982. I hold a Bachelor's of Arts degree in Economics from

the State University of New York (SUNY) at Stony Brook and am a Certified Fraud Examiner and

Certified Insolvency and Restructuring Adviser. I am currently a managing member at Accurity

Advisors.

3.    I have extensive experience as a financial consultant and forensic accountant to trial

lawyers, bankruptcy trustees and receivers, in-house counsel, state and federal regulators and

special committees in complex commercial litigation matters, fraud investigations, and matters

related to bankruptcy and reorganization. I serve as a consultant to clients on corporate

investigation matters including allegations of money laundering, tax fraud, Ponzi schemes, bank and securities fraud, employee embezzlement, and fraudulent financial reporting which include the use of both domestic and international asset tracing. I advise clients in commercial litigation matters involving breach of contract, wrongful termination, post-merger and acquisition disputes, shareholder disputes, and disputes related to business transactions. My consulting in bankruptcy and reorganization proceedings includes day-to-day business operations, asset and cash flow management, insolvency determination, preference and fraudulent conveyance claims, orderly liquidation, and creditor negotiations. In addition, I assist investors and financial institutions with due diligence and ongoing asset monitoring.

4.    I have also served as a court appointed receiver for the benefit of the secured creditors, and have testified as an expert witness in several federal court proceedings and arbitrations.

5.    Sometime between August 14 and August 16, 2018 I was contacted by Rabbi Dovid Cohen to provide forensic accounting services in connection with a dispute between Mr. Shlomo Rechnitz and Messrs. Ephraim and Jonathan Kutner. My connection with the dispute was purely through Rabbi Cohen. I knew neither party to the dispute. Rabbi Cohen is a leading rabbinic scholar and expert in Jewish law and I have provided forensic accounting services to Rabbi Cohen on one other occasion unrelated to the present dispute.

6.    I am advised that the Kutners have stated that the only matter involved in the dispute before Rabbi Cohen was a dispute regarding mezzanine loans whose funding came from Mr. Rechnitz or entities owned by Mr. Rechnitz.

7.    When I spoke to Rabbi Cohen, he informed me that the arbitration involved claims by Petitioner against the Kutners concerning several financial issues, not one discreet issue, and

2

he wanted me to investigate all of the claims that were being raised by Rechnitz. Rabbi Cohen also told me to contact both of the parties and that he had ordered both sides to cooperate in terms of communicating with me and providing the documents and information that I needed to evaluate Rechnitz's claims.

8.     At Rabbi Cohen's instruction, I immediately reached out to both sides to discuss the process by which my review would take place. To perform my review, I needed the cooperation of the Kutners, whose records were to be audited. I asked to have a joint meeting with both sides and to send me whatever information each side wanted to send me.

9.     On August 17, 2018, David Weldler contacted me on behalf of Petitioner and spoke to me about the claims that Mr. Rechnitz had raised, which included issues relating to a lawsuit between the Kutners and Greystone Funding Corp. (the "Greystone Lawsuit"), certain mezzanine loans and other loans or business transactions between the parties. My instructions from Rabbi Cohen were to investigate and report back on all of the claims that had been made.

10.     Soon after speaking with Weldler, I received a handwritten letter from him which I received during the week of August 20, 2018 setting forth the claims Rechnitz was making, requests that Rechnitz had of me as the forensic accountant, and contained schedules of information regarding moneys provided by Mr. Rechnitz to the Kutners and vice versa, and amounts claimed to be owed. The items provided by Weldler included issues relating to the mezzanine loans, the Greystone Lawsuit and other loans or business dealings. (*See* Exhibit A, hereto).

11.     It was my understanding that the Greystone Lawsuit dispute was part of the arbitration, and no one told me that was not the case. After speaking with Weldler, I also had a call with someone who was described as the Kutners' Chief Financial Officer or some position of

3

that nature, named Morris Goldstein, with whom I spoke briefly regarding obtaining the information that was needed to resolve the issues that had been raised in the arbitration. I was particularly interested in the accounting software that was used by the Kutners. Mr. Goldstein did not state that the information I was requesting was not part of the arbitration.

12.    My recollection is that Mr. Goldstein represented that he would fully cooperate with my requests for information and suggested that we should have a joint telephone call with him and the Kutners. I followed up a few times with Goldstein and the Kutners, but they stopped communicating with me. I reported to Rabbi Cohen that the Kutners were not cooperating and providing me with any information regarding all of the various matters including the Greystone Lawsuit.

13.    Among the work that I was supposed to perform included (a) to investigate and determine the amounts of money provided by Mr. Rechnitz to the Kutners in connection with the mezzanine loans, the Greystone Lawsuit, and other loans relating to the Kutners' business; (b) to investigate and determine any amounts of money that the Kutners had provided, if any, with respect to the mezzanine loans, the Greystone Lawsuit, and other business ventures involving Mr. Rechnitz, and/or any payments they had made to Mr. Rechnitz; (c) to determine the uses of all of the moneys that were provided by Mr. Rechnitz; and (d) to investigate and report back on the status of the Greystone Lawsuit, mezzanine loans and other business ventures., and (e) to determine if the money that was provided to for the Greystone Lawsuit actually was used for that purpose.

14.    Because of the Kutners' failure to cooperate, there was no way for me to audit the records which were in their possession, and the matter was concluded from my end.

4

A-219

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:     May 27, 2020
              Baltimore, Maryland

VICTOR LIPNITSKY

Dear Victor

Included herein please find

① Forensic accounting - Goals # Objectives

② Din Torah "ASKS"

SCHEDULE ① ③ Schedule of every dollar funded to Kutner or
Kutner entities:

> Please note that Strategic Legal Partners
> relates to funding of Kutner litigation
> with Greystone.

> There were instances that we show
> funding to Kutner and they designated
> it to one of the entities. I don't
> really care.

This schedule shows every penny # funded
and everything given back to us, from
inception

SCHEDULE ② Schedule of existing mezzanine loans (2 pages)
SCHEDULE 3 ③ schedule ~~done~~ done in 2017 showing they
had overdistributed app 1.7 - (probably not
relevant as you will build the full picture)

④ Rechnitz differential
⑤ Summary of amounts due

David We

A-221

Case 1:20-cv-01607-KAM-VMS   Document 42-1   Filed 05/29/20   Page 7 of 11 PageID #: 628

SCHEDULE 

| Date | Name | Memo | Lender | Debit | Total |
|------|------|------|--------|-------|-------|
| 09/09/2013 | | Funds Transfer | SR Capital | $ 1,500,000 | |
| 10/29/2013 | | Funds Transfer | SR Capital | $ 1,000,000 | |
| 01/16/2014 | Ephraim Kutner | | SR Capital | $ 2,500,000 | |
| 06/03/2014 | Ephraim Kutner | | SR Capital | $ 500,000 | |
| 12/30/2014 | Ephraim Kutner | Deposit | SR Capital | $ (624,799) | |
| 09/18/2015 | Ephraim Kutner | Deposit | YTR Capital | $ (2,000,000) | $ 2,875,201 |
| | | | | | |
| 08/26/2014 | Ephraim Kutner | | YTR Capital | $ 1,650,000 | |
| 07/31/2014 | Ephraim Kutner | | SR Capital | $ 950,000 | |
| 03/02/2015 | Harborview Capital Funding | | YTR Capital | $ 302,500 | |
| 05/19/2015 | Harborview Capital Funding | Westgate Nursing Home Mezzanine | YTR Capital | $ 1,156,250 | |
| 11/27/2015 | Harborview Capital Funding | | YTR Capital | $ 1,350,000 | |
| 02/11/2016 | Harborview Capital Funding | | YTR Capital | $ 1,200,000 | |
| 09/09/2016 | Harborview Capital Funding | Deposit | SR Capital | $ (1,600,000) | |
| 03/28/2017 | Harborview Capital Funding | | YTR Capital | $ 2,300,000 | |
| 03/29/2017 | Harborview Capital Funding | Deposit- Mather Loan Repay | YTR Capital | $ (950,000) | |
| 05/30/2017 | Harborview Capital Funding | | YTR Capital | $ 2,659,000 | $ 9,017,750 |
| | | | | | |
| 12/02/2014 | Ephraim Kutner | | YTR Capital | $ 500,000 | |
| 07/31/2014 | Ephraim Kutner | | SR Capital | $ 650,000 | |
| 12/29/2014 | Strategic Legal Partners | | YTR Capital | $ 624,799 | |
| 04/16/2015 | Strategic Legal Partners | | SR Capital | $ 200,215 | |
| 04/17/2015 | Strategic Legal Partners | | SR Capital | $ 34,347 | |
| 05/27/2015 | Strategic Legal Partners | | SR Capital | $ 5,338 | |
| 06/04/2015 | Strategic Legal Partners | | SR Capital | $ 55,000 | |
| 07/01/2015 | Strategic Legal Partners | | SR Capital | $ 55,000 | |
| 08/03/2015 | Strategic Legal Partners | | SR Capital | $ 55,000 | |
| 09/03/2015 | Strategic Legal Partners | | SR Capital | $ 55,000 | |
| 10/01/2015 | Strategic Legal Partners | | SR Capital | $ 355,000 | |
| 10/30/2015 | Strategic Legal Partners | | SR Capital | $ 55,000 | |
| 10/23/2015 | Ephraim Kutner | | YTR Capital | $ 500,000 | |
| 01/13/2016 | Ephraim Kutner | | YTR Capital | $ 400,000 | |
| 11/08/2016 | Strategic Legal Partners | | SR Capital | $ 25,000 | |
| 12/01/2016 | Strategic Legal Partners | | SR Capital | $ 10,000 | |
| 12/06/2016 | Strategic Legal Partners | | SR Capital | $ 31,824 | |
| 01/06/2017 | Strategic Legal Partners | | SR Capital | $ 10,000 | |
| 02/01/2017 | Strategic Legal Partners | | SR Capital | $ 10,000 | |
| 03/13/2017 | Strategic Legal Partners | | SR Capital | $ 10,000 | |
| 04/03/2017 | Strategic Legal Partners | | SR Capital | $ 10,000 | |
| 05/02/2017 | Strategic Legal Partners | | SR Capital | $ 10,000 | |
| 06/06/2017 | Strategic Legal Partners | | SR Capital | $ 10,000 | |
| 07/03/2017 | Strategic Legal Partners | | SR Capital | $ 10,000 | |
| 05/20/2016 | Abrams, Fensterman | | YTR Capital | $ 35,000 | |
| 07/30/2015 | Venable | Harborview | YTR Capital | $ 4,487 | $ 3,721,009 |
| | | | | | |
| | | | | $ 15,613,960 | $ 15,613,960 |
| | | UNALLOCATED | | | $ 5,000,000 |
| | | | | | $ 10,613,960 |

A-222

Case 1:20-cv-01607-KAM-VMS   Document 42-1   Filed 05/29/20   Page 8 of 11 PageID #: 629

SCHEDULE  2

| Project Name | Senior Lender | Loan Amount | Interest Rate | Participant Name (Primary; Secondary) | Secondary Participant Interest | Maturity Date | Monthly Payments | Locations | Bed Counts | Status | First Mortgage Initial Balance | First Mortgage Maturity | First Mortgage Recourse | Latest Financials Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Symphony of Oswego | the PrivateBank | $ 1,350,000 | 12% | Shlomo Rechnitz; NA | n/a | 1/1/2019 | $ 13,500.00 | Oswego County, IL | 106 | Current | $ 10,800,000 | 1/1/2019 | | 11/30/2017 |
| Bethany | MinnWest | $ 302,500 | 12% | Shlomo Rechnitz; NA | n/a | 3/2/2018 | $ 3,025.00 | Minneapolis, MN | 66 | Current | $ 2,420,000 | 3/2/2020 | Recourse | 11/30/2017 |
| WestGate Tier 1 | S&T | $ 693,750 | 12% | Shlomo Rechnitz; NA | n/a | 5/21/2017 | $ 6,937.50 | Rochester, NY | 124 | Past Maturity | $ 4,125,000 | 5/21/2020 | Recourse | 11/30/2017 |
| WestGate Tier 2 | S&T | $ 462,500 | 21% | Shlomo Rechnitz; NA | n/a | 5/22/2017 | $ 8,093.75 | Rochester, NY | 124 | Past Maturity | See Above | See Above | Recourse | See Above |
| CareRite - Courtyard Gardens | 5th Third | $ 1,200,000 | 12% | Shlomo Rechnitz; NA | n/a | 9/1/2020 | $ 13,000.00 | Jupiter, FL | 104 | Current | See Below | 5/1/2020 | Recourse | 11/30/2017 |
| CareRight Accentia | 5th Third | $ 2,659,000 | 13% | Shlomo Rechnitz; David Blonder | 7.50% | 9/1/2020 | $ 29,913.75 | Tampa, FL | 266 | Current | $ 39,900,000 | 5/1/2020 | Recourse | 11/30/2017 |
| Legends SNF Port | S&T | $ 2,300,000 | 13% | Shlomo Rechnitz; HT Equity (MM) | 7.00% | 4/1/2019 | $ 23,000.00 | Ohio | 252 | Current | $ 18,400,000 | 5/1/2020 | Recourse | 12/31/2017 |
| | | $ 8,967,750 | | | | | | | | | | | | |

| Project Name | Senior Lender | Loan Amount | T12 Revenue | T12 Expense | T12 EBIDAR | Latest T12 Occ. | Financials Notes | Guarantors |
|---|---|---|---|---|---|---|---|---|
| Symphony of Oswego | the PrivateBank | $ 1,350,000 | $ 12,556,149 | $10,315,258 | $ 2,240,891 | 58.4% | All Payments Current; Ann. T11; Awaiting Expand | David Hartman, Michael Munter, Robert Hartman, Symprop Oswego LLC, Symphony Oswego LLC |
| Bethany | MinnWest | $ 302,500 | $ 3,022,018 | $ 3,851,655 | $ (829,638) | 64.3% | All Payments Current; Owner putting in additiona | Philip Friedman, David Scharf, Jay Eisenstadt, Bethany MN Realty LLC, Bethany MN Management LLC |
| WestGate Tier 1 | S&T | $ 693,750 | 8,829,796 | $ 8,334,416 | $ 495,380 | 79.7% | All Payments Current; Under contract for sale at | Philip Friedman, Elie Deitsch, Paragon Healthcare LLC, QH Consultants LLC, Westgate Building LLC, Westgate NY Management LLC |
| WestGate Tier 2 | S&T | $ 462,500 | See Above | See Above | See Above | See Above | See Above | Philip Friedman, Elie Deitsch, Paragon Healthcare LLC, QH Consultants LLC, Westgate Building LLC, Westgate NY Management LLC |
| CareRite - Courtyard Gardens | 5th Third | $ 1,200,000 | 12,296,332 | $ 11,443,748 | $ 852,584 | 92.6% | All Payments Current; In first Year of Extension; 1 | Neil Einhorn, Mark Friedman, Jupiter Gardens Property LLC, The Rehabilitation Center at Jupiter Gardens LLC |
| CareRight Accentia | 5th Third | $ 2,659,000 | 22,658,615 | $ 18,206,489 | $ 4,452,126 | 84.5% | All Payments Current; In first Year. 6 Month Ann | Neil Einhorn, Mark Friedman, Yossie Zucker, Steven Sax, Akiva Rudner, Eliezer Schwartz, 1818 Ventures LLC, Bristol Tampa FL Ventures LLC |
| Legends SNF Port | S&T | $ 2,300,000 | 16,199,121 | $ 15,000,117 | $ 1,199,004 | 80.4% | All Payments Current; In first Year; Diligence is du | Samuel Sherman, Jeffrey Goldstein, Alexander Sherman, Israel Sherman, Opcos and Procos |
| | | $ 8,967,750 | | | | | | |

## Forensic Accounting Goals and Objectives

1. Quantification of dollars funded by "Rechnitz" less any monies returned. This includes
   a. Monies to Kutner personally
   b. Monies to Kutner to fund business
   c. Monies to Harborview Funding (Mezz company)
   d. Monies to fund lawsuit
2. Calculation of Profits and Losses and Pro rata allocations
3. Quantification of delta on HUD financing proceeds
4. Detailed quantification of Salaries, Commissions and loans to E. Kutner
5. Detailed quantification of Salaries, Commissions and loans to j. Kutner
6. Detailed quantification of Salaries, Commissions and loans to all other Kutner family members
7. Details on charitable contributions issued by the business
8. Establish business value

Case 1:20-cv-01607-KAM-VMS   Document 42-1   Filed 05/29/20   Page 11 of 11 PageID #: 632

**Din Torah – Asks**

1. Direct payment of mezzanine loans to Shlomo – granted
2. Production of financial statements – granted

Next items for determination/asks

1. Confidentiality
2. Pro-rata share of mezzanine losses if any
3. Pro-rata share of Glenner losses, if any
4. Beneficial ownership of CLAT (charitable fund – funded from business proceeds)
5. Quantification of pro-rata share of income – and payment thereof, if any
6. Quantification of value of business and establish buy-out value
7. Ensure that they can not just close down this business and reopen in another name
8. Control of lawsuit – based upon 4 million funded
9. DESTRUCTION OF ILLEGAL RECORDINGS (AFTER RABBI COHEN HAS HEARD THEM IF HE IS SO INCLINED)

UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
SHLOMO YEHUDA RECHNITZ,

                         Petitioner/Plaintiff,

      v.

EPHRAIM KUTNER, JONATHAN KUTNER and
GREYSTONE FUNDING CORP.,

                      Respondents/Defendants.
----------------------------------------------------------------X

Case No. 20-cv-1607 (KAM)(VMS)

**DECLARATION OF DAVID WELDER IN SUPPORT OF ATTACHMENT, PETITION TO CONFIRM, AND IN OPPOSITION TO CROSS-MOTION TO VACATE ARBITRATION AWARD**

        I, DAVID WELDLER, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

        1.      I am the Chief Operating Officer of Boardwalk West Financial, LLC, a financial services company owned by Shlomo Yehuda Rechnitz ("Petitioner").  I also hold several other positions with companies associated with Petitioner's various investments. I submit this Declaration in support of the Petition to confirm the arbitration award issued by Rabbi Cohen on March 11, 2020 (the "Award"), the motion for an attachment in aid of arbitration, and in opposition to the cross-motion filed by the Kutners to vacate the Award directing the proceeds of the settlement of a lawsuit between the Kutners and Greystone Funding Corp. (the "Greystone Lawsuit") to be paid to Petitioner.  I have personal knowledge of all the facts set forth herein and if called to testify could and would truthfully testify to the following.

        2.      On Petitioner's behalf, I participated in the arbitration proceeding between Petitioner, on the one hand, and Ephraim Kutner and Jonathan Kutner, on the other hand (collectively, the "Kutners") before Rabbi Dovid Cohen, commencing on August 14, 2018 (the "Arbitration").  As part of my involvement in the arbitration, and pursuant to Rabbi Cohen's

1

directives, I provided information to Victor Lipnitsky CPA.  Both prior to and subsequent to the

Arbitration's commencement, I was involved in a number of settlement negotiations between the

parties.  In this regard, I am intimately familiar with: (a) the parties' dispute, including the

matters subsumed and their scope; (b) the parties' negotiations; and (c) the scope of dispute

submitted to Rabbi Cohen and Mr. Lipnitsky CPA, the forensic accountant appointed by Rabbi

Cohen to investigate the various financial claims and issues raised during the Arbitration.

      3.      The Kutners essentially make two arguments in opposition to the Petition, and

in support of their cross-motion to vacate the Award.  The first is the false assertion that the only

dispute submitted by the parties to Rabbi Cohen related solely to the mezzanine loans.[1]  In fact,

the dispute submitted to Rabbi Cohen unquestionably included: the mezzanine loans, the funding

of the Greystone Lawsuit and attendant issues, as well as other moneys provided by Petitioner to

the Kutners.  The second argument they raise in support of their position is they were not

afforded an opportunity to present evidence in defense of the claims raised against them.  This

assertion is also false.  In fact, as detailed below, they disregarded all of Rabbi Cohen's orders,

which among other things, frustrated the forensic review process that Rabbi Cohen had ordered,

and then refused to appear for any hearing relating to the resolution of the parties' rights to the

proceeds of the settlement of the Greystone Litigation.  The Kutners did argue to Rabbi Cohen

that the parties had settled all of the issues that Rechnitz was now seeking to arbitrate, but Rabbi

Cohen rejected that argument based on the documents submitted by the Kutners, as stated in the

Award.  The Kutners never argued to Rabbi Cohen that the dispute concerning the Greystone

---

[1] The declaration of Ephraim Kutner is filled with false and intentionally scandalous statements and mischaracterizations.  However, we address herein only the false statements that are pertinent to the motions before the Court.  It should not be construed as an admission that anything in his declaration is true, including his slanderous accusation of a kickback demand.

Lawsuit was beyond the scope of the arbitration.  Nor could they because that argument was invented by them in connection with this action and is false.

4.       As detailed below, each of the Kutners' arguments is conclusively disproven based on contemporaneous documents, witness testimony and statements made by the Kutners and their agents.

## I.       The Greystone Lawsuit Dispute Was Unquestionably Submitted to Arbitration

5.       The Kutners' claim that the parties' dispute with respect to the Greystone Lawsuit was not submitted as part of the Arbitration is unquestionably false.  As set forth below, the evidence demonstrating the fallacy of this assertion includes: the parties' historical communications giving rise to the dispute, the broad arbitration agreement signed by the parties, the documents presented at the August 14, 2018 hearing, the discussions at the August 14, 2018 hearing, communications with and documents submitted to Victor Lipnitsky CPA, the forensic accountant appointed by Rabbi Cohen to investigate the Petitioner's claim immediately after the August 2018 hearing, and communications by the Kutners and their agents in connection with the Arbitration.

### A.       Events Leading Up to the Arbitration

6.       The history of the Greystone Lawsuit dispute between the parties provides important context leading up to the August 2018 hearing.  I learned about Rechnitz's funding of the Greystone Lawsuit when I started working for Rechnitz in 2015.  Prior to that time, Rechnitz agreed to loan funds to the Kutners to finance a lawsuit against Greystone on the condition that: (a) any recovery first go to pay the funds provided by Petitioner; and (b) after Petitioner recovered all funds advanced, without interest, the remainder would be divided 30 percent to

Petitioner and 70 percent to the Kutners.  The Kutners were in charge of managing the day to day aspects of the Greystone Lawsuit, but they agreed to apprise Petitioner of the case's progress.

7.       For several years before the commencement of the Greystone Lawsuit, based on my review of his general ledgers, Rechnitz loaned the Kutners millions of dollars.  Based on my review of his general ledgers, by mid-2017, Rechnitz had total outstanding loans to the Kutners in the amount of $15,613,960.  This included more than $3.7 million towards the Greystone Lawsuit, even though no depositions had yet commenced.  Subsequently, the Kutners had significantly diminished the flow of financial information they were providing to us with regard to all of our dealings.  We had also come to learn about business expenses purportedly incurred by the Kutners, which we believed to be exorbitant and highly inappropriate.

8.       Sometime in 2017, without more information about the use of all of the funds that we had provided to the Kutners and the direction of the lawsuit, among other things, we did not believe further funding of the lawsuit was proper.  We received e-mails from the Kutners and a Harborview Capital employee requesting additional funds for the lawsuit, but refused to do so without coming to a resolution regarding how all of the money provided to the Kutners was used, how we were going to be repaid, information about profits and loss and how they were going to be divided for the: mezzanine loans, Greystone lawsuit and other moneys provided to the Kutners.  (*See* Exhibit A).

9.       As a result of their continued substantial expenditures and decreasing transparency, by late 2017 and early 2018, Rechnitz and I became concerned that the Kutners had misappropriated and/or failed to properly account for certain monies.  Accordingly, we became concerned, among other matters, that the Kutners would not repay the money that we provided to fund the mezzanine loans and/or the Greystone lawsuit, as well as other monies.

4

These concerns have proven well founded, because, since the settlement of the Greystone lawsuit, the Kutners recovered approximately $1.4 million, while Rechnitz has not received any of the amounts he provided to them to fund the Greystone Lawsuit.

10.     The rising tensions are reflected in email correspondence dated February 25, 2018, a true and correct copy of which is attached as <u>Exhibit B</u> hereto.  Specifically, on February 25, 2018, I received a copy of an email directed by Rechnitz to Ephraim Kutner, voicing frustrations at Kutner's failure "to repay every penny that you [Kutner] owe" Rechnitz.  Rechnitz demanded that the Kutners come to a deal with him "to give me what's legally mine, every penny you stole from me, by 10:00 PM TONIGHT (EST) . . .pay every dollar you owe!! plus all my attorneys fees, plus everything you slipped into different categories to fool me plus late pay interest charges…."

11.     That the Kutners fully understood that Rechnitz was asserting claims relating to the funding of the Greystone Lawsuit is confirmed by Ephraim Kutner's response, which was received less than 15 minutes after Rechnitz sent his email:

> I tried calling you upon receipt of your email below. It is unfortunate that you have resorted to such words and feelings. . . . You were the one that pushed me to leave Steve and fight for what you felt was right. For you to say the shocking words below is extremely hurtful. **You insisted upon investing in my case and lawsuit and you were the one who came up with attorneys we should use and the strategies we were going to implement. You decided to invest in my case on your own volition. You created the structure and the percentages we both agreed to and were to split upon the closing of the case. The terms that you suggested and agreed to were for you to receive the amount of monies spent first on legal fees then to split the difference with you receiving 35% and me receiving 65%. We just discussed this again less than a week ago when I was in your house at your request.**

(*Id.*)

12.      On June 7, 2018, Ephraim Kutner forwarded me the February 25, 2018 from

Rechnitz demanding the payment of every single cent Rechnitz was claiming which included

claims relating to the funding of the Greystone Lawsuit, and wrote:

> Please read this again and tell me what you would do if you were me. You have to
> agree that it is not unreasonable of me to ask for finality under these
> circumstances. I've done everything asked of me including repayment and more
> of Shlomo's loans. **All I am asking for is for us to document finality**. I look
> forward to hearing your thoughts.

(*See* <u>Exhibit C</u>).

13.      The tension between the parties proved to be vexing.  Eventually, it became clear

that the dispute could not be resolved by the parties, without a form of third-party adjudication.

The Kutners and Petitioner self-identify as Orthodox Jews who are obligated as a matter of

religious law (*i.e. halachah*) to submit their financial disputes to a Rabbinical Court (otherwise

known as a "*beis din*") or a single Rabbinic arbitrator for resolution, rather than proceeding in a

secular court without advance permission from a beis din or Rabbinic authority.

14.      We advised the Kutners to select any rabbinic authority of their choice and that

we would agree to submit the parties' dispute, which included among other issues, issues of

accounting of funds related to the Greystone Lawsuit.  They selected Rabbi Dovid Cohen who is

a well-known and respected Rabbinic judge who lives in Brooklyn.  We agreed to that choice.

**B.      The Arbitration and the Arbitration Agreement**

15.      On August 14, 2018, Rechnitz, the Kutners and I appeared before Rabbi Cohen.

We had a discussion explaining that we were coming to him to resolve claims relating to *all* of

the moneys that we had provided to the Kutners; these moneys included funds which they used

to lend to others, to fund a lawsuit, and for other purposes.  Rabbi Cohen asked whether the

parties were seeking for him to mediate or arbitrate the dispute between them, after explaining

the difference between non-binding mediation and binding arbitration.  Each of the parties orally

agreed that we would arbitrate the dispute by binding arbitration.

16.     The oral agreement was reduced to writing as reflected in the arbitration

agreement which was drafted by Rabbi Cohen.  The agreement to arbitrate provides in full:

> Shlomo Yehuda Rechnitz (SYR) on his own, and as a partner in Harborview
> Capital LLC and Jonathan and Ephraim Kutner (JEK) on their own, and as
> partners in the above company, have come to me to adjudicate a dispute.

(Exhibit 2 to Petition).

17.     The Kutners contend that the arbitration agreement was intended to cover only

the money that Rechnitz provided for the mezzanine loans.  The Kutners are well aware that this

assertion is false.  First, as demonstrated by Exhibits A, B and C, the Greystone Lawsuit dispute

was one of the central issues that the parties were fighting about when we appeared before Rabbi

Cohen.  Harborview was sending us emails seeking additional funds for the litigation and we

were demanding an accounting, information, transparency and a determination of the pro-rata

split of any recovery on all matters before agreeing to the Kutners' requests.  Ephraim Kutner

had just a few weeks before written to me "for us to document finality" and resolve all of the

parties' disputes in an agreement.  The Greystone Lawsuit was a matter that was at the center of

the tension between the parties.  There obviously was not going to be finality if the issues

concerning the Greystone Lawsuit were not resolved.

18.     Moreover, in connection with the agreement to arbitrate we had discussed with

Rabbi Cohen that there was in excess of $10.5 million of funding from Rechnitz to the Kutners,

which included the money used to fund the Greystone Lawsuit.

19.     The use by Rabbi Cohen of the word "dispute" had nothing to do with limiting

the issue to be resolved in the arbitration to mezzanine loan issues.  The dispute between the

parties related to several different issues, no different than a court action can encompass and frequently encompasses several claims between parties.

20.     The use of the word "dispute" by its terms broadens, not limits, the agreement between the parties to not exclude any matters of dispute between the parties, and that was what was intended.

21.     The Kutners also argue that the arbitration agreement did not relate to Rechnitz's funding of the Greystone Lawsuit because Grove Let LLC and Strategic Legal Partners LLC were not parties to the arbitration agreement.  However, the Kutners and Rechnitz signed the arbitration agreement and they are parties to the arbitration agreement, and were authorized as the owners and agents of the relevant companies, and represented the interest of any companies that are relevant to the issues that were in dispute between the parties.

22.     Moreover, much of the money to fund the Greystone Lawsuit was provided directly to Ephraim Kutner, not Strategic Legal Partners LLC, and Kutner was a party to the joint venture relating to the Greystone Lawsuit, who is a signatory to the arbitration agreement. Furthermore, Harborview Capital employees also acted in connection with the funding of the Greystone Lawsuit.

**C.     Documentary Evidence From the Arbitration**

23.      Aside from evidence of the parties' dispute leading up to the arbitration and prior to the signing of the arbitration agreement, immediately after we signed the arbitration agreement, issues relating to the Greystone Litigation dispute were discussed at the arbitration. Rechnitz first gave an overview the history of the parties' financial relationships and raised concerns about financial improprieties he believed the Kutners had committed.  I then presented financial details regarding Petitioner's dispute and claims against the Kutners, including

8

associated dollar figures with the parties' various relationships.  These figures, which were reflected on a financial schedule that I presented at that time to Rabbi Cohen and the Kutners included our understanding of the sums that Rechnitz had funded for the Greystone Lawsuit. (*See* Exhibit D hereto).  The yellow highlighted portion of the schedule reflects the moneys that were provided by Petitioner through his wholly owned companies, SR Capital and YTR Capital, to the Kutners (either to Ephraim Kutner directly, to his attorneys at Abrams, Fensterman, and/or to entities under his control) to fund the Greystone Lawsuit.  The other sections of the schedule represent the loans to the Kutners (either to Ephraim Kutner personally or to Harborview Capital Funding, LLC) that were used to fund the mezzanine loans, or moneys that were provided to the Kutners purportedly relating to other businesses.  The schedule had gone through various iterations based on communications from the Kutners and their Chief Financial Officer.  (*See, e.g.,* Exhibit E (which is an e-mail exchange in September 2017 between the Kutners' CFO and me attaching an earlier version of the schedule).

24.     Rabbi Cohen then asked the Kutners about the alleged financial improprieties. They acknowledged the charged conduct.

25.     At the arbitration hearing, Rabbi Cohen ruled that the parties should submit detailed financial information regarding all of the funds that were at issue, including relating to the Greystone Lawsuit, for a forensic accounting before Victor Lipnitsky, CPA.

26.     Following further discussions at the hearing, we asked Rabbi Cohen for a ruling that we should be able to control the mezzanine loans because Rechnitz had funded those loans completely.  Rabbi Cohen ruled that since there was no dispute that all of the money advanced on account of the mezzanine loans had been funded by Rechnitz, and that he expressed justified trust issues with the Kutners, that Rechnitz should be entitled to control the mezzanine loans, and

that the Kutners were required to notify the borrowers that Rechnitz controlled the loans and that all payments of principal were to go to Rechnitz or his designee and interest should be placed in escrow.

27.     At the hearing, Rabbi Cohen also instructed the Kutners to provide Rechnitz directly with financial information about the status of all of the parties' financial dealings.

28.     The Kutners did not object that Petitioner's presentation of its claims, which included issues relating to the Greystone Lawsuit, exceeded the scope of what the parties had agreed to arbitrate. Nor did they contend that the sole subject in dispute was the mezzanine loans.

**D.     Evidence From Immediately After the Arbitration Hearing**

29.     Further proof that issues regarding the Greystone Lawsuit were submitted for arbitration is demonstrated by the correspondence that immediately followed the hearing on August 14, 2018.

30.     On August 16, 2018, two days after the arbitration hearing, I sent an email to Ephraim Kutner requesting financial information regarding "**all** of the companies." A true and correct copy of this email is attached as Exhibit F hereto.

31.     On August 21, 2018, pursuant to the order of Rabbi Cohen, I sent a proposed direction letter to the Kutners, which I requested that he furnish to the mezzanine borrowers. A true and correct copy of this email is attached as Exhibit G hereto.

32.     On or about August 16, 2018, I was contacted by the forensic accountant appointed by Rabbi Cohen, Victor Lipnitsky, CPA. He asked for information regarding the issues that were in dispute.

33.     On August 22, I responded for Petitioner with a handwritten letter and exhibits summarizing the claims Petitioner had made at the arbitration. A true and correct copy of the letter and exhibits is attached as <u>Exhibit H</u> hereto. The letter details Petitioner's objectives by the forensic accounting. Included within such objectives were quantification of dollars funded by Rechnitz, less monies returned. As I noted, "this includes, (a) monies to Kutner personally, (b) monies to Kutner to fund business, (c) monies to Harborview Funding (mezz company, and **(d) monies to fund lawsuit**." (Emphasis added). The "monies to fund lawsuit" is a reference to the Greystone Lawsuit. The next objective for the forensic accountant was "Calculation of Profits and Losses and Pro rata allocations," which referred to all of the businesses we had funded for the Kutners.

34.     As demonstrated above, resolution of the parties' relationship with respect to the Greystone Lawsuit was submitted to Rabbi Cohen for resolution. The Kutners required a final resolution of "all" issues between the parties, including the parties' respective entitlements. Rechnitz was seeking an accounting of the moneys that had been funded and how they were used, a ruling as to the amounts that were owed by the Kutners and whether funding was required and more control over the lawsuit and/or settlement.

**II.     The Kutners Were Afforded An Opportunity to Present Evidence to Rabbi Cohen, But Declined to Participate**

35.     As discussed above, at the August 14, 2018 arbitration hearing, Rabbi Cohen made several oral rulings including requiring the Kutners to turn over control of the mezzanine loans and provide financial information to Rechnitz, the appointment of Victor Lipnitsky CPA as a forensic accountant, and requiring the parties to cooperate with Mr. Lipnitsky. A written order

appointing Lipnitsky and requiring cooperation with him was issued by Rabbi Cohen on August 22, 2018.  (*See* Exhibit I).

36.     On August 30, 2018, Rabbi Cohen advised the parties again that he expected them to fully cooperate with Mr. Lipnitsky or it would adversely impact further decisions in the arbitration.  Rabbi Cohen wrote "any 'coverup' or claim of loss or displacement of the material he wants shall be a detriment in my final conclusion."  (*See* Exhibit J)

37.     Despite these rulings, the Kutners did not comply with Rabbi Cohen's directives in any respect.  They refused to cooperate with Mr. Lipnitsky. (*See* Lipnitsky Decl. filed herewith). They refused to sign a direction letter regarding the mezzanine loans which I had provided to them.  They did not place interest payments received in connection with the mezzanine loans in escrow.  They did not provide us with the requisite financial information for any of the parties' financial relationships.

38.     Because the Kutners refused to cooperate regarding turning over documents and information to the forensic accountant or to us, on October 26, 2018, on notice to the Kutners, we asked Rabbi Cohen to issue a written award formalizing the rulings that he made concerning the mezzanine loans that he issued orally at the August 14, 2018 hearing, and I provided a proposed order.  (*See* Exhibit K).

39.     On October 30, 2018, through their rabbinic lawyer, the Kutners asked Rabbi Cohen for another hearing at which time they would bring evidence refuting "all of Mr. Rechnitz's claims." Notably, the letter did not limit the parties' dispute to a single claim regarding the mezzanine loans, but references Mr. Rechnitz's "claims" in the plural. (*See* Exhibit L).

40.     On November 5, 2018, Rabbi Cohen issued an award memorializing the rulings he had previously made concerning the mezzanine loan dispute at the August 14, 2018 hearing. The Kutners were to send out a direction letter to the mezzanine loan borrowers advising them that the loans were being transferred to Rechnitz.  All payments on the loans would be made directly to Rechnitz, with interest payments to be held in a separate account by Rechnitz until the principal Rechnitz had provided was fully repaid.  That award expressly states that the mezzanine loan issue was "the first discrete issue that the parties presented to me for a ruling" and that Rabbi Cohen "retain[ed] jurisdiction concerning the other business disputes between the parties."  (*See* Exhibit M pp. 1, 3).

41.     Thereafter, we engaged in more than a year of settlement negotiations with the Kutners concerning all of the issues in dispute between the parties, including issues relating to the Greystone Lawsuit, and attempted to obtain voluntary compliance by the Kutners with Rabbi Cohen's ruling concerning the mezzanine loans issue.

42.     In mid-2019, the Greystone Lawsuit was settled for $8 million.  Rechnitz was instrumental in negotiating and obtaining that settlement, which was considered a favorable settlement by the Kutners.  Contrary to the claim of the Kutners, there was never an agreement that if the Kutners allowed Rechnitz to participate in the settlement negotiations or if they agreed to settle for $8 million, Rechnitz would agree to forego his contractual right to receive the funds that he had provided to finance the lawsuit before any profits were split between the parties. There were ongoing discussions about different possible arrangements with respect to the settlement payments that were to be received by Greystone, but those were all part of negotiating and arriving at a comprehensive final agreement between the parties to resolve all of the issues that were in dispute which never occurred.

13

43.     In May 2019, the Kutners received an initial payment of $500,000 and then they began receiving monthly settlement payments of $150,000 from Greystone thereafter.  None of those payments were forwarded to Rechnitz.  Additionally, the Kutners did not comply with Rabbi Cohen's November 5, 2018 ruling.  They did not send out the direction letter to the mezzanine loans borrowers, and settlement negotiations between the parties broke down.  Although there were times when the parties were close to an agreement to resolve their dispute, no agreement was ever reached.

44.     As a result, on February 17, 2020, I emailed Rabbi Cohen on notice to Ephraim Kutner and asked Rabbi Cohen to reconvene the arbitration so that he could issue a new award on the mezzanine loan issue to, among other things, allow Rechnitz to send the direction letter to the mezzanine loan borrowers on behalf of the Kutners, and to issue rulings on the other business issues between the parties including the Greystone Lawsuit.  (*See* Exhibit N).

45.      On February 20, 2020, Rabbi Cohen sent an email to the Kutners and me advising the parties that we were being summoned to complete the arbitration and setting a date to appear for March 1, 2020 at 4:00pm.  (*See* Exhibit O).

46.     On February 29, 2020, the Kutner's rabbinic advocate Mr. Yochanan Bechhoffer, responded to Rabbi Cohen's summons on behalf of the Kutners and indicated that they did not intend to participate in any further arbitration.  Significantly, Bechhoffer did not claim (as the Kutners now argue in their papers to this Court) that Rabbi Cohen did not have authority to continue the arbitration because the only issue that was subject to arbitration was the dispute about the mezzanine loans which had been already decided.  Instead, he argued that the arbitration was unnecessary because the parties had long ago come to a binding and already

partially implemented agreement on all of the issues that Bechhoffer admitted were previously submitted to arbitration in August 2018.  (*See* Exhibit P).

47.     The purported agreement attached to the Bechhoffer letter on its face was not a binding agreement between the parties as reflected in some of the back and forth comments which reveal disagreements on several material points, and settlement negotiations continued for more than a year following the purported email agreement.  However, the Bechhoffer letter is important because the first issue referenced in the email attachment is a discussion about the Greystone Lawsuit.  In other words, contrary to their position before this Court, the Kutners conceded that the dispute regarding the Greystone Lawsuit was before Rabbi Cohen, but they argued it had been already settled.  Because the parties had allegedly settled their original dispute, Bechhoffer argued that a new arbitration agreement was needed, and the Kutners were unwilling to participate in such an arbitration before Rabbi Cohen.  (*Id.*)

48.     On March 1, 2020, Mr. Bechhoffer reiterated the Kutner's position that the parties had settled their dispute, and that therefore they believed any continuation of the arbitration was improper.  Once again, Mr. Bechhoffer never advised Rabbi Cohen that the issues that Rechnitz sought to arbitrate were beyond the scope of the arbitration.  (*See* Exhibit Q).

49.     On March 1, 2020, I appeared before Rabbi Cohen, but the Kutners did not appear, consistent with what had been stated in their letter.  Because the Kutners did not appear before Rabbi Cohen on March 1, 2020, no substantive proceedings occurred.

50.     Instead, I advised Rabbi Cohen that I would make a submission to Rabbi Cohen by email on notice to the Kutners so they would be given an opportunity to respond.

51.     On March 9, 2020, by email to Rabbi Cohen on notice to the Kutners, I asked Rabbi Cohen to issue an award with respect to the Greystone Lawsuit settlement.  Although Rechnitz's records showed that he had contributed more than $3.7 million to fund the Greystone Lawsuit, the Kutners claimed that $650,000 of that amount was a personal loan to Ephraim Kutner not used for the lawsuit.  We asked that Rabbi Cohen issue an award providing that Rechnitz is entitled to $3,071,009 representing the funds that were provided to the Kutners to finance the lawsuit, plus $1,328,697 representing Rechnitz's 30 percent share of the recovery after taking into account the $3 million that Rechnitz had provided and $500,000 that the Kutners claimed they had spent to pay for the lawsuit.  Additionally, we asked that the remainder of any Greystone Settlement payment be paid to Rechnitz to cover millions that he is owed by the Kutners with respect to the other loans that were made to the Kutners and amounts that are owing from the Kutners that remain unpaid.  A proposed order was also submitted to Rabbi Cohen.  A true and correct copy of the proposed order submitted is attached hereto.  (*See* Exhibit R).

52.     The Kutners did not respond to my submission.  They did not file an objection to Rabbi Cohen arguing that the only dispute before Rabbi Cohen was the mezzanine loans issue.  They did not disagree with the amount that Rechnitz claimed he had provided to fund the Greystone Lawsuit, or the calculation of the amounts owed in connection with the Greystone lawsuit.

53.     On March 11, 2020, Rabbi Cohen rejected the arguments made by Bechhoffer and issued the Award that is the subject of this Petition.

54.     In March 2020, more than none months after Rechnitz was supposed to be receiving all of the settlement payment made by Greystone, in an attempt to coverup their

16

misappropriation of Rechnitz's money, I was advised that the Kutners had contacted Greystone to advise that it should start sending 50 percent of the monthly settlement payments to Rechnitz. This instruction from the Kutners only came after the Kutners learned that they were being summoned to appear before Rabbi Cohen. To date, they have received approximately $1.4 million, and Rechnitz has received nothing.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:     May 28, 2020
              Lakewood, New Jersey

                                                    DAVID WELDLER

17

| From: | davidzweldler@gmail.com |
|---|---|
| To: | Efrem Schwalb |
| Subject: | Fwd: Dechert Settlement Payment for August through November |
| Date: | Friday, April 3, 2020 10:23:12 AM |
| Attachments: | Strategic Legal Partners Wiring Instructions.pdf |

Sent from my iPhone

Begin forwarded message:

**From:** Devora Pinson <devorarpinson@gmail.com>
**Date:** April 2, 2020 at 11:37:26 PM EDT
**To:** David Weldler <davidzweldler@gmail.com>
**Subject: Fwd:  Dechert Settlement Payment for August through November**

---------- Forwarded message ---------
From: **Bracha Gorbacz** <bgorbacz@harborviewcp.com>
Date: Wed, Jul 19, 2017 at 10:45 AM
Subject: Dechert Settlement Payment for August through November
To: Devorah Raichik (DevoraRpinson@gmail.com)
<DevoraRpinson@gmail.com>, kuppermann@gmail.com
<kuppermann@gmail.com>
Cc: Ephraim Kutner <ekutner@harborviewcp.com>, Bracha Gorbacz
<bgorbacz@harborviewcp.com>

Hello Devora and Alain,

As I am expecting b'ezras H-shem right after Labor Day, I wanted to ask if you could advance the
$10,000 settlement payments for August, September, October and November now (total of $40K)
so I can send on to Dechert?

Ephraim and I would like to ensure that there are no issues/delays in submitting these payments
while I am out and feel it makes more sense to advance the payments for the next few months'
worth until I return from maternity leave.

I've attached the Strategic wiring Instructions.

Looking forward to hearing back from you.


Thanks!


**Bracha Gorbacz | Harborview Capital Partners**
335 Central Avenue
Lawrence | NY | 11559
516.453.9409 | direct

516.453.9400 | main
516.453.9401 | fax
bgorbacz@harborviewcp.com

www.harborviewcp.com



| From: | davidzweidler@gmail.com |
|---|---|
| To: | Efrem Schwalb |
| Subject: | Fwd: Dechert Settlement Payment + O/S Legal Fees |
| Date: | Friday, April 3, 2020 10:21:54 AM |
| Attachments: | Strategic Legal Partners Wiring Instructions.pdf |

Sent from my iPhone

Begin forwarded message:

> **From:** Devora Pinson <devorarpinson@gmail.com>
> **Date:** April 2, 2020 at 11:35:30 PM EDT
> **To:** David Weldler <davidzweldler@gmail.com>
> **Subject: Fwd:  Dechert Settlement Payment + O/S Legal Fees**

---------- Forwarded message ---------
From: **Bracha Gorbacz** <bgorbacz@harborviewcp.com>
Date: Tue, Sep 4, 2018 at 8:41 AM
Subject: Dechert Settlement Payment + O/S Legal Fees
To: Devorah Raichik (DevoraRpinson@gmail.com) <DevoraRpinson@gmail.com>
Cc: Ephraim Kutner <ekutner@harborviewcp.com>, Marilyn Tirado <mtirado@harborviewcp.com>

Hello Devora,

We need to submit $10,000 for the September Dechert settlement payment  by the 10th of the month. *Can you please let me know if you will be able to send us the funds before the end of the week?*

Additionally, as I mentioned in my email last month, the to-date amount Ephraim has paid Abrams Fensterman in litigation fees stands at $123,744.35 (see below for a full accounting of funds).

As per Shlomo and Ephraim's conversation back in June, Shlomo was going to pay these legal fees incurred to-date in addition to the Dechert settlement payment fees.

Therefore, if you could please send a wire for $153,744.35 (Fensterman fees plus $30K for July, August & September Dechert settlement payments).

Wiring instructions are attached.

Please let us know once the wire has been sent out.

Thank you!

Bracha

Abrams, Fensterman

| Invoice Date | Invoice # | Invoice Amount | Amount Paid | Discount | Balance Due | Payment Method |
|---|---|---|---|---|---|---|
| 5/31/2016 | 135999 | 4,500.00 | (4,500.00) | | - | Applied to $35k retainer |
| 6/30/2016 | 137388 | 5,606.64 | (5,606.64) | | | Applied to $35k retainer |
| 7/31/2016 | 139179 | 4,650.00 | (4,650.00) | | | Applied to $35k retainer |
| 8/31/2016 | 140258 | 6,419.50 | (6,419.50) | | | Applied to $35k retainer |
| 9/30/2016 | 141512 | 2,291.00 | (2,291.00) | | | Applied to $35k retainer |
| 10/31/2016 | 142205 | 4,980.00 | (4,980.00) | | - | Applied to $35k retainer |
| 11/30/2016 | 144556 | 100.00 | (100.00) | | | Applied to $35k retainer |
| 12/31/2016 | 146951 | 6,280.00 | (4,824.66) | - | 1,425.34 | Applied to $35k retainer |
| 1/31/2017 | 148500 | 472.50 | | - | 472.50 | |
| 2/28/2017 | 149233 | 1,302.50 | | | 1,302.58 | |
| 3/31/2017 | 150314 | 41,090.90 | | | 41,090.68 | |
| 4/30/2017 | N/A | | | | | |
| 5/31/2017 | 154398 | 29,639.10 | | | 29,639.10 | |
| 6/30/2017 | 155661 | 1,700.00 | | | 1,700.00 | |
| 7/31/2017 | 157666 | 10,730.00 | | | 10,730.00 | |
| 8/31/2017 | 159203 | 1,620.00 | | - | 1,620.00 | |
| 9/30/2017 | 159322 | 1,860.86 | | - | 1,860.86 | |
| 10/31/2017 | 162185 | 2,310.00 | | - | 2,310.00 | |
| 11/30/2017 | 163368 | 2,850.00 | | - | 2,850.00 | |
| 12/31/2017 | 165179 | 1,501.05 | | - | 1,501.05 | |
| 1/31/2018 | 166768 | 10,912.00 | (25,000.00) | | (14,088.00) | |
| 2/28/2018 | N/A | | | | | |
| 3/31/2018 | 169652 | 951.00 | | - | 951.00 | |
| 4/30/2018 | 173428 | 40,325.00 | | | 40,325.00 | |
| 5/31/2018 | | | | 25,000.00 | (25,000.00) | |
| 6/21/2018 | | | (98,374.35) | | 98,374.35 | |
| | Total | 183,774.15 | (123,774.15) | (25,000.00) | | |

The payments made from May through December 2016 were applied to a $35,000 retainer that Shlomo sent to Abrams Fensterman in May 2016. The total paid to-date from Ephram Kutner is $123,774.35.

**Bracha Gorbacz | Harborview Capital Partners**
335 Central Avenue
Lawrence | NY | 11559
516.453.9409 | direct

516.453.9400 | main
516.453.9401 | fax
bgorbacz@harborviewcp.com

www.harborviewcp.com



| From: | davidzweidler@gmail.com |
|---|---|
| To: | Efrem Schwalb |
| Subject: | Fwd: Dechert Settlement Payments |
| Date: | Friday, April 3, 2020 10:23:22 AM |
| Attachments: | Strategic Legal Partners Wiring Instructions.pdf |

Sent from my iPhone

Begin forwarded message:

> **From:** Devora Pinson <devorarpinson@gmail.com>
> **Date:** April 2, 2020 at 11:36:37 PM EDT
> **To:** David Weldler <davidzweidler@gmail.com>
> **Subject: Fwd:  Dechert Settlement Payments**
>
>
>
> ---------- Forwarded message ---------
> From: **Bracha Gorbacz** <bgorbacz@harborviewcp.com>
> Date: Tue, Mar 6, 2018 at 9:13 AM
> Subject: Dechert Settlement Payments
> To: Devorah Raichik (DevoraRpinson@gmail.com)
> <DevoraRpinson@gmail.com>
> Cc: David Weldler (davidzweidler@gmail.com) <davidzweidler@gmail.com>,
> Ephraim Kutner <ekutner@harborviewcp.com>
>
>
> Hello Devora,
>
>
> Hope you had a nice Purim!
>
>
> As per Ephraim's conversation with David Weldler regarding the Dechert settlement payments,
> he was advised you were going to wire the $10K from last month as well as the $10K for this
> month's payment. Just as a reminder, this month's payment is due by Friday.
>
>
> I have attached the wiring instructions.
>
>
> Thank you so much!

Bracha Gorbacz | Harborview Capital Partners
335 Central Avenue
Lawrence | NY | 11559
516.453.9409 | direct

516.453.9400 | main
516.453.9401 | fax
bgorbacz@harborviewcp.com

www.harborviewcp.com



A-249

| | |
|---|---|
| **From:** | davidzweldler@gmail.com |
| **To:** | Efrem Schwalb |
| **Subject:** | FW: Loans |
| **Date:** | Wednesday, May 27, 2020 11:39:53 AM |

---

**From:** Ephraim Kutner <ekutner@harborviewcp.com>
**Date:** February 25, 2018 at 5:17:05 PM EST
**To:** Shlomo Rechnitz <shlomohealth@gmail.com>
**Cc:** "davidzweldler@gmail.com" <davidzweldler@gmail.com>, Jonathan Kutner
<jkutner@harborviewcp.com>
**Subject: Re:  Loans**


Shlomo,
I tried calling you upon receipt of your email below. It is unfortunate that you have
resorted to such words and feelings. I have considered us friends above everything else
for over ten years. I have always been on your side and in your corner. You were the
one that pushed me to leave Steve and fight for what you felt was right. For you to say
the shocking words below is extremely hurtful. You insisted upon investing in my case
and lawsuit and you were the one who came up with attorneys we should use and the
strategies we were going to implement. You decided to invest in my case on your own
volition. You created the structure and the percentages we both agreed to and were to
split upon the closing of the case. The terms that you suggested and agreed to were for
you to receive the amount of monies spent first on legal fees then to split the
difference with you receiving 35% and me receiving 65%. We just discussed this again
less than a week ago when I was in your house at your request. I dropped everything I
was doing at your request as I have always done since we first became friends. I have
done this every single time you have asked. When I texted you on Thursday that my
flight was delayed and my time on the ground before the red eye was less than I
originally thought, your text back to me was that I should just go back to NY and meet
with David Weldler. I responded by asking you what does David Weldler have to do
with what you wanted to discuss with me and this was your response, "Weldler just
needs to tell you the offer that I wanted to say. He has no authority to negotiate or
anything else." I was at a family Simcha all weekend and  was planning on calling David
tomorrow to set up a meeting to follow up as per your suggestion. I just tried calling
him a few minutes ago to set up a time to meet. David, please call me when you can.
Thanks



**Ephraim Kutner**

**Harborview Capital Partners**

335 Central Avenue

Lawrence | NY | 11559
516.453.9402 | direct
516.453.9400 | main
516.453.9414 | fax
ekutner@harborviewcp.com
www.harborviewcp.com

NOTICE: This e-mail and any attachments contain confidential
information that may be legally privileged. If you are not
the intended recipient, you must not review, retransmit,
print, copy, use or disseminate it. Please immediately notify
me by return e-mail and delete it. If this e-mail contains a
forwarded e-mail or is a reply to a prior email, the contents
may not have been produced by the sender and therefore I am
not responsible for its contents.

This notice is automatically appended to each e-mail. It is
the recipient's responsibility to take measures to ensure
that this e-mail is virus free, and I take no responsibility for
any loss or damage arising in any way from its use.
-------------------

On Feb 25, 2018, at 2:05 PM, Shlomo Rechnitz <shlomohealth@gmail.com> wrote:

> Efram,
> You are evading me over and over. When you were here last, you left one
> hour to spare for a discussion that would take a minimum of a few hours.
> When you left, you specifically assured me that you'd come back here on
> the way back from one of your tropical locations. I specifically asked you if
> there was ANY reason you wouldn't be able to meet. You assured me that
> you'd be here. Then I got some bullshit text about traffic.
> THE GAMES END NOW.
> You're a psychopath when it comes to spending money. You have
> absolutely no discipline and are clearly headed to financial ruin. You don't
> know how to keep your word. You lie, and then justify it in your head with
> skewed reasoning. More and more people are telling me that you
> renegotiated with them at the last minute. (I can relate to that). As a
> matter of fact, I can't recall one person mentioning to me that they
> enjoyed doing business with you. Everyone who deals with you has a
> complaint about you by the time the deal is over.

You keep insisting that you don't want to be a Kafui Tov. You are the epitome, exhibit A of a Kafui Tov. First, Steve Rosenberg took you out of the gutter, gave you a semblance of a life and you just end up suing him. Now that I know who you are, I don't believe for one second that your case has any merit. That's why it's 5 years and you got nowhere.

I don't doubt for a second that you believe he screwed you. You simply have a twisted, skewed, warped way if thinking when it comes to money that you transact. Then I come and take you out of the gutter, to the point that you needed money to eat. And now this. You should be ashamed of the negative light you put on your wife and kids. You want to screw up your own life, nobody can stop you, but who gives you the right to screw up theirs?o

As I might have told you, I started a new campaign called "no more fucking Shlomo".

I'm not Steve Rosenberg. I think I command a little more respect than Steve Rosenberg. Everybody knows I'm an easy going, flexible and generous person, so if I have a major problem with someone, everybody will know who fucked who without even having to look into the story. If you don't work out a deal with Weldler, to give me what's legally mine, every penny you stole from me, by 10:00 PM TONIGHT (EST), I will do EVERYTHING in my power, within my legal rights, to expose who you are to not only every person I know, but also to everybody who knows me. Whatever fall out will be (and it will be fast), will put you right back in the gutter with the shitty name and reputation you deserve. I will not let you out of my mind every morning till I feel that everyone knows who you are. And I doubt very strongly that you're going to find another Steve Rosenberg or Shlomo Rechnitz.

The deal that I offered you before is completely off the table. You'll pay every dollar you owe!! plus all my attorneys fees, plus everything you slipped into different categories to fool me plus late pay interest charges. Congratulations. You're the first person ever to take me over the barrel, and boy are you going to feel it.

Sent from my iPad

A-252

| | |
|---|---|
| **From:** | davidzweidler@gmail.com |
| **To:** | Efrem Schwalb |
| **Cc:** | Avi Wagner |
| **Subject:** | Fwd: Loans |
| **Date:** | Wednesday, May 27, 2020 2:05:51 PM |

**From:** Ephraim Kutner <ekutner@harborviewcp.com>
**Date:** June 7, 2018 at 3:36:04 PM EDT
**Cc:** "davidzweidler@gmail.com" <davidzweidler@gmail.com>, Jonathan
Kutner <jkutner@harborviewcp.com>
**Subject: Re:  Loans**

 Dovid,
Please read this again and tell me what you would do if you were me. You
have to agree that it is not unreasonable of me to ask for finality under
these circumstances. I've done everything asked of me including
repayment and more of Shlomo's loans. All I am asking for is for us to
document finality. I look forward to hearing your thoughts.

**Ephraim Kutner**

**Harborview Capital Partners**

335 Central Avenue

Lawrence | NY | 11559

516.453.9402 | direct

516.453.9400 | main

516.453.9414 | fax

ekutner@harborviewcp.com

www.harborviewcp.com

NOTICE: This e-mail and any attachments contain confidential
information that may be legally privileged. If you are not
the intended recipient, you must not review, retransmit,
print, copy, use or disseminate it. Please immediately notify
me by return e-mail and delete it. If this e-mail contains a
forwarded e-mail or is a reply to a prior email, the contents
may not have been produced by the sender and therefore I am
not responsible for its contents.

A-253

This notice is automatically appended to each e-mail. It is
the recipient's responsibility to take measures to ensure
that this e-mail is virus free, and I take no responsibility for
any loss or damage arising in any way from its use.
--------------------


On Feb 25, 2018, at 2:05 PM, Shlomo Rechnitz
<shlomohealth@gmail.com> wrote:

> Efram,
> You are evading me over and over. When you were here last,
> you left one hour to spare for a discussion that would take a
> minimum of a few hours. When you left, you specifically
> assured me that you'd come back here on the way back
> from one of your tropical locations. I specifically asked you if
> there was ANY reason you wouldn't be able to meet. You
> assured me that you'd be here. Then I got some bullshit text
> about traffic.
> THE GAMES END NOW.
> You're a psychopath when it comes to spending money. You
> have absolutely no discipline and are clearly headed to
> financial ruin. You don't know how to keep your word. You
> lie, and then justify it in your head with skewed reasoning.
> More and more people are telling me that you renegotiated
> with them at the last minute. (I can relate to that). As a
> matter of fact, I can't recall one person mentioning to me
> that they enjoyed doing business with you. Everyone who
> deals with you has a complaint about you by the time the
> deal is over.
> You keep insisting that you don't want to be a Kafui Tov. You
> are the epitome, exhibit A of a Kafui Tov. First, Steve
> Rosenberg took you out of the gutter, gave you a semblance
> of a life and you just end up suing him. Now that I know who
> you are, I don't believe for one second that your case has
> any merit. That's why it's 5 years and you got nowhere.
> I don't doubt for a second that you believe he screwed you.
> You simply have a twisted, skewed, warped way if thinking
> when it comes to money that you transact. Then I come and
> take you out of the gutter, to the point that you needed
> money to eat. And now this. You should be ashamed of the
> negative light you put on your wife and kids. You want to
> screw up your own life, nobody can stop you, but who gives
> you the right to screw up theirs?o
> As I might have told you, I started a new campaign called "no

more fucking Shlomo".

I'm not Steve Rosenberg. I think I command a little more respect than Steve Rosenberg. Everybody knows I'm an easy going, flexible and generous person, so if I have a major problem with someone, everybody will know who fucked who without even having to look into the story.

If you don't work out a deal with Weldler, to give me what's legally mine, every penny you stole from me, by 10:00 PM TONIGHT (EST), I will do EVERYTHING in my power, within my legal rights, to expose who you are to not only every person I know, but also to everybody who knows me. Whatever fall out will be (and it will be fast), will put you right back in the gutter with the shitty name and reputation you deserve. I will not let you out of my mind every morning till I feel that everyone knows who you are. And I doubt very strongly that you're going to find another Steve Rosenberg or Shlomo Rechnitz.

The deal that I offered you before is completely off the table. You'll pay every dollar you owe!! plus all my attorneys fees, plus everything you slipped into different categories to fool me plus late pay interest charges.

Congratulations. You're the first person ever to take me over the barrel, and boy are you going to feel it.

Sent from my iPad

A-255

SCHEDULE 

| Date | Name | Memo | Lender | Debit | | Total |
|------|------|------|--------|-------|---|-------|
| 09/09/2013 | | Funds Transfer | SR Capital | $ | 1,500,000 | |
| 10/29/2013 | | Funds Transfer | SR Capital | $ | 1,000,000 | |
| 01/16/2014 | Ephraim Kutner | | SR Capital | $ | 2,500,000 | |
| 06/03/2014 | Ephraim Kutner | | SR Capital | $ | 500,000 | |
| 12/30/2014 | Ephraim Kutner | Deposit | SR Capital | $ | (624,799) | |
| 09/18/2015 | Ephraim Kutner | Deposit | YTR Capital | $ | (2,000,000) | $ 2,875,201 |
| | | | | | | |
| 08/26/2014 | Ephraim Kutner | | YTR Capital | $ | 1,650,000 | |
| 07/31/2014 | Ephraim Kutner | | SR Capital | $ | 950,000 | |
| 03/02/2015 | Harborview Capital Funding | | YTR Capital | $ | 302,500 | |
| 05/19/2015 | Harborview Capital Funding | Westgate Nursing Home Mezzanine | YTR Capital | $ | 1,156,250 | |
| 11/27/2015 | Harborview Capital Funding | | YTR Capital | $ | 1,350,000 | |
| 02/11/2016 | Harborview Capital Funding | | YTR Capital | $ | 1,200,000 | |
| 09/09/2016 | Harborview Capital Funding | Deposit | SR Capital | $ | (1,600,000) | |
| 03/28/2017 | Harborview Capital Funding | | YTR Capital | $ | 2,300,000 | |
| 03/29/2017 | Harborview Capital Funding | Deposit- Mather Loan Repay | YTR Capital | $ | (950,000) | |
| 05/30/2017 | Harborview Capital Funding | | YTR Capital | $ | 2,659,000 | $ 9,017,750 |
| | | | | | | |
| 12/02/2014 | Ephraim Kutner | | YTR Capital | $ | 500,000 | |
| 07/31/2014 | Ephraim Kutner | | SR Capital | $ | 650,000 | |
| 12/29/2014 | Strategic Legal Partners | | YTR Capital | $ | 624,799 | |
| 04/16/2015 | Strategic Legal Partners | | SR Capital | $ | 200,215 | |
| 04/17/2015 | Strategic Legal Partners | | SR Capital | $ | 34,347 | |
| 05/27/2015 | Strategic Legal Partners | | SR Capital | $ | 5,338 | |
| 06/04/2015 | Strategic Legal Partners | | SR Capital | $ | 55,000 | |
| 07/01/2015 | Strategic Legal Partners | | SR Capital | $ | 55,000 | |
| 08/03/2015 | Strategic Legal Partners | | SR Capital | $ | 55,000 | |
| 09/03/2015 | Strategic Legal Partners | | SR Capital | $ | 55,000 | |
| 10/01/2015 | Strategic Legal Partners | | SR Capital | $ | 355,000 | |
| 10/30/2015 | Strategic Legal Partners | | SR Capital | $ | 55,000 | |
| 10/23/2015 | Ephraim Kutner | | YTR Capital | $ | 500,000 | |
| 01/13/2016 | Ephraim Kutner | | YTR Capital | $ | 400,000 | |
| 11/08/2016 | Strategic Legal Partners | | SR Capital | $ | 25,000 | |
| 12/01/2016 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 12/06/2016 | Strategic Legal Partners | | SR Capital | $ | 31,824 | |
| 01/06/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 02/01/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 03/13/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 04/03/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 05/02/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 06/06/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 07/03/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 05/20/2016 | Abrams, Fensterman | | YTR Capital | $ | 35,000 | |
| 07/30/2015 | Venable | Harborview | YTR Capital | $ | 4,487 | $ 3,721,009 |
| | | | | $ | 15,613,960 | $ 15,613,960 |
| | | UNALLOCATED | | | $ | 5,000,000 |
| | | | | | $ | 10,613,960 |

**Efrem Schwalb**

| | |
|---|---|
| **From:** | Efrem Schwalb |
| **Sent:** | Thursday, May 28, 2020 1:46 AM |
| **To:** | Efrem Schwalb |
| **Subject:** | FW: Kutner FUNDINGS.xlsx |
| **Attachments:** | Kutner FUNDINGS.xlsx |

---------- Forwarded message ---------
From: **David Weidler** <DWeidler@bwaymgmt.com>
Date: Tue, Sep 5, 2017 at 3:28 PM
Subject: Kutner FUNDINGS.xlsx
To: Morris Goldstein <morrisg@goldsteintax.com>
CC: Devora Pinson <devorarpinson@gmail.com>

1

**davidzweldler@gmail.com**

| | |
|---|---|
| **From:** | davidzweldler@gmail.com |
| **Sent:** | Thursday, August 16, 2018 3:15 PM |
| **To:** | Efraim Kutner |
| **Subject:** | Financial Statements |

Efraim

Please forward the financial statements for all the companies.
Please include all of 2017, Q1 2018, Q2 2018. We would also require the payroll and commission detail.

Thank you
David Weldler
Sent from my iPhone

1

## davidzweldler@gmail.com

| From: | davidzweldler@gmail.com |
| --- | --- |
| To: | Ephraim Kutner |
| Subject: | Harborview Direction Letter |
| Attachments: | Harborview Direction Letter.docx |

EFRAIM

PLEASE SEE ATTACHED DIRECTION LETTER. PLEASE LET ME KNOW IF YOU THINK IT NEEDS TO BE MODIFIED IN ANY WAY. WE WILL FURNISH THE SPECIFIC ACCOUNT INFORMATION ONCE WE AGREE ON THE EXACT LANGUAGE.

THANK YOU

HARBORVIEW LETTER HEAD

Via Email and Overnight Mail

August ___, 2018

BORROWER NAME

AND CONTACT INFORMATION

Dear Borrower,

By this letter we, Harborview Capital Partners, hereby authorize and direct you to make payment of all outstanding amounts on all loans from our fund by wire transfer to the following bank account:

_____ (the "Account").

This letter shall be your good and sufficient irrevocable authorization and direction for making such payments to the Account.  This authorization and direction may not be modified or revoked unless expressly authorized in writing by Mr. David Weldler.  Mr. Weldler's contact information is _____.

Please contact me should you have any questions.

Sincerely,

Ephraim Kutner for Harboview Capital Partners

A-260

Dear Victor

Included herein please find

① Forensic accounting -    Goals & Objectives

② Din Torah    "ASKS"

SCHEDULE ① ③ Schedule of every dollar funded to Kutner or
Kutner entities:

==Please note that Strategic Legal Partners==
==relates to funding of Kutner litigation==
==with Greystone.==

There were instances that we show
funding to Kutner and they designated
it to one of the entities. I don't
really care.

This schedule shows every penny funded
and everything given back to us, from
inception

SCHEDULE ② schedule of existing mezzanine loans (2 pages)
SCHEDULE 3 ③ schedule ~~xxxxx~~ done in 2017 showing they
had overdistributed app 1.7 - (probably not
relevant as you will build the full picture)

④ Rechnitz differential
⑤ Summary of amounts due

## Forensic Accounting Goals and Objectives

1. Quantification of dollars funded by "Rechnitz" less any monies returned. This includes
   a. Monies to Kutner personally
   b. Monies to Kutner to fund business
   c. Monies to Harborview Funding (Mezz company)
   d. Monies to fund lawsuit
2. Calculation of Profits and Losses and Pro rata allocations
3. Quantification of delta on HUD financing proceeds
4. Detailed quantification of Salaries, Commissions and loans to E. Kutner
5. Detailed quantification of Salaries, Commissions and loans to j. Kutner
6. Detailed quantification of Salaries, Commissions and loans to all other Kutner family members
7. Details on charitable contributions issued by the business
8. Establish business value

**Din Torah – Asks**

1. Direct payment of mezzanine loans to Shlomo – granted
2. Production of financial statements – granted

Next items for determination/asks

1. Confidentiality
2. Pro-rata share of mezzanine losses if any
3. Pro-rata share of Glenner losses, if any
4. Beneficial ownership of CLAT (charitable fund – funded from business proceeds)
5. Quantification of pro-rata share of income – and payment thereof, if any
6. Quantification of value of business and establish buy-out value
7. Ensure that they can not just close down this business and reopen in another name
8. Control of lawsuit – based upon 4 million funded
9. DESTRUCTION OF ILLEGAL RECORDINGS (AFTER RABBI COHEN HAS HEARD THEM IF HE IS SO INCLINED)

SCHEDULE 

| Date | Name | Memo | Lender | Debit | | Total |
|------|------|------|--------|------|---|-------|
| 09/09/2013 | | Funds Transfer | SR Capital | $ | 1,500,000 | |
| 10/29/2013 | | Funds Transfer | SR Capital | $ | 1,000,000 | |
| 01/16/2014 | Ephraim Kutner | | SR Capital | $ | 2,500,000 | |
| 06/03/2014 | Ephraim Kutner | | SR Capital | $ | 500,000 | |
| 12/30/2014 | Ephraim Kutner | Deposit | SR Capital | $ | (624,799) | |
| 09/18/2015 | Ephraim Kutner | Deposit | YTR Capital | $ | (2,000,000) | $ 2,875,201 |
| | | | | | | |
| 08/26/2014 | Ephraim Kutner | | YTR Capital | $ | 1,650,000 | |
| 07/31/2014 | Ephraim Kutner | | SR Capital | $ | 950,000 | |
| 03/02/2015 | Harborview Capital Funding | | YTR Capital | $ | 302,500 | |
| 05/19/2015 | Harborview Capital Funding | Westgate Nursing Home Mezzanine | YTR Capital | $ | 1,156,250 | |
| 11/27/2015 | Harborview Capital Funding | | YTR Capital | $ | 1,350,000 | |
| 02/11/2016 | Harborview Capital Funding | | YTR Capital | $ | 1,200,000 | |
| 09/09/2016 | Harborview Capital Funding | Deposit | SR Capital | $ | (1,600,000) | |
| 03/28/2017 | Harborview Capital Funding | | YTR Capital | $ | 2,300,000 | |
| 03/29/2017 | Harborview Capital Funding | Deposit- Mather Loan Repay | YTR Capital | $ | (950,000) | |
| 05/30/2017 | Harborview Capital Funding | | YTR Capital | $ | 2,659,000 | $ 9,017,750 |
| | | | | | | |
| 12/02/2014 | Ephraim Kutner | | YTR Capital | $ | 500,000 | |
| 07/31/2014 | Ephraim Kutner | | SR Capital | $ | 650,000 | |
| 12/29/2014 | Strategic Legal Partners | | YTR Capital | $ | 624,799 | |
| 04/16/2015 | Strategic Legal Partners | | SR Capital | $ | 200,215 | |
| 04/17/2015 | Strategic Legal Partners | | SR Capital | $ | 34,347 | |
| 05/27/2015 | Strategic Legal Partners | | SR Capital | $ | 5,338 | |
| 06/04/2015 | Strategic Legal Partners | | SR Capital | $ | 55,000 | |
| 07/01/2015 | Strategic Legal Partners | | SR Capital | $ | 55,000 | |
| 08/03/2015 | Strategic Legal Partners | | SR Capital | $ | 55,000 | |
| 09/03/2015 | Strategic Legal Partners | | SR Capital | $ | 55,000 | |
| 10/01/2015 | Strategic Legal Partners | | SR Capital | $ | 355,000 | |
| 10/30/2015 | Strategic Legal Partners | | SR Capital | $ | 55,000 | |
| 10/23/2015 | Ephraim Kutner | | YTR Capital | $ | 500,000 | |
| 01/13/2016 | Ephraim Kutner | | YTR Capital | $ | 400,000 | |
| 11/08/2016 | Strategic Legal Partners | | SR Capital | $ | 25,000 | |
| 12/01/2016 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 12/06/2016 | Strategic Legal Partners | | SR Capital | $ | 31,824 | |
| 01/06/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 02/01/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 03/13/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 04/03/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 05/02/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 06/06/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 07/03/2017 | Strategic Legal Partners | | SR Capital | $ | 10,000 | |
| 05/20/2016 | Abrams, Fensterman | | YTR Capital | $ | 35,000 | |
| 07/30/2015 | Venable | Harborview | YTR Capital | $ | 4,487 | $ 3,721,009 |
| | | | | $ | 15,613,960 | $ 15,613,960 |
| | | UNALLOCATED | | | $ | 5,000,000 |
| | | | | | $ | 10,613,960 |

Case 1:20-cv-01607-KAM-VMS   Document 46   Filed 05/29/20   Page 5 of 6 PageID #: 671

A-264



| Project Name | Senior Lender | Loan Amount | Interest Rate | Participant Name (Primary; Secondary) | Secondary Participant Interest | Maturity Date | Monthly Payments | Locations | Bed Counts | Status | First Mortgage Initial Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Symphony of Oswego | the PrivateBank | $ 1,350,000 | 12% | Shlomo Rechnitz; NA | n/a | 1/1/2019 | $ 13,500.00 | Oswego County, IL | 106 | Current | $ 10,800,000 |
| Bethany | MinnWest | $ 302,500 | 12% | Shlomo Rechnitz; NA | n/a | 3/2/2018 | $ 3,025.00 | Minneapolis, MN | 66 | Current | $ 2,420,000 |
| WestGate Tier 1 | S&T | $ 693,750 | 12% | Shlomo Rechnitz; NA | n/a | 5/21/2017 | $ 6,937.50 | Rochester, NY | 124 | Past Maturity | $ 4,125,000 |
| WestGate Tier 2 | S&T | $ 462,500 | 21% | Shlomo Rechnitz; NA | n/a | 5/22/2017 | $ 8,093.75 | Rochester, NY | 124 | Past Maturity | See Above |
| CareRite - Courtyard Gardens | 5th Third | $ 1,200,000 | 12% | Shlomo Rechnitz; NA | n/a | 9/1/2020 | $ 13,000.00 | Jupiter, FL | 104 | Current | See Below |
| CareRight Accentia | 5th Third | $ 2,659,000 | 13% | Shlomo Rechnitz; David Blonder | 7.50% | 9/1/2020 | $ 29,913.75 | Tampa, FL | 266 | Current | $ 39,900,000 |
| Legends SNF Port | S&T | $ 2,300,000 | 13% | Shlomo Rechnitz; HT Equity (MM) | 7.00% | 4/1/2019 | $ 23,000.00 | Ohio | 252 | Current | $ 18,400,000 |
| | | $ 8,967,750 | | | | | | | | | |

Case 1:20-cv-01607-KAM-VMS   Document 46   Filed 05/29/20   Page 6 of 6 PageID #: 672

A-265

| First Mortgage Maturity | First Mortgage Recourse | Latest Financials Date | T12 Revenue | T12 Expense | T12 EBIDAR | Latest T12 Occ. | Financials Notes | Guarantors |
|---|---|---|---|---|---|---|---|---|
| 1/1/2019 | | 11/30/2017 | $ 12,556,149 | $10,315,258 | $ 2,240,891 | 58.4% | All Payments Current; Ann. T11; Awaiting Explana | David Hartman, Michael Munter, Robert Hartman, Symprop Oswego LLC, Symphony Oswego LLC |
| 3/2/2020 | Recourse | 11/30/2017 | $ 3,022,018 | $ 3,851,655 | $ (829,638) | 64.3% | All Payments Current; Owner putting in addition | Philip Friedman, David Scharf, Jay Eisenstadt, Bethany MN Realty LLC, Bethany MN Management LLC |
| 5/21/2020 | Recourse | 11/30/2017 | $ 8,829,796 | $ 8,334,416 | $ 495,380 | 79.7% | All Payments Current; Under contract for sale at $ | Philip Friedman, Elie Deitsch, Paragon Healthcare LLC, QH Consultants LLC, Westgate Building LLC, Westgate NY Management LLC |
| See Above | Recourse | See Above | See Above | | See Above | See Above | See Above | Philip Friedman, Elie Deitsch, Paragon Healthcare LLC, QH Consultants LLC, Westgate Building LLC, Westgate NY Management LLC |
| 5/1/2020 | Recourse | 11/30/2017 | $ 12,296,332 | $ 11,443,748 | $ 852,584 | 92.6% | All Payments Current; In first Year of Extension; 1 | Neil Einhorn, Mark Friedman, Jupiter Gardens Property LLC, The Rehabilitation Center at Jupiter Gardens LLC |
| 5/1/2020 | Recourse | 11/30/2017 | $ 22,658,615 | $ 18,206,489 | $ 4,452,126 | 84.5% | All Payments Current; In first Year. 6 Month Ann. | Neil Einhorn, Mark Friedman, Yossie Zucker, Steven Sax, Akiva Rudner, Eliezer Schwartz, 1818 Ventures LLC, Bristol Tampa FL Ventures LLC |
| 5/1/2020 | Recourse | 12/31/2017 | $ 16,199,121 | $ 15,000,117 | $ 1,199,004 | 80.4% | All Payments Current; In first Year; Diligence is du | Samuel Sherman, Jeffrey Goldstein, Alexander Sherman, Israel Sherman, Opcos and Procos |

01/09/2011  17:48    7183767388                                                PAGE  02/02
Case 1:20-cv-01007-KAM-VMS   Document 46-1   Filed 05/29/20   Page 1 of 1 PageID #: 673

דוד קאהן

ביהמ"ד גבול יעבץ
ברוקלין, נ.י. יארק

Aug. 22, '18                                בס"ד

    This is in response to the fax & E mail that
I received from Rav Yochanan M. Bechhofer א'ה'ו'ש'ע.
    I challenge the statement that there was
any hint of coercion to sign an arbitration
agreement. I was not aware of any agreement not
to bring the CFO. Both sides were quite amenable
when I asked what they preferred - it was arbitration.
    I stand by my oral ruling that Victor
(Yaakov) Jurnitzky who is a forensic accountant
go through all of the books + records and be paid
by the company.
    I have already assured the Kutners that
we shall all get together before a final
decision is rendered.
    I am a very busy person with many commitments
and cannot promise a full day but I shall
certainly cooperate to give everyone ample time to
present their side.
    I am faxing this document to both parties

Rabbi David Cohen

To Weldler rep. Buchwitz and
Katner

301

I am hereby stating that I want total
cooperation with Mr. Victor Spinetzky
the forensic accountant that I have
designated. Any "coverup" or claim
of loss or displacement of material he
wants to inspect shall be a
determinant in my final conclusion.
I want everything done with
alacrity.

Lawerence Cohen
Aug. 30, 18

**Efrem Schwalb**

**To:**                        eschwalb@koffskyschwalb.com
**Subject:**                   FW: Comments to letter, order and letter to Rabbi Cohen

**From:** davidzweldler@gmail.com <davidzweldler@gmail.com>
**Sent:** Friday, October 26, 2018 12:11 PM
**To:** leahtrenkcohen@gmail.com; 'Shlomo Rechnitz' <shlomohealth@gmail.com>
**Cc:** 'Ephraim Kutner' <ekutner@harborviewcp.com>; jkutner@harborviewcp.com
**Subject:** FW: Comments to letter, order and letter to Rabbi Cohen

Dear Rabbi Cohen,

I am writing to you on behalf of Shlomo Yehuda Rechnitz to ask that the Rav issue a final written award concerning the dispute between Mr. Rechnitz and Ephraim and Jonathan Kutner relating to certain mezzanine loans that Mr. Rechnitz funded ("Mezzanine Loans").  As the Rav is aware, at the arbitration hearing on August 14, 2018, the Rav ruled, among other things, that the Kutners and the entities they control must direct the Mezzanine Loans borrowers to make payments directly to Mr. Rechnitz, with the interest payments to be held in escrow until Mr. Rechnitz is repaid in full, and to inform the Mezzanine Loans borrowers that Mr. Rechnitz or his agent is authorized to act on behalf of the lender of the Mezzanine Loans.  The Kutners have failed to send out such letter and no information has been provided to Mr. Rechnitz regarding the loans since February 2018.  We have attached a proposed award that we would ask the Rav to sign after allowing a minimum of 5 days for the Kutners to comment on the proposed award.  We are providing notice to the Kutners and their Rabbinic advocate so that they may comment on the proposed award.  By this letter, we ask that the Kutners respond to the proposed award.  Mr. Rechnitz reserves his right to respond to any comments that the Kutners may have.  We expect to confirm the signed award in court and seek a court's assistance so that the Rav's ruling is followed and Mr. Rechnitz's interest in the loans is protected.

Sincerely,

David Weldler

In the Matter of the Din Torah Arbitration Between

Shlomo Yehuda Rechnitz

and

Ephraim Kutner and Jonathan Kutner

**[PROPOSED] ARBITRATION AWARD RELATING TO MEZZANINE LOAN DISPUTE**

On August 14, 2018, Shlomo Yehuda Rechnitz ("SYR"), on the one hand, and Ephraim Kutner and Jonathan Kutner (the "Kutners"), on the other hand, appeared before me to arbitrate various disputes relating to their business dealings that they had been discussing and trying to resolve for many months prior to their appearance.  The parties signed an arbitration agreement which is attached as Exhibit 1 to this decision and award pursuant to which they agreed to abide by my decision.  The first discrete issue that the parties presented to me for a ruling related to certain mezzanine loans that were made using the money of SYR ("Mezzanine Loans").  The Mezzanine Loans consist of the loans attached as Exhibit 2 which is the most recent update sent by the Kutners to SYR concerning the outstanding loans.

It was undisputed by the parties that SYR had provided millions of dollars to fund the Mezzanine Loans and that SYR was owed $8,967,750 relating to those loans, which represented the principal balance of the Mezzanine Loans at the time of the hearing.

At the arbitration, I issued an oral ruling requiring the Kutners to send a letter irrevocably directing the Mezzanine Loans borrowers to repay the Mezzanine Loans directly to SYR and for the interest that is repaid to be held in a separate account controlled by SYR where it shall remain until SYR is fully repaid for the moneys he advanced relating to the Mezzanine Loans.

This is my written award concerning the Mezzanine Loans dispute.

IT IS HEREBY ORDERED AND ADJUDGED THAT:

1.      The Mezzanine Loans borrowers shall be directed to repay their loans directly to SYR, including the interest payments that are made.  The letter attached as Exhibit 3 shall be sent to the Mezzanine Loans borrowers by the Kutners.  In the event that the Mezzanine Loans borrowers require other instructions to begin making payments directly to SYR, the Kutners will do what is needed to make sure that the moneys are paid directly to SYR.

2.      The Kutners shall respond to all questions from SYR or his agents regarding the Mezzanine Loans, and turn over to SYR all documents relating to the Mezzanine Loans including the Mezzanine Loans agreements.

3.      All funds received by the Kutners or any entities controlled by the Kutners including Harborview Capital Funding LLC from the Mezzanine Loan borrowers or their agents shall be immediately turned over to SYR.

4.      SYR shall receive all loan repayments relating to the Mezzanine Loans and will place the principal in one account to be used to repay SYR for the moneys he provided to fund the Mezzanine Loans, and the interest in another account where it shall remain until SYR is fully repaid for the moneys he advanced to fund the Mezzanine Loans.

5.      The Kutners and all entities they control shall cooperate and not interfere with the instructions to the Mezzanine Loan borrowers to make all loan payments directly to SYR.

6.      If requested by SYR, the Kutners shall execute any and all additional documents that will allow SYR or his agent to control, manage and act on behalf of the lender in connection with the Mezzanine Loans.

7.      This award constitutes a final award concerning the dispute regarding the Mezzanine Loans, as well as constituting an award of injunctive relief issued to protect SYR's

A-271

right to receive back the money that he loaned which both parties agreed constitutes all of the capital that was raised to fund the Mezzanine Loans.

8.      I retain jurisdiction concerning the Mezzanine Loans dispute to the extent that the Kutners fail to follow this award or a Court decides not to confirm this award.  Additionally, I retain jurisdiction concerning the other business disputes between the parties.

Dated: October __, 2018
          Brooklyn, New York

                                            _____

                                              Rabbi Dovid Cohen

<u>Via Email and Overnight Mail</u>

_____, 2018

BORROWER NAME

AND CONTACT INFORMATION

Dear Borrower,

~~This letter is sent pursuant to order of Supreme Court for the State of New York, County of Kings.~~ By this letter you are hereby authorized and directed to make payments due and owing on your outstanding loan to Harborview Funding, LLC by wire transfer to the following bank accounts:

For payments of principal: _____

For payments of interest: _____

(these two accounts are referred to as the "Accounts")

This letter shall be your good and sufficient irrevocable authorization and direction for making such payments to the Accounts.  Neither this authorization and direction nor the terms of loan and or payment schedule may be modified or revoked unless expressly authorized in writing by Mr. David Weldler.  Mr. Weldler's contact information is davidzweldler@gmail.com.  Mr. Weldler is authorized to act on behalf of the lender of your loan.

Please contact me should you have any questions.

Sincerely,

Ephraim Kutner for Harborview Funding, LLC

| | |
|---|---|
| **From:** | Efrem Schwalb |
| **To:** | Efrem Schwalb |
| **Subject:** | FW: Letter to Rav Dovid Cohen |
| **Date:** | Thursday, May 28, 2020 9:16:53 AM |

**From:** davidzweldler@gmail.com <davidzweldler@gmail.com>
**Sent:** Tuesday, October 30, 2018 7:44 PM
**To:** Efrem Schwalb <eschwalb@koffskyschwalb.com>
**Subject:** Fwd: Letter to Rav Dovid Cohen

Sent from my iPhone

Begin forwarded message:

> **From:** Micki Silver <msilver@harborviewcp.com>
> **Date:** October 30, 2018 at 12:58:40 PM PDT
> **To:** "davidzweldler@gmail.com" <davidzweldler@gmail.com>,
> "shlomohealth@gmail.com" <shlomohealth@gmail.com>,
> "leahtrenkcohen@gmail.com" <leahtrenkcohen@gmail.com>,
> "Evenshesiya@gmail.com" <Evenshesiya@gmail.com>
> **Cc:** Jonathan Kutner <jkutner@harborviewcp.com>, Ephraim Kutner
> <ekutner@harborviewcp.com>
> **Subject: Letter to Rav Dovid Cohen**
>
> I am sending this email on behalf of Ephraim Kutner, Yoni Kutner and Rabbi
> Bechhofer.
>
> Please see the attached letter from today as well as the letter from 8/21/18 that we have
> yet to receive response.
>
> Thank you,

**Micki Silver | Harborview Capital Partners**
335 Central Avenue
Lawrence | NY | 11559
516.453.9418 | direct
516.453.9400 | main
516.453.9401 | fax
msilver@harborviewcp.com
www.harborviewcp.com

Case 1:20-cv-01607-KAM-VMS   Document 46-4   Filed 05/29/20   Page 2 of 4 PageID #: 681



כ״א חשון תשע״ט

10/30/2018

לכבוד הגאון הגדול מוהר״ר דוד קאהן שליט״א רב דק״ק גבול יעבץ

We hope this letter Finds the Rav well. We have been waiting patiently for the Rav to announce when the next "Diyun" will be.

As we wrote to the Rav and copied the other side on August 21st (that letter is appended below), we dispute all of Mr. Rechnitz's claims and we have proof to our stance in documents, email, text messages, recorded conversations, and above all witnesses who will come in to testify.

We wrote there (see below) that we could arrange for the witnesses to come in as soon as September 13th (the day following Tzom Gedaliah). This letter was shared with Mr. Rechnitz and Mr. Weldler as is plainly obvious.

We are waiting for the Rav to announce when the next "Diyun" will be. We need no more than ten days notice to gather our materials and notify our witnesses, assuming that their travel schedule allows.

Mr. Weldler's actions of dictating to the Rav what his Psak should be and how to write it are totally out of line in all circumstances.

However, in our situation it is totally out of place as he knows that a "Diyun" is pending where we will bring witnesses and proofs to refute all of his and Mr. Rechnitz's claims.

We await the Rav's announcement for when the next "Diyun" will be.

B'Kavod HaTorah

CC. David Weldler
Shlomo Yehuda Rechnitz

*[Hebrew handwriting]*

*[Hebrew handwriting]*

This message is being sent via email to R' Shlomo Rechnitz and his CFO, David Weldler.

My name is Yochanan Bechhofer and I am advising Ephraim and Yoni Kutner in regard to their dispute with the aforementioned party. I am writing this on their behalf.

The Kutner brothers came into you last week with the understanding that it was to be a mediation and not an arbitration. They did not question signing the document that was placed before them so as not to hamper the flow of the mediation. They were surprised by the unannounced appearance of Mr. Rechnitz's CFO, as it was previously agreed that only Mr. Rechnitz would be in attendance. The goal of the meeting was to mediate in the presence of the Rav to bring a resolution to the dispute. However, since matters took a turn and we are now embroiled in an arbitration for which we were not prepared, we request another hearing in front of the Rav in the presence of Mr. Rechnitz and whoever he would like to bring.

At this hearing, we will present all of our evidence, including documents, recordings and witnesses who will fly in to give their testimony. We are endeavoring to bring this matter to a swift resolution as quickly as possible. We feel that we can likely pull this all together as soon as Thursday, September 13th, the fourth of Tishrei, 5779.

Due to the volume of evidence and testimony, we would ask to block a full day for us to present our material and allow Mr. Rechnitz to respond.

Cc: R' Shlomo Rechnitz, Mr. David Weldler

*[Hebrew handwriting]*

*[Hebrew handwriting]*

ביהמ״ד גבול יעב״ץ
ברוקלין, נוא יארק

דוד קאהן

---

In the Matter of the Din Torah Arbitration Between

Shlomo Yehuda Rechnitz

and

Ephraim Kutner and Jonathan Kutner

[PROPOSED] ARBITRATION
AWARD RELATING TO
MEZZANINE LOAN DISPUTE

---

On August 14, 2018, Shlomo Yehuda Rechnitz ("SYR"), on the one hand, and Ephraim Kutner and Jonathan Kutner (the "Kutners"), on the other hand, appeared before me to arbitrate various disputes relating to their business dealings that they had been discussing and trying to resolve for many months prior to their appearance. The parties signed an arbitration agreement which is attached as Exhibit 1 to this decision and award pursuant to which they agreed to abide by my decision. The first discrete issue that the parties presented to me for a ruling related to certain mezzanine loans that were made using the money of SYR ("Mezzanine Loans"). The Mezzanine Loans consist of the loans attached as Exhibit 2 which is the most recent update sent by the Kutners to SYR concerning the outstanding loans.

It was undisputed by the parties that SYR had provided millions of dollars to fund the Mezzanine Loans and that SYR was owed $8,967,750 relating to those loans, which represented the principal balance of the Mezzanine Loans at the time of the hearing.

At the arbitration, I issued an oral ruling requiring the Kuttners to send a letter irrevocably directing the Mezzanine Loans borrowers to repay the Mezzanine Loans directly to SYR and for the interest that is repaid to be held in a separate account controlled by SYR where it shall remain until SYR is fully repaid for the moneys he advanced relating to the Mezzanine Loans.

This is my written award concerning the Mezzanine Loans dispute.

IT IS HEREBY ORDERED AND ADJUDGED THAT:

1.      The Mezzanine Loans borrowers shall be directed to repay their loans directly to SYR, including the interest payments that are made. The letter attached as Exhibit 3 shall be sent to the Mezzanine Loans borrowers by the Kutners. In the event that the Mezzanine Loans borrowers require other instructions to begin making payments directly to SYR, the Kutners will do what is needed to make sure that the moneys are paid directly to SYR.

2.      The Kutners shall respond to all questions from SYR or his agents regarding the Mezzanine Loans, and turn over to SYR all documents relating to the Mezzanine Loans including the Mezzanine Loans agreements.

3.      All funds received by the Kutners or any entities controlled by the Kutners including Harborview Capital Funding LLC from the Mezzanine Loan borrowers or their agents shall be immediately turned over to SYR.

4.      SYR shall receive all loan repayments relating to the Mezzanine Loans and will place the principal in one account to be used to repay SYR for the moneys he provided to fund the Mezzanine Loans, and the interest in another account where it shall remain until SYR is fully repaid for the moneys he advanced to fund the Mezzanine Loans.

5.      The Kutners and all entities they control shall cooperate and not interfere with the instructions to the Mezzanine Loan borrowers to make all loan payments directly to SYR.

6.      If requested by SYR, the Kutners shall execute any and all additional documents that will allow SYR or his agent to control, manage and act on behalf of the lender in connection with the Mezzanine Loans.

7.      This award constitutes a final award concerning the dispute regarding the Mezzanine Loans, as well as constituting an award of injunctive relief issued to protect SYR's

right to receive back the money that he loaned which both parties agreed constitutes all of the capital that was raised to fund the Mezzanine Loans.

8.    I retain jurisdiction concerning the Mezzanine Loans dispute to the extent that the Kutners fail to follow this award or a Court decides not to confirm this award.  Additionally, I retain jurisdiction concerning the other business disputes between the parties.

Dated: ~~October~~ _NOVEMBER_ _5_, 2018
          Brooklyn, New York

_Rabbi Dovid Cohen_

_____
          Rabbi Dovid Cohen

STATE OF NEW YORK)
                                    ss.:
COUNTY OF KINGS)

On the _5th_ day of ~~October~~ _November_, in the year 2018, before me, the undersigned, personally appeared Rabbi Dovid Cohen, personally known to me on the basis of satisfactory evidence to the individual whose name is subscribed within the arbitration award dated ~~October~~ _November_ _5_, 2018 and acknowledged to me that he executed the same in his capacity, and that by his signature on the arbitration award, Rabbi Dovid Cohen executed the arbitration award.

Notary Public

NAAMI DAVIS
NOTARY PUBLIC, State of New York
No. 01DA6367818
Qualified in Kings County
Commission Expires Dec. 4, 20 21

Case 1:20-cv-01607-KAM-VMS   Document 46-5   Filed 05/29/20   Page 4 of 9 PageID #: 687

# EXHIBIT 1

A-281

302

Shlomo Yehuda Rechnitz (SYR) on his own, and as a partner in Harborview Capital, and Jonathan and Ephraim Kutner (JEK) on their own, and as partners in the above company, have come to me to adjudicate a dispute. They have agreed to accept any decision.

Rabbi David Cohen   Aug. 14, 18

08/14/18

8/14/18

8/14/18

# EXHIBIT 2

| Project Name | Senior Lender | Loan Amount | Participant Name (Primary; Secondary) | Secondary Participant Interest | Maturity Date | Monthly Payments | Locations | Status | First Mortgage Initial Balance | First Mortgage Maturity | First Mortgage Recourse |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Symphony of the Oswego | PrivateBank | $ 1,350,000 | Shlomo Rechnitz; NA | n/a | 1/1/2019 | $ 13,500.00 | Oswego County, IL | Current | $ 10,800,000 | 1/1/2019 | |
| Bethany | MinnWest | $ 302,500 | Shlomo Rechnitz; NA | n/a | 3/2/2018 | $ 3,025.00 | Minneapolis, MN | Current | $ 2,420,000 | 3/2/2020 | Recourse |
| WestGate Tier 1 | S&T | $ 693,750 | Shlomo Rechnitz; NA | n/a | 5/21/2017 | $ 6,937.50 | Rochester, NY | Past Maturity | $ 4,125,000 | 5/21/2020 | Recourse |
| WestGate Tier 2 | S&T | $ 462,500 | Shlomo Rechnitz; NA | n/a | 5/22/2017 | $ 8,093.75 | Rochester, NY | Past Maturity | See Above | See Above | Recourse |
| CareRite - Courtyard Gardens | 5th Third | $ 1,200,000 | Shlomo Rechnitz; NA | n/a | 9/1/2020 | $ 13,000.00 | Jupiter, FL | Current | See Below | 5/1/2020 | Recourse |
| CareRight Accentia | 5th Third | $ 2,659,000 | Shlomo Rechnitz; David Blonder | 7.50% | 9/1/2020 | $ 29,913.75 | Tampa, FL | Current | $ 39,900,000 | 5/1/2020 | Recourse |
| Legends SNF Port | S&T | $ 2,300,000 | Shlomo Rechnitz; HT Equity (MM) | 7.00% | 4/1/2019 | $ 23,000.00 | Ohio | Current | $ 18,400,000 | 5/1/2020 | Recourse |

# EXHIBIT 3

Via Email and Overnight Mail

_____, 2018

BORROWER NAME

AND CONTACT INFORMATION


Dear Borrower,

By this letter you are hereby authorized and directed to make payments due and owing on your outstanding loan to Harborview Funding, LLC by wire transfer to the following bank accounts:

For payments of principal: _____

For payments of interest: _____

(these two accounts are referred to as the "Accounts")

This letter shall be your good and sufficient irrevocable authorization and direction for making such payments to the Accounts. Neither this authorization and direction nor the terms of loan and or payment schedule may be modified or revoked unless expressly authorized in writing by Mr. David Weldler. Mr. Weldler's contact information is davidzweldler@gmail.com. Mr. Weldler is authorized to act on behalf of the lender of your loan.

Please contact me should you have any questions.

Sincerely,


Ephraim Kutner for Harboview Funding, LLC

**From:**      Efrem Schwalb
**To:**        Efrem Schwalb
**Subject:**   FW: Din Torah continuation
**Date:**      Thursday, May 28, 2020 11:16:08 AM

---

**From:** davidzweldler@gmail.com <davidzweldler@gmail.com>
**Sent:** Thursday, February 20, 2020 1:02 PM
**To:** Efrem Schwalb <eschwalb@koffskyschwalb.com>
**Subject:** Fwd: Din Torah continuation

Sent from my iPhone

Begin forwarded message:

> **From:** davidzweldler@gmail.com
> **Date:** February 17, 2020 at 3:15:53 PM PST
> **To:** leahtrenkcohen@gmail.com
> **Cc:** Ephraim Kutner <ekutner@harborviewcp.com>, Shlomo Yehuda Rechnitz
> <shlomohealth@gmail.com>
> **Subject: Din Torah continuation**

Dear Rabbi Cohen,

At the request of Shlomo Yehuda Rechnitz, I would like to ask Rabbi Cohen to
reconvene the din torah in order to achieve a resolution/psak on the balance of the
items that Rabbi Cohen has yet to pasken on.  I attach hereto the copy of the different
issues that were to be covered by the din torah. This had been provided to Rabbi
Cohen and to the forensic accountant at the onset of the din torah.

I can be reached at 212 203 1388.

Efraim Kutner can be reached at 646 209 1025. His email address is
ekutner@harborviewcp.com

We would make ourselves available as soon as Rabbi Cohen could schedule the
meeting.

Thank you

Dovid Weldler for Shlomo Yehuda Rechnitz.

**Din Torah – Asks**

1. Direct payment of mezzanine loans to Shlomo – granted
2. Production of financial statements – granted

Next items for determination/asks

1. Confidentiality
2. Pro-rata share of mezzanine losses if any
3. Pro-rata share of Glenner losses, if any
4. Beneficial ownership of CLAT (charitable fund – funded from business proceeds)
5. Quantification of pro-rata share of income – and payment thereof, if any
6. Quantification of value of business and establish buy-out value
7. Ensure that they can not just close down this business and reopen in another name
8. Control of lawsuit – based upon 4 million funded
9. DESTRUCTION OF ILLEGAL RECORDINGS (AFTER RABBI COHEN HAS HEARD THEM IF HE IS SO INCLINED)

ברוקלין, נוא יארק

דוד קאהן

Feb 20, 20

ג' אדר ת"ש

att: Mr. Rechnik 'j and Mr. Kutner'j
litigants who have come to me for legal
arbitration.

I hereby summon both of you to come
before me to complete the arbitration on
Sunday, March 1, 20 on 4 PM. As you know
my address is 1518 E. 7 st. 11230. my
phone numbers are (718) 376 7388/7923
my fax # is 718 376 7388. (to be faxed
from 8AM – 9 PM not between 3 PM – 4 PM)

Rabbi David Cohen

| | |
|---|---|
| **From:** | Efrem Schwalb |
| **To:** | Efrem Schwalb |
| **Subject:** | FW: Urgent message on behalf of Ephraim and Yonasan Kutner |
| **Date:** | Thursday, May 28, 2020 11:43:34 AM |

**From:** davidzweldler@gmail.com <davidzweldler@gmail.com>
**Sent:** Sunday, March 1, 2020 12:30 AM
**To:** Efrem Schwalb <eschwalb@koffskyschwalb.com>
**Cc:** Avi Wagner <avi@thewagnerfirm.com>
**Subject:** Fwd: Urgent message on behalf of Ephraim and Yonasan Kutner

Sent from my iPhone

Begin forwarded message:

> **From:** Yochanan Bechhofer <evenshesiya@gmail.com>
> **Date:** February 29, 2020 at 9:57:42 PM EST
> **To:** leahtrenkcohen@gmail.com
> **Cc:** shlomohealth@gmail.com, davidzweldler@gmail.com
> **Subject: Urgent message on behalf of Ephraim and Yonasan Kutner**
>
>
> מוצש"ק פר' תרומה תש"פ
> לכבוד הגאון הגדול מוהר"ר דוד קאהן שליט"א
> רב דקהילת גבול יעבץ בפלאטבוש נ. י.
> Gut Voch!
> My name is Yochanan Bechhofer and I am a "toen" representing Mr. Ephraim and Mr.
> Yonasan Kutner.
>
> Please open the attached document for an important message on behalf of my clients.
>
> This message with attachment is being copied to Mr. Rechnitz and his associate Mr.
> Weldler.
>
> We wish the honored Rabbi a good week and a freilichen Purim.
>
> Sincerely,
> Yochanan Bechhofer
> On behalf of Ephraim and Yonasan Kutner

# יוחנן מאיר בקהופר

**טוען רבני**

בעמ"ס אבן שתיה על הי"ג עקרים להרמב"ם

א' דר"ח אדר תש"פ

לכבוד הגאון הגדול מוהר"ר דוד קאהן שליט"א רב דקהילת גבול יעבץ בפלאטבוש נ.י.

My name is Yochanan Bechhofer and I represent Mr. Ephraim Kutner and Mr. Yonasan Kutner (referred to in this letter as "my clients").

On behalf of my clients I wish to bring to the honored Rabbi's attention that the dispute between my clients and Mister Rechnitz for which they appeared before from the honored Rabbi in the summer of 2018 has long since been **resolved**.

In the fall of 2018, an agreement was reached between the parties ( see attached "article 1") that would settle the dispute once and for all. This agreement was not only **put in writing in an email that is legally binding** but it has already been **implemented** in good faith and **at great expense to my clients**.

Amongst the items of the agreement that were implemented already was to pay Mr. Gershon Beigelison at  great expense to my clients, which they did already long ago and **already paid him at Mr. Rechnitz's request** **an entire annual salary.**

The initial dispute has been resolved and the current dispute is over the terms and conditions of an agreement that was **wholly agreed to by both sides** (see attached "Article 2") and is in stages of **implementation** already. Should we seek an arbitration from the honored Rabbi, it would **require a new arbitration agreement,** since it is not the issue for which we signed an arbitration agreement for in the past.

At this time, we are not asking for a new arbitration by the honored Rabbi, but rather we ask Mr. Rechnitz to come back to the negotiating table. We are confident that just as we reached this agreement and lived in peace and harmony for over a year, so also we will surely work out whatever disagreements there are regarding this agreement at this time.

We wish the honored Rabbi a Chodesh Tov and a freilichen Purim
Sincerely,

*Yochanan Meir Bechhofer*

Yochanan Meir Bechhofer
on Behalf of Ephraim and Yonasan Kutner
CC Reb Shlomo Yehuda Rechnitz

**Article 1**
Summary of agreement arrived at in the fall of 2018
Mr. Rechnitz's responses in capital letters

On Dec 2, 2018, at 6:23 PM, Ephraim Kutner <ekutner@harborviewcp.com> wrote:

Shlomo,
We sincerely appreciate you taking the time to sit with us and come to a peaceful resolution. I'm sorry it took so long to get you this email.
I woke up with a pinched nerve last Monday and have been out flat on my back all week. Here are the points we agreed to and please let me know if I've left anything off or misrepresented any points of our discussion.

-lawsuit - we agreed to try and take advantage of where we are at in our litigation and after Matt tried reaching out to Scharff with no response Yoni met with Steve on Tuesday afternoon and told him we would accept 8.5mm. Steve responded with another lowball offer last night and I will send you that in a separate email. We have court tomorrow and will continue to press. ADDITIONALLY, THE KUTNERS WILL MAKE THEMSELVES AVAILABLE AND DO EVERYTHING IN THEIR POWER TO HELP RECHNITZ WITH THE LAWSUIT.

Of course we will

NEED TO MAKE A QUICK DEADLINE, OTHERWISE YOU CAN PRESS FOREVER.
A

We have a court date tomorrow and another one in two weeks. We feel the judge will continue to push for a settlement and his numbers were more than Steve's and the judge said he can push Scharff so why respond to Steve's offer quickly

-mezz loans- will assign over the PG on the Tillers/Hartman loan to you personally, all payoff notices will include escrow instructions into a mutually accessible escrow account where SY will take the original principal amount of the loan. ALL interest payments, exit fees and financing origination fees stay in Harborview Funding but any additional monies made on the exit loan gets split and your half goes towards your initial personal loan of 2.9mm (this is instead of CLAT) until all that principal is paid and anything above that amount in the form of additional fees or monies made on the exit loan stays in Harborview. There will be no Glenner or other Mezz loan guarantees provided by Harborview.
THE ACCOUNT WILL BE IN MY NAME AND THE INSTRUCTIONS ON THE LETTER WILL BE THE ONLY PLACE THE ACCOUNT NUMBER APPEARS.

How do we then disperse the funds over and above the original principal loan amount as you said you wanted none of that interest and exit fee money?

ANY ADDITIONAL LOAN PROCEEDS, HUD FEES, ORIGINATION OR BREAKUP FEES FIRST GOES AS A PREFERENCE TO SHLOMO RECHNITZ TO PAY OFF THE INITIAL PERSONAL LOAN OF $2.9 MILLION DOLLARS.

This isn't what we discussed as we were looking for an alternative to the CLAT issue and the CLAT was something that would take 20 or 30 years to pay off as opposed to this structure where it should take less than 3 years with us splitting the income off of the exit loans as we have real internal expenses to process the loans and use First American

-60k for one year to Jake's cousin whom we are meeting with on Tuesday and Yoni spoke to this week a few times

-100k/ year engagement fee for 2 years to you for speaking at our annual Healthcare conference

-SY "doesn't want anything else at all"

-SY will send a letter to Reb Dovid Cohen as per our discussion that we will review prior to sending

-SY will continue to remain a client of Harborview in good faith and there will be a maximum of 4 1/2 points (including both origination and trade fees) made on all future HUD loans done for SY by Harborview
THIS IS NOT A CONDITION. (JUST REMEMBER HOW YOU FELT WHEN STEVE TRIED TO PAY YOU OFF LIKE THAT).

Not a condition just a point you wanted me to make mention of
- HARBORVIEW WILL IMMEDIATELY BEGIN WORKING ON RAISING SHLOMO'S HUD CREDIT LINE TO $500,000,000

Happy to do so- who will be running point on your end- Alan Ma?

- RECHNITZ WILL MAKE EVERY ATTEMPT TO ATTEND THE KUTNER WEDDING TO DISPEL ANY RUMORS THAT THERE WE HAVE SOME DISAGREEMENT.

Very much appreciated but please don't feel any pressure to do so

- THERE WILL BE A CONFIDENTIALITY AGREEMENT AND A NON DISPARAGING AGREEMENT.

I have the one that was included in the original settlement/ resolution agreement that I will forward to you

- THE KUTNERS WILL HAVE TO SIT DOWN WITH WELDLER AND WORK OUT THEIR DIFFERENCES.

If you say so we are happy to do so

Please confirm via email and let me know if I've made any mistakes. Thanks again and wishing you a freilichin Chanukah.

Ephraim

Ephraim Kutner
Harborview Capital Partners
335 Central Avenue
Lawrence | NY | 11559
516.453.9402 | direct
516.453.9400 | main
516.453.9414 | fax
ekutner@harborviewcp.com
www.harborviewcp.com

## <u>Article 2</u>

Ephraim Kutner and Shlomo Rechnitz reaffirming their commitments they made a year earlier

On top is Shlomo Rechnitz replying to the message initiated by Ephraim Kutner which is on the bottom

From: Shlomo Rechnitz <shlomohealth@gmail.com>
Date: November 3, 2019 at 11:10:43 AM PST
To: Ephraim Kutner <ekutner@harborviewcp.com>
Cc: Jonathan Kutner <jkutner@harborviewcp.com>
Subject: Re:  Calculation

 Ephraim,
I'm not going back on my word at all. You yourself admitted that we still need to work on the lawsuit.
Throughout this process, you've shlepped it so long so every meeting or phone call you got even more out of me.
Take a step back and look what I've given up already. Anybody you ask who will be honest with you will tell you that this resolution is crazy lopsided.
The only part left out is the lawsuit money and I've made up my mind on what I want (which still keeps the deal crazy lopsided).
 Sitting and talking again will make no difference. Let's just get this over with in a somewhat Bakovideke outcome for me.

Sent from my iPad

On Oct 30, 2019, at 12:03 PM, Ephraim Kutner <ekutner@harborviewcp.com> wrote:

 Shlomo,
We agreed on a settlement and shook hands in your house and you said that you wanted to write a letter to Reb Dovid
 letting him know of the settlement before my daughter's chasunah. The only outstanding issue at that time was the Greystone lawsuit.
 I will send you your emails and our communication again to remind you.
 Now you are going back on that agreement and asking to go back to Reb Dovid Cohn.
I'm not following you and your email at all. Yoni and I will be in LA next week Tuesday and Wednesday
 and would very much like to come and talk to you
 as I said last week but if you don't want to or don't have the time then so be it.
 It is truly a shame that you can't do what we both said and agreed what we would do.
 **We have been paying your cousin and brother in law as we said we would do and living up to our end of our agreement.**
 Like I said, I will resend you our email correspondence to see if it clarifies things for you.
 Mazel Tov on your new grandson and wishing you and your family only continued simchos and tons of nachas IYH.

Ephraim Kutner
Harborview Capital Partners
335 Central Avenue
Lawrence | NY | 11559
516.453.9402 | direct
516.453.9400 | main
516.453.9414 | fax
ekutner@harborviewcp.com
www.harborviewcp.com

 ReplyForward

From: **Yochanan Bechhofer** evenshesiya@gmail.com
Subject: **Response to Mr. Rechnitz's letter from this morning**
Date: **Mar 1, 2020 at 1:56:47 PM**
To: leahtrenkcohen@gmail.com
Cc: shlomohealth@gmail.com, davidzweidler@gmail.com

<div dir="rtl">

לכבוד הגאון הגדול מוהר"ר דוד קאהן שליט"א
רב דקהילת גבול יעבץ בפלאטבוש נ.י.

</div>

Time is just too precious, so I will not spend it on relating to the "compliments and blessings" showered upon me by Mr. Rechnitz.

The first thing I want to do is restate a matter already on public record. I wish to restate it in case the original document I sent back in the summer of 2018 is no longer your possession.

When the initial dispute erupted between Mr. Rechnitz and my clients in 2018, my clients came before the honored Rabbi for his sage advice. The honored Rabbi at that time said to summon Mr. Rechnitz to come before the honored Rabbi in August 2018 with the hope that the honored Rabbi would serve as a mediator and peacemaker between my clients and Mr Rechnitz.

My clients never intended for it to be an arbitration as they came in totally unrepresented. They thought that they were agreeing to a mediation when they signed the honored Rabbi's hand scripted agreement. My clients wish this to go on public record especially as Mr. Rechnitz cares so much about "Emes".

As I said in my last letter to the honored Rabbi, the issue for which my clients and Mr. Rechnitz appeared before the honored Rabbi in the summer of 2018 has been resolved. The emails I attached yesterday as "articles 1 & 2" in my letter to the honored Rabbi speak for themselves, as do the circumstances. It is now over a year and a half since my clients appeared before the honored Rabbi in August 2018. If there had not been an agreement in place, surely Mr. Rechnitz would not have let such a weighty matter linger for so long.

My clients erroneously trusted Mr. Rechnitz, as the plaintiff, to be the one to inform the honored Rabbi that an agreement was reached. His failure to do so does not change the facts and it is all evidenced by the emails attached and all the money spent, at great expense to my clients, to implement the agreement.

Mr. Rechnitz's conduct brings to mind a saying attributed to
David Ben-Gurion: "make peace as if there is no war and
make war as if there is no peace".

It is surprising that Mr Rechnitz, who "cares so much for
Kovod Torah" would leave the honored Rabbi 'in the dark' as
to how to the reality changed in order to 'keep the file open' to
play his "double game" - taking whatever he can peacefully
through making agreements and then fighting as if there was
never any agreement at all.

As I said in the name of my clients:
My clients ask Mr. Rechnitz to uphold his part of the
agreement and to settle any disagreements or
misunderstandings regarding the agreement with my clients
directly. The issue from the summer of 2018 was settled by
mutual consent. We are not seeking a new arbitration from the
honored Rabbi on this new issue.

בברכות התורה
יוחנן מאיר בקהופר

CC: Shlomo Rechnitz
CC: David Weldler

A-297

**Efrem Schwalb**

| | |
|---|---|
| **From:** | Efrem Schwalb |
| **Sent:** | Thursday, May 28, 2020 12:59 PM |
| **To:** | Efrem Schwalb |
| **Subject:** | FW: Din Torah between Shlomo Yehuda Rechnitz v. Ephraim Kutner and Jonathan Kutner |

**From:** davidzweldler@gmail.com <davidzweldler@gmail.com>
**Sent:** Monday, March 9, 2020 9:19 AM
**To:** Rabbi Dovid Cohen <leahtrenkcohen@gmail.com>
**Cc:** Efraim Kutner <ekutner@harborviewcp.com>; Jonathan Kutner <jkutner@harborviewcp.com>; Shlomo Yehuda Rechnitz <shlomohealth@gmail.com>
**Subject:** Fwd: Din Torah between Shlomo Yehuda Rechnitz v. Ephraim Kutner and Jonathan Kutner

Dear Rabbi Cohen,

I am writing to you on behalf of Shlomo Yehuda Rechnitz to ask that the Rav issue a written award concerning the dispute between Mr. Rechnitz and Ephraim Kutner and Jonathan Kutner (the "Kutners") relating to certain mezzanine loans that Mr. Rechnitz funded ("Mezzanine Loans"), as well as proceeds from a lawsuit against Greystone Funding that Mr. Rechnitz funded on behalf of the Kutners (the "Greystone Lawsuit") which was previously discussed with Rav Cohen that entitled Mr. Rechnitz to the return of the expenses he funded, as well as 30 percent of the Kutners' recovery above the expenses.

As the Rav will recall, more than a year ago, the Rav ruled, among other things, that the Kutners and the entities they control must direct the Mezzanine Loans borrowers to make payments directly to Mr. Rechnitz, with the interest payments to be held in escrow until Mr. Rechnitz is repaid in full, and to inform the Mezzanine Loans borrowers that Mr. Rechnitz or his agent was authorized to act on behalf of the lender of the Mezzanine Loans. The Kutners failed to send out such letters. The Rav retained jurisdiction over the Mezzanine Loans matter in the event the Kutners did not abide by the Rav's ruling. Concerning the Mezzanine Loans dispute, we are asking the Rav to issues an order allowing Mr. Rechnitz to direct the Mezzanine Loans borrowers to repay the Mezzanine Loans directly to SYR and for the interest that is repaid to be held in a separate account controlled by SYR where it shall remain until SYR is fully repaid for the moneys he advanced relating to the Mezzanine Loans. Attached is a spreadsheet showing that Mr. Rechnitz is owed $7,617,750 relating to the Mezzanine Loans, which represents the current principal balance of the Mezzanine Loans.

Additionally, there is no dispute that the Greystone Lawsuit was settled for $8 million. Mr. Rechnitz is owed $3,071,009 that was provided to the Kutners to finance their lawsuit against Greystone Funding, plus $1,328,697 representing SYR's 30 percent share of the recovery over the expenses from that lawsuit. Greystone has been providing $150,000 per month to the

1

Kutners (to date, the Kutners have received in excess of $1.4 million of which nothing has been transferred to Mr. Rechnitz) and we ask that the Rav issue an award directing that all of that money moving forward to be paid directly to Mr. Rechnitz to cover the millions that he is owed by the Kutners with respect to the Greystone Lawsuit, as well as other amounts that are owing.

You have attempted to meet with all parties, but the Kutners have made it clear that they do not intend to appear before Rav Cohen.  Their response is that they never agreed to arbitrate these disputes and the parties have settled the matter and, therefore, there is no basis to Rav Cohen to adjudicate anything.  The Rav has already ruled that the Kutners agreed to arbitrate these disputes before Rav Cohen, and it is Mr. Rechnitz's position that the Rav should reject this argument once again.  The Kutners signed a binding agreement to arbitrate these disputes, and the Mezzanine Loans, Greystone Lawsuit and other business disputes were all addressed at the hearing that took place in August 2018.  They have refused to abide by the Rav's decisions to date.  Moreover, the documents submitted by the Kutners to Rav Cohen on their face demonstrate that there was and has been no settlement of the parties' disputes.  To the extent that Rav Cohen requires further submissions on that issue, we can show months of discussions following the two emails submitted by the Kutners showing that the parties have never come to an agreement, and the emails themselves indicate that there was no agreement, just negotiations which have continued for an extended period of time.

If the Rav accepts Mr. Rechnitz's position, we have attached a proposed award that we would ask the Rav to sign which will allow Mr. Rechnitz to secure some of the multi-millions of dollars he is owed by the Kutners.  In addition, we will be making a further submission concerning other amounts that are owing to Mr. Rechnitz that were discussed at the prior arbitration hearing.

Sincerely,

David Weldler

A-299

---

In the Matter of the Din Torah Arbitration Between

Shlomo Yehuda Rechnitz

and

Ephraim Kutner and Jonathan Kuthe mner

**[PROPOSED] ARBITRATION AWARD RELATING TO MEZZANINE LOAN AND JOINT VENTURE DISPUTE**

---

On August 14, 2018, Shlomo Yehuda Rechnitz ("SYR"), on the one hand, and Ephraim Kutner and Jonathan Kutner (the "Kutners"), on the other hand, appeared before me to arbitrate various disputes relating to their business dealings that they had been discussing and trying to resolve for many months prior to their appearance. The parties signed an arbitration agreement which is attached as Exhibit 1 to this decision and award pursuant to which they agreed to abide by my decision. At that time several issues were discussed including, but not limited to, a dispute regarding (a) the repayment of certain mezzanine loans that were made using the money of SYR ("Mezzanine Loans," see Exhibit 2); and (b) the repayment of a loan provided by SYR to the Kutners in connection with a lawsuit between Greystone Funding Corp. and the Kutners (the "Greystone Lawsuit"), and a sharing agreement from any recovery for that lawsuit equal to 30 percent of the recovery from the lawsuit after subtracting the amount spent by SYR to finance the lawsuit.

It was undisputed by the parties that SYR had provided millions of dollars to fund the Mezzanine Loans and the Greystone Lawsuit. SYR has provided updated information establishing that he is owed $7,617,750 relating to the Mezzanine Loans, which represents the current principal balance of the Mezzanine Loans. Additionally, SYR has provided information establishing that the Greystone Lawsuit was settled for $8 million, that SYR is owed $3,071,009 for financing the

A-300

Kutners in that lawsuit, plus not less than $1,328,697 representing SYR's 30 percent share of the recovery from that lawsuit.

I previously issued an oral and written ruling requiring the Kutners to send a letter irrevocably directing the Mezzanine Loans borrowers to repay the Mezzanine Loans directly to SYR and for the interest that is repaid to be held in a separate account controlled by SYR where it shall remain until SYR is fully repaid for the moneys SYR advanced relating to the Mezzanine Loans.  I retained jurisdiction over the Mezzanine Loans dispute in the event the Kutners failed to comply with my ruling, as well as the other disputes that the parties discussed with me at the arbitration hearing.

After more than a year of settlement negotiations that did not result in an agreement, SYR requested that the parties meet again with me for a decision on the items that were discussed at the first hearing in the arbitration, including the Mezzanine Loans dispute which has not been finally resolved.  The Kutners have refused to attend a subsequent hearing and claimed that they did not submit the disputes to arbitration, only mediation, and that the parties settled all of their disputes. I have reviewed the documents submitted by the Kutners and find that on their face, there was no settlement of the parties' disputes.  I also reject the argument by the Kutners that the dispute was only submitted to me for mediation, as it was made clear at the hearing that the parties were submitting their disputes to me for a legal adjudication, not mediation, and in fact, the Kutners were the party that selected me as the arbitrator in this matter and the document signed by the parties made clear that the parties were submitting their disputes to me for a decision.

Accordingly, this is my decision regarding the Mezzanine Loans and Greysone Lawsuit disputes.  I will issue a separate decision on the other outstanding disputes.

IT IS HEREBY ORDERED AND ADJUDGED THAT:

1.      The Mezzanine Loans borrowers shall be directed to repay their loans directly to SYR, including the interest payments that are made.  As the Kutners have not sent the letter previously directed for them to send to the Mezzanine Loans borrowers, SYR may send letters to the Mezzanine Loans borrowers directing them to pay all amounts directly to SYR.

2.      The Kutners shall respond to all questions from SYR or his agents regarding the Mezzanine Loans, and turn over to SYR all documents relating to the Mezzanine Loans including the Mezzanine Loans agreements.

3.      All funds received by the Kutners or any entities controlled by the Kutners including Harborview Capital Funding LLC from the Mezzanine Loan borrowers or their agents shall be immediately turned over to SYR.

4.      SYR shall receive all loan repayments relating to the Mezzanine Loans and will place the principal in one account to be used to repay SYR for the moneys he provided to fund the Mezzanine Loans, and the interest in another account where it shall remain until SYR is fully repaid for the moneys he advanced to fund the Mezzanine Loans.

5.      All amounts still owed by Greystone Funding shall be paid directly to SYR, including the $3,071,009 provided by SYR to fund the lawsuit against Greystone, plus the $1,328,967 representing SYR's 30 percent share of the remaining amount recovered in that lawsuit.  Any additional amounts from that lawsuit shall be paid to SYR for repayment of amounts owing to SYR relating to other outstanding amounts.  SYR may contact Greystone Funding directly and direct Greystone Funding to make all payments directly to SYR.

6.      The Kutners and all entities they control shall cooperate and not interfere with the instructions to the Mezzanine Loan borrowers to make all loan payments directly to SYR.

7.      The Kutners may not modify or extend the terms of the Mezzanine Loans unless expressly authorized in writing by Shlomo Yehuda Rechnitz's representative Mr. David Weldler.

8.      The Kutners and all entities they control shall cooperate and not interfere with the instructions to Greystone Funding to make all payments relating to the Greystone Lawsuit directly to SYR.

9.      If requested by SYR, the Kutners shall execute any and all additional documents that will allow SYR or his agent to control, manage and act on behalf of the lender in connection with the Mezzanine Loans or the Kutners in connection the Greystone Lawsuit settlement.

10.      This award constitutes a final award concerning the dispute regarding the Mezzanine Loans and Greystone Lawsuit, as well as constituting an award of injunctive relief issued to protect SYR's right to receive back the money that he loaned which both parties agreed constitutes all of the capital that was raised to fund the Mezzanine Loans, as well as the recovery on the Greystone Lawsuit.

11.     I retain jurisdiction concerning the Mezzanine Loans and Greystone Lawsuit dispute to the extent that the Kutners fail to follow this award or a Court decides not to confirm this award.  Additionally, I retain jurisdiction concerning the parties' other business disputes.

Dated: March __, 2020
        Brooklyn, New York

                                        _____
                                             Rabbi Dovid Cohen

STATE OF NEW YORK)
                                   ss.:
COUNTY OF KINGS)

        On the __ day of March, in the year 2020, before me, the undersigned, personally appeared Rabbi Dovid Cohen, personally known to me on the basis of satisfactory evidence to the individual whose name is subscribed within the arbitration award dated March _, 2020 and acknowledged to me that he executed the same in his capacity, and that by his signature on the arbitration award, Rabbi Dovid Cohen executed the arbitration award.


_____
Notary Public

# EXHIBIT 1

301

Shlomo Yehuda Rechnitz (SYR) on his own,
and as a partner in Harborview Capital "" and
Jonathan and Ephraim Kutner (JEK) on their
own, and as partners in the above company, have
come to me to adjudicate a dispute. They have
agreed to accept any decision.

Rabbi David Cohen   Aug. 14, 18

08/14/18

8/14/18

8/14/18

Case 1:20-cv-01607-KAM-VMS   Document 46-10   Filed 05/29/20   Page 10 of 11 PageID #: 713

# EXHIBIT 2

| Project Name | Senior Lender | Loan Amount | Interest Rate | Participant Name (Primary; Secondary) | Secondary Participant Interest | Maturity Date | Monthly Payments | Locations | Bed Counts | Status | First Mortgage Initial Balance | First Mortgage Maturity | First Mortgage Recourse | Latest Financials Date | T12 Revenue | T12 Expense | T12 EBIDAR | Latest T12 Occ. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bethany | MinnWest | $ 302,500 | 12% | Shlomo Rechnitz; NA | n/a | 3/2/18 | $ 3,025.00 | Minneapolis, MN | 66 | Current | $ 2,420,000 | 3/2/20 | Recourse | 11/30/17 | $ 3,022,018 | $ 3,851,655 | $ (829,638) | 64.3% |
| WestGate Tier 1 | S&T | $ 693,750 | 12% | Shlomo Rechnitz; NA | n/a | 5/21/17 | $ 6,937.50 | Rochester, NY | 124 | Past Maturity | $ 4,125,000 | 5/21/20 | Recourse | 11/30/17 | $ 8,829,796 | $ 8,334,416 | $ 495,380 | 79.7% |
| WestGate Tier 2 | S&T | $ 462,500 | 21% | Shlomo Rechnitz; NA | n/a | 5/22/17 | $ 8,093.75 | Rochester, NY | 124 | Past Maturity | See Above | See Above | Recourse | See Above | See Above | See Above | See Above | See Above |
| CareRite - Courtyard Gardens | 5th Third | $ 1,200,000 | 12% | Shlomo Rechnitz; NA | n/a | 9/1/20 | $ 13,000.00 | Jupiter, FL | 104 | Current | See Below | 5/1/20 | Recourse | 11/30/17 | $ 12,296,332 | $ 11,443,748 | $ 852,584 | 92.6% |
| CareRight Accentia | 5th Third | $ 2,659,000 | 13% | Shlomo Rechnitz; David Blonder | 7.50% | 9/1/20 | $ 29,913.75 | Tampa, FL | 266 | Current | $ 39,900,000 | 5/1/20 | Recourse | 11/30/17 | $ 22,658,615 | $ 18,206,489 | $ 4,452,126 | 84.5% |
| Legends SNF Port | S&T | $ 2,300,000 | 13% | Shlomo Rechnitz; HT Equity (MM) | 7.00% | 4/1/19 | $ 23,000.00 | Ohio | 252 | Current | $ 18,400,000 | 5/1/20 | Recourse | 12/31/17 | $ 16,199,121 | $ 15,000,117 | $ 1,199,004 | 80.4% |

$ 7,617,750

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
SHLOMO YEHUDA RECHNITZ,                                    Docket No. 20-cv-1607 (KAM)(VMS)

                              Plaintiff,                   **NOTICE OF APPEAL**

          -against-

EPHRAIM KUTNER, JONATHAN KUTNER
and GREYSTONE FUNDING CORP.,

                              Defendants.
-----------------------------------------------------------------------x
GREYSTONE FUNDING CORP.,

                              Counterclaimant/Cross-
                              Claimant and Third-
                              Party Plaintiff,

          -against-

SHLOMO YEHUDA RECHNITZ,

                              Counterclaim
                              Defendant,

          -and-

EPHRAIM KUTNER and JONATHAN KUTNER,

                              Cross-Claim
                              Defendants,

          -and-

HARBORVIEW CAPITAL PARTNERS, LLC and
CLARITY CAPITAL PARTNERS LLC,

                              Third-Party
                              Defendants.
-----------------------------------------------------------------------x

          NOTICE IS HEREBY GIVEN that defendants Ephaim Kutner and Jonathan

Kutner hereby appeal to the United States Court of Appeals for the Second Circuit

from the (1) memorandum and order of the United States District Court, Eastern

District of New York (Hon. Kiyo A. Matsumoto) entered on June 8, 2020 (Exh. A –

Docket No. 47), to the extent that it granted plaintiff Shlomo Yehuda Rechnitz's

motion to confirm an arbitration award dated March 11, 2020 (the "Arbitration

Award") and the order of attachment in aid of arbitration (the "Order of

Attachment") and denied the Kutners' motion to vacate the arbitration award and

from each and every part thereof and (2) the judgment entered June 15, 2020,

issued by the Clerk of the Court, United States District Court, Eastern District of

New York (Exh. B – Docket No. 48), which granted plaintiff's motion to confirm the

Arbitration Award and the Order of Attachment and denied the Kutners' motion to

vacate the underlying arbitration award and from each and every part thereof.

Date:  June 23, 2020

> ABRAMS, FENSTERMAN, FENSTERMAN,
> EISMAN, FORMATO, FERRARA, WOLF &
> CARONE, LLP
>
> By: _____
>     Matthew F. Didora
>     3 Dakota Drive
>     Suite 300
>     Lake Success, New York 11042
>     (516) 592-5848
>     mdidora@abramslaw.com

To:   All parties via ECF

2

A-310

1

```
 1
 2                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 3
 4     - - - - - - - - - - - - - - X
                                   :      20-CV-1697
 5    RECHNITZ,
 6                                 :
 7                      Plaintiff,:
 8                                 :
         V.                                U.S. Courthouse
 9                                         Brooklyn, New York
10    KUTNER,                      :
11                                 :
                        Defendant.    :
12
                                      June 3, 2020
13                                    10:00 o'clock a.m.
                                   :
14     - - - - - - - - - - - - - - X
15               TRANSCRIPT OF TELEPHONE CONFERENCE
16               BEFORE THE HONORABLE KIYO A. MATSUMOTO
                 UNITED STATES DISTRICT JUDGE
17
18    APPEARANCES:
      For the Plaintiff:             EFREM SCHWALB, ESQ.
19
20
21    For the Defendant:             MATTHEW DIDORA, ESQ.
22
      Court Reporter:                Anthony M. Mancuso
23                                   (718) 260-2419
24
25    Proceedings recorded by mechanical stenography,
      transcript produced by CAT.
```

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

A-311

1          (case called; both sides ready.)

2          THE COURT:  Good morning.  This is judge

3  Matsumoto.  This is a hearing to confirm an arbitration

4  award and the name of the case is Rechnitz vs.  Kutner,

5  20 civil 1607.  Starting first with plaintiff's counsel,

6  will you state your appearance, please.

7          MR. SCHWALB:  Good morning, your Honor this

8  is Efrem Schwalb from Koffsky Schwalb.

9          THE COURT:  Who do we have for the Kutners?

10          MR. DIDORA:  Matthew Didora for the Kutners.

11          THE COURT:  And we also have Graystone.

12  Would you please state your appearance?  I'm sorry.

13  Please use the microphone.

14          MR. SPEYER:  Good morning, Jay Speyer for

15  Graystone.

16          THE COURT:  I would like to deal first with

17  the Graystone motion if I could because I know they have

18  been anxious to be relieved from this case and so let me

19  hear from Mr. Speyer.  I think you have laid out grounds

20  for relief.  I am happy to hear from you, if you would

21  like to be heard further.

22          MR. SPEYER:  I think, with our revised

23  application for fees, we rely upon our papers for the

24  most part.  We believe that our fee request is

25  exceedingly reasonable.  At this point for the reasons

A-312

3

```
 1    laid out in our papers we do not believe that the forum
 2    rule should apply here and we believe that the court has
 3    broad discretion in this regard.  We do not believe the
 4    forum rule should apply here for a variety of reasons
 5    including that this case did not arise out of a vacuum.
 6    Graystone was retained in response to a demand by
 7    Rechnitz upon Graystone before this action commenced.
 8    Graystone is a defendant in this action.  Morrison Cohen
 9    Cohen was retained because of its expertise really with
10    the issues in this action emanating out of a six-year
11    litigation between Graystone and Rechnitz.  Morrison
12    Cohen has detailed knowledge of the parties, the issues,
13    as well as the settlement agreement which is at issue
14    here and for that reason it was reasonable for Graystone
15    to retain Morrison Cohen.
16            So as you saw in our amended request we have
17    reduced our fees and we are not claiming now any fees in
18    connection with our supplemental papers to the court.
19    We are not claiming any fees in connection with our
20    reply papers to the court.  We have also reduced our
21    fees by reducing all attorney time that we otherwise
22    were claiming by five percent on account of any internal
23    conferences or communications between attorneys at
24    Morrison Cohen and by 7.5 percent in case there was any
25    duplication of effort and we would ask that the court
```

A-313

4

```
 1  award us attorneys' fees as requested in our
 2  application.  We believe that Southern District rates
 3  are appropriate at six hundred dollars an hour for
 4  attorneys, $200 an hour for our paralegal and 175
 5  dollars an hour for our managing clerks.  Those rates
 6  are well below our standard rates and we believe they
 7  are well within the rates typically awarded in the
 8  Southern District.
 9              If your Honor believes the Eastern District
10  rates should apply, we would ask for rates of 475
11  dollars an hour for attorneys and a blended rate of $100
12  an hour for our managing clerks and paralegal.
13              THE COURT:  All right.  Thank you,
14  Mr. Speyer.  I am prepared to rule as follows:
15  Graystone shall be permitted to deposit the disputed
16  settlement funds, if they have not already, in the
17  registry of the court.  We have made arrangements with
18  the clerk of the court and we will be prepared to give
19  you the name of a clerk in the court's office to assist
20  you with the deposit.  And that it be placed in an
21  interest-bearing account.  There will be some
22  administrate fees and they would not be as high as one
23  would find with a private bank.
24              Second, it did not appear that anybody
25  objects to dismissing Graystone from this action and I
```

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

A-314

```
1   will do so with prejudice and I believe Graystone also

2   asks that it be held harmless for any further claims by

3   Mr. Rechnitz or the Kutners for proceeding against

4   Graystone; is that correct?

5            MR. SPEYER:  That's correct, your Honor.

6            THE COURT:  Does any attorney for either

7   Mr. Rechnitz or the Kutners object to the request that

8   Graystone be held harmless and not be sued or be immuned

9   from any claims or proceedings against Graystone for any

10  matters relating to this dispute?  Does anybody have

11  issues with that?  They will continue to honor their

12  agreement with the Kutners.  I'm happy to hear first

13  from plaintiff's counsel, Mr. Schwalb.

14           MR. SCHWALB:  This is Mr. Schwalb.

15           I was just going to say provided that they

16  are complying with their agreements and that the

17  deposits that were supposed to be made were made we

18  don't have an objection to hold harmless with Graystone.

19           THE COURT:  What about you, Mr. Didora?

20           MR. DIDORA:  No, your Honor.  Subject to the

21  same conditions that Mr. Schwalb just articulated, we

22  have no objection to a hold harmless for Graystone.

23           THE COURT:  In addition, I will be in a

24  position to award attorneys' fees to counsel for

25  Graystone.  I will not state an amount at this time.  I
```

A-315

6

```
 1   wanted to take a closer look at Graystone's fees.  It

 2   did strike me initially that the hourly rate, the amount

 3   of time spent at least based on what I could observe

 4   from the docket submissions and the appearances by

 5   Graystone's counsel at a few of the conferences, they

 6   seemed quite high.  I appreciate Graystone's willingness

 7   to impose a five percent fee reduction and also,

 8   frankly, sir, in the Eastern District we apply Eastern

 9   District rates, so I will be looking at that closely and

10   will issue a specific order directed to the amount of

11   fees that will be awarded to Graystone.

12            My understanding is that there are no

13   objections -- the Graystone fees will be paid.  Is it

14   correct in my understanding that they will be in the

15   amount owed by Graystone to the Kutners?

16            MR. SPEYER:  Your Honor, what we requested

17   and what I believe the case law allows is that the

18   attorneys' fees and costs may be deducted from the

19   amount that we are currently holding in escrow in our

20   attorney escrow account, which is the disputed funds.

21   So we are holding right now 450 thousand dollars in our

22   escrow account which are the monthly payments for April

23   1, May 1 and June 1 and we would ask your Honor that we

24   be allowed to deduct whatever attorneys' fees your Honor

25   awards us from that amount.
```

A-316

7

```
 1              THE COURT:  I see.  And then the balance
 2    would be placed in the clerk's registry and all future
 3    payments would be deposited in the clerk's registry.  Is
 4    that what you contemplate, Mr. Speyer?
 5              MR. SPEYER:  Yes, your Honor, that is what
 6    we contemplate.
 7              THE COURT:  All right.  Thank you.  What we
 8    will do is issue an order that provides that
 9    arrangement, absent any objection by the plaintiff or
10    the defendant Kutners.
11              Mr. Schwalb, do you have an objection?
12              MR. SCHWALB:  It's not an objection, your
13    Honor.  I guess the Kutners' counsel and I have
14    discussed that we had an agreement that it would be okay
15    if the money was placed in my escrow account which makes
16    it simpler to get the money out if we can resolve this.
17    Assuming that Mr. Didora is okay with that and assuming
18    that the law allows the funds to be deposited in another
19    location it might make it simpler if we had that
20    agreement.  That's one issue.
21              The only other issue I wanted to mention is
22    that the -- we believe that the interpleader -- whether
23    or not the petition to confirm is granted the
24    interpleader should remain in effect.  In other words,
25    the deposits from Graystone should remain in effect
```

ANTHONY M. MANCUSO,    CSR    OFFICIAL COURT REPORTER

A-317

8

1   until the disputes, the entire disputes between the

2   Kutners and Mr. Rechnitz are resolved because the

3   interpleaders were agreeing to let Graystone out of this

4   providing that the money is being set aside so that when

5   this dispute is resolved we can get the money.

6         THE COURT: Well, my view is that the clerk

7   of the court will hold the money because, A, that is

8   what Graystone requested; B, that is commonly done; and

9   C, I don't believe that there would be any further

10   disputes between the parties if the clerk were to hold

11   the money. The clerk will issue, upon any order, issue

12   funds as I direct, whereas it seemed to me that the

13   Kutners and Mr. Rechnitz are at odds over many things

14   and sometimes we think they have agreed and sometimes

15   they walk away from their agreement.

16         With regard to Graystone and the money that

17   it owes to the Kutners, the monies should be on deposit

18   with the clerk of the court and Graystone will continue

19   to deposit each month the amount that it owes to the

20   Kutners.

21         Now, it may be that Graystone is capable of

22   just depositing the full amount, so I don't know. In

23   any event, making those monthly deposits whether you

24   make a lump sum of what is owed is up to Graystone. I

25   think that the monies will be under the court's

1  jurisdiction and we will make distributions based on the
2  resolution of this case.  I will retain jurisdiction
3  just in case Graystone is not honoring its agreements
4  and we have issues.  The whole key to resolving this
5  case appears to be making sure that the monies that
6  would be available pursuant to the arbitration award are
7  going to fund whatever decision, judgment or resolution
8  we might reach in this case.  So I didn't want to keep
9  Mr. Speyer longer than necessary because I believe your
10 fee clock is running while we conduct this hearing, and
11 so I wanted to address your motion first.  Does anyone
12 have anything they would like to raise regarding
13 Graystone's role in this?  If not, I will excuse
14 Mr. Speyer.
15            Does Mr. Schwalb or Mr. Didora have anything
16 else they would like to resolve or discuss regarding
17 Graystone?  Mr. Schwalb.
18            MR. SCHWALB:  No, your Honor.  Thank you.
19            THE COURT:  Mr. Didora.
20            MR. DIDORA:  No, your Honor.
21            THE COURT:  All right.  Thank you.
22 Mr. Speyer, thank you for your time and attention, we
23 will be issuing a fee award, although at this point I'm
24 not prepared to tell you how much your award will be.
25            MR. SPEYER:  Thank you, your Honor.

A-319

```
 1            THE COURT:  Thank you.

 2            We're here to decide whether or not the

 3   attachment and the arbitration award should be confirmed

 4   and I have read the parties' submissions.  However, if

 5   the parties wanted to present evidence regarding whether

 6   or not the award should be confirmed I'm happy to hear

 7   from the parties.  Did you have evidence you wanted to

 8   present, Mr. Schwalb on behalf of Mr. Rechnitz and the

 9   plaintiffs?

10            MR. SCHWALB:  Your Honor, the evidence that

11   we submitted are the declarations and the exhibits.  For

12   all the declarations, I'm assuming your Honor is

13   accepting those into evidence.  There are obviously

14   issues that are being debated between the parties.

15   Fundamentally I believe it's the Kutners' burden to show

16   that it is clear -- the language from the Supreme Court

17   is that it's clear that the arbitration clause did not

18   include this dispute, the Graystone dispute, and I

19   believe that they have not satisfied that burden to show

20   that the clause did not clearly involve this dispute.

21   To the contrary I think the evidence that we showed --

22   as your Honor mentioned, there were many disputes.

23   Graystone was one of them.  They were fighting about

24   Graystone in multiple ways and that issue was supposed

25   to be decided by Rabbi Cohen and it was decided by Rabbi
```

A-320

1   Cohen.  There are many documents and emails that show

2   that the Graystone litigation was a matter of dispute in

3   several different ways.  Mr. Rechnitz stopped funding.

4   There were issues as to that.  How much he stopped

5   funding was an issue.  What the pro rata was to be was

6   an issue.  Who should control the litigation was an

7   issue and these are all before Rabbi Cohen.

8           THE COURT:  You're breaking up, sir.

9           MR. SCHWALB:  I apologize.  So what I was

10  saying is to the extent that the court would like me to

11  address any of the issues that the Kutners -- the claims

12  the Kutners made about this and the evidence showing

13  that those claims are false, the papers address

14  everything.  But to the extent that the court has any

15  questions about them I can certainly address and show in

16  the evidence where -- that it is clear that this issue

17  was before Rabbi Cohen.

18          THE COURT:  Mr. Schwalb, you're breaking up.

19  We can't hear you.  You are frozen.

20          MR. SCHWALB:  It may be the internet

21  connection.  How is it now?

22          THE COURT:  It's fine.

23          MR. SCHWALB:  I apologize.

24          THE COURT:  Let me just say this:  One, I'm

25  prepared to accept the exhibits that have been submitted

A-321

1    by the parties.  There doesn't seem to be a dispute that

2    the parties did enter into an arbitration agreement

3    before the rabbi.  It appears also that they agreed to

4    submit the dispute to the rabbi.  It appears that the

5    rabbi resolved the dispute, which included the Graystone

6    loan.  It does not appear to me, at least based on the

7    evidence before me, that the Kutners ever objected to

8    the Graystone loans being part of the arbitration

9    conducted by the rabbi.  In fact, the rabbi heard

10   evidence regarding many loans, including a total of I

11   believe it was eleven million dollars in loans between

12   Mr. Rechnitz and the Kutner brothers.

13          In addition, it appears that the rabbi

14   attempted to bring the Kutners in for a second hearing

15   after the parties' settlement attempts were

16   unsuccessful.  The rabbi said come forward, we did give

17   you an opportunity to present the evidence and the

18   witnesses that you would like me to consider.  The

19   response to that was a letter from the Kutners'

20   representative saying that they do not have to come in

21   because the matter was resolved and apparently after the

22   matter in fact was not resolved Mr. Rechnitz' attorney

23   asked the rabbi to go ahead and issue a decision because

24   the Kutners were not willing to come forward to continue

25   to present their evidence.  And I'm citing to

A-322

13

```
 1   Mr. Bechhoffer's letter to the rabbi which states that
 2   the dispute has been resolved and everyone is in
 3   agreement and the Kutners need not appear to present --
 4   that the Kutners did not choose to avail themselves of
 5   the rabbi's invitation to come in and present further
 6   evidence on their behalf at the second arbitration
 7   hearing.
 8             Now, Mr. Didora, I don't know if you dispute
 9   that.  I don't see any evidence that the Kutners ever
10   said, wait a minute, rabbi, we want to come in and
11   present -- this is after Mr. Bechhoffer's letter saying
12   we need not come in and present.
13             MR. DIDORA:  Your Honor, Rabbi Bechhoffer is
14   just that.  He's a rabbi.  He is not a lawyer.  He is
15   not trained in the process of arbitration.  He doesn't
16   understand the law regarding the arbitration act or the
17   consequences.  He was a layperson to Rabbi Cohen.  The
18   essential message from Rabbi Bechhoffer, there was no
19   need to come in because there was nothing to arbitrate
20   for two reasons.  One, in the Kutners' mind they thought
21   they had reached a settlement agreement with
22   Mr. Rechnitz.  If that belief was wrong -- the second
23   reason why there was no purpose of having a subsequent
24   arbitration because the Kutners never agreed to
25   arbitrate anything about the Graystone litigation loan.
```

A-323

1   The August arbitration agreement specified a single

2   dispute and if you look at the list of what Mr. Rechnitz

3   had said about this it's very telling how the story has

4   changed over the last couple of months.

5            THE COURT:  Sir, may I just ask you a simple

6   question?  Where in the record do your clients inform

7   the rabbi that the Graystone loans are not part of the

8   dispute?  Where do they state that?

9            MR. DIDORA:  Well, we say it -- it's in

10  Rabbi Bechhoffer's letter.  Again, it's the spirit of

11  what's in the letter.  It's not in their verbatim.

12           THE COURT:  I used federal contract

13  principles in deciding whether the parties agreed to

14  arbitrate.  The Bechhoffer letter says the dispute

15  between my client and Mr. Rechnitz for which they

16  appeared before the -- this is what Mr. Bechhoffer said

17  in a letter to Rabbi Cohen.  "On behalf of my client I

18  wish to bring to the honored rabbi's attention that the

19  dispute between my clients and Mr. Rechnitz for which

20  they appeared before the honored rabbi in the summer of

21  2018 has long since been resolved."

22           During the earlier proceedings the rabbi

23  heard evidence of multiple monetary obligations that the

24  Kutners had to Mr. Rechnitz, including the Graystone

25  loan.  So this is that the Kutners did not understand

1    and not object -- they did not object to the rabbi

2    considering the dispute which included the Graystone

3    loan.  There's no doubt in my mind and the defendant has

4    pointed to no evidence.

5            MR. DIDORA:  If you look at Rabbi

6    Bechhoffer's letter, which is attached as Exhibit P to

7    Mr. Weldler's declaration which contains the quote that

8    your Honor just read, that letter attaches a form of

9    2018 email between Kutner and Mr. Rechnitz.  It mentions

10    two things, one of which is the Mezzanine loans.  We

11    have maintained that the only thing that was discussed

12    at the arbitration hearing in August of 2018 and what

13    that email discusses regarding the Mezzanine loans is a

14    resolution that is different than what Rabbi Cohen ruled

15    on in November of 2018.  So when Rabbi Bechhoffer says

16    the dispute has long since been resolved, what he's

17    saying is we resolved the Mezzanine loan issue and

18    that's over.  The reference to the Graystone litigation

19    that's in this -- that's attached to Rabbi Bechhoffer's

20    letter is a summary that was drafted in the fall of 2018

21    and all it says there is we have agreed that we are

22    going to take advantage of the available position we

23    have in the litigation against Graystone right now and

24    try to settle the case.  It does not reflect any dispute

25    between the parties regarding the Graystone case.  Make

A-325

16

1    no mistake about it.  What the arbitrator ruled in March

2    of 2020 was a dispute about the division of the

3    settlement proceeds which could not have existed prior

4    to May of 2019 when there was in fact a settlement and

5    money to be split up.  That dispute only arose for the

6    very first time in May of 2019 or after that.  It could

7    not have existed and did not exist in August of 2018.

8    And if you look at what Mr. Rechnitz has said about

9    this, if you look at his original submissions to the

10   court, painted a picture that he went to arbitration in

11   August of 2018 and the only thing that was discussed was

12   the Mezz loans and it resulted in the March 2020 award,

13   when we know that that is not true at all.  Only now,

14   only after being challenged on that, did Mr. Rechnitz

15   say, oh, yeah, the August arbitration involved a number

16   of issues, a number of issues, including the Graystone

17   litigation and the Mezzanine loan issue.  He has

18   concocted these issues that were apparently in dispute

19   back in August of 2018, whether he had to continue

20   funding the litigation, amounts he funded towards the

21   litigation and those issues are being characterized as

22   central to the August arbitration.  Well, if they were

23   so central how come the arbitrator's award didn't

24   reference those issues at all in any respect?  They

25   never come up in the award.  Not a single shred of

A-326

```
 1    evidence after the time of the August arbitration
 2    references this supposedly central issue and if it was
 3    so central, those issues about what was being funded --
 4    had been funded and whether Mr. Rechnitz had an
 5    obligation to continue funding then why on the earth
 6    weren't they included in the November 2018 award when
 7    those issues were hot then.  Those are issues.  They
 8    needed to be decided then.
 9              One last point.  If you look at Exhibit K to
10    Mr. Welder's declaration he says there verbatim that we
11    asked that the rabbi issue a final written award
12    concerning the dispute, the singular dispute, between
13    Mr. Rechnitz and Ephraim and Jonathan Kutner relating to
14    certain Mezzanine loans that Mr. Rechnitz funded.
15    That's in the October 26, 2018 email from Mr. Welder.
16    There is not a single mention of anything about the
17    Graystone litigation.  There was no dispute at that time
18    that was capable of being resolved by the arbitrator.
19    Was Mr. Rechnitz unhappy with the progress of the case?
20    Yes, he was.  But that's not something the arbitrator
21    can resolve.  Maybe it's something the arbitrator did
22    resolve.  The only issue the arbitrator did resolve is
23    an issue that arose after May of 2019.  By temporal
24    reality that dispute could not have existed in August of
25    2018 such that it was presented to Rabbi Cohen.
```

A-327

```
 1                THE COURT:  Are you finished?

 2                MR. DIDORA:  Yes.

 3                THE COURT:  There's no evidence in the

 4     record that your client unequivocally stated to the

 5     rabbi or suggested to the rabbi consideration of the

 6     evidence which included the Graystone lawsuit.

 7                MR. DIDORA:  There was no evidence.

 8                THE COURT:  Yes.  I know there's no

 9     evidence.  That's why I'm asking you the question.  I

10     want to confirm there's no evidence.  There is no

11     evidence that your clients ever said, rabbi, the

12     Graystone loans are not part of this, we object.  Rabbi

13     we want to object to any evidence that Mr. Rechnitz

14     presents regarding the Graystone loans because it's not

15     part of this arbitration.  Your clients have been all

16     over the place.  They signed an arbitration agreement

17     then they said it was not an arbitration agreement.  Now

18     they concede it is an arbitration agreement.  What they

19     are saying now is that they did not agree to arbitrate

20     the Graystone loan.  Let me tell you something.  The

21     rabbi understood that he was arbitrating the Graystone

22     loan and there's no evidence in the record that your

23     clients said, rabbi, no, you're not arbitrating the

24     Graystone loans.  They are not part of this.  I object

25     to the evidence Mr. Rechnitz is tendering regarding the
```

A-328

19

1    Graystone loans.  The law, the supreme court counsels

2    that we interpret the arbitration agreement broadly and

3    here when the rabbi actually rendered his decision he

4    directly decided and resolved the disputes regarding the

5    Graystone loans.

6               And let me back up even a little further.  I

7    think you said at the beginning of your argument that

8    he's just a rabbi.  He's not a lawyer.  He can't

9    arbitrate.  Well, your clients and the plaintiffs agreed

10   to avail themselves of the beth din process and submit

11   their dispute to a rabbi and whether or not you or I or

12   anyone else thinks a rabbi who is at a lawyer should not

13   act in a decision-making capacity, the parties agreed

14   that this rabbi would do so.  You know what, it's quite

15   common in this district.  The parties do submit to a

16   rabbinical court.  You are now asking me as a district

17   judge to confirm the arbitration award issued by a

18   rabbinical court.  I don't agree with you that after

19   your clients and the plaintiffs agreed that the rabbi

20   had authority to resolve their dispute and they did so

21   in writing that now I have authority because that rabbi

22   is just a rabbi and he's not a lawyer.

23               MR. DIDORA:  Your Honor, what I was saying

24   about that the person was just a rabbi, I was not

25   referring to Rabbi Cohen.  I was referring to rabbi

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

A-329

20

```
 1   Bechhoffer -- your Honor, in excusing his lack of

 2   understanding of the arbitration act I was referring to

 3   Rabbi Bechhoffer, not Rabbi Cohen.

 4              THE COURT:  Sir, look, your clients chose

 5   him to represent them.  They chose someone who is not a

 6   lawyer.  That is not our problem at this point.  He was

 7   the designated choice of your clients to represent them

 8   before the rabbi who decided this case.  I am not

 9   disputing that choice.  Do not now come and say that

10   your client's own choices to resolve them of the

11   consequences of their choices in front of the rabbi in

12   the rabbinical court.  Nobody made them retain somebody

13   who was not a lawyer.  That was their choice.  It might

14   have been a very smart choice to have a rabbi who is

15   learned and scholarly appear before another rabbi to

16   make whatever arguments they thought would be best in

17   the service of the client.  I'm not questioning that.

18   Please don't come now and say, well, this wasn't a real

19   arbitration and the representative the defendants chose

20   was only a rabbi and not a lawyer and that now we should

21   not confirm the rabbi's decisions, which clearly

22   included the Graystone dispute in my view or your

23   clients should have objected at the time, not in

24   hindsight, which is what they are doing now.

25              MR. DIDORA:  Your Honor, I don't think that
```

```
1    the law is such that unless you tell an arbitrator he

2    doesn't have the power to decide something that that

3    imbues the arbitrator with a the power to make a

4    decision on it.  Arbitration is a consensual process and

5    you must affirmatively opt into arbitration through a

6    consent, not through silence.

7              THE COURT:  They consented and signed a

8    document saying that they agreed to have the rabbi

9    resolve the dispute and what I think you are arguing now

10   is what the dispute is because the rabbi certainly

11   stated unequivocally on August 22, 2018 -- I read some

12   frustration in the rabbi's language here.  Rabbi Cohen

13   said I challenge the statement that there was any hint

14   of coercion to sign an arbitration agreement.  I was not

15   aware of any agreement not to bring the CFO.  This is

16   Mr. Rechnitz's CFO.  Both sides were quite amenable when

17   I asked what they preferred and it was arbitration.  I

18   have already assured the Kutners that we shall all get

19   together before a final decision is rendered.  So the

20   Kutners understood exactly what they were getting into.

21   The rabbi says it was absolutely a voluntary agreement

22   and I think understandably, if I'm reading his tone

23   correctly, he's a little bit miffed that your clients

24   would claim it was not really an arbitration agreement.

25              MR. DIDORA:  We clearly agreed to arbitrate
```

A-331

```
 1   a dispute.  They clearly agreed to arbitrate a dispute
 2   and that dispute related to the Mezzanine loans.
 3   Mr. Weldler said it, the post-August responses reflect a
 4   singular dispute relating to the Mezzanine loan and that
 5   singular dispute was resolved by Rabbi Cohen in the
 6   November 2018 award.  At that point the arbitration was
 7   over.  A single dispute over in November of 2018.  The
 8   parties to the litigation funding agreement were a party
 9   to the arbitration agreement.  The only --
10               THE COURT:  I think you are repeating
11   yourself.
12               Do you have anything else you want to say,
13   Mr. Didora?
14               MR. DIDORA:  No, your Honor.
15               THE COURT:  Mr. Schwalb, do you want to be
16   heard on this?
17               MR. SCHWALB:  No, your Honor.  I think your
18   Honor has said it better probably than I can say it.
19               THE COURT:  This is the thing:  The parties
20   claim there was some sort of resolution.  Maybe part of
21   this was resolved or it wasn't.  At some point
22   Mr. Rechnitz said all right, enough already, rabbi put
23   on the second hearing so that the Kutners can come and
24   present their evidence and we can get this case
25   resolved.  The rabbi did that and he was met with this
```

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

A-332

23

1   letter from Mr. Bechhoffer, Exhibit P, stating, you

2   know, it's all resolved.  No problems.  We don't need

3   more -- we don't need another hearing before you.  So at

4   that point Mr. Rechnitz asked the rabbi to issue an

5   award in connection with the Graystone loan and, again,

6   evidence had been presented before the rabbi at the

7   hearing regarding the Graystone loan without any

8   objection from the Kutners.

9          On March 11, 2020 Rabbi Cohen issued an

10  arbitration award specifically dealing with the

11  Graystone loan and made rulings and also reserved the

12  fact that a separate decision on other outstanding

13  disputes would be issued.  So clearly we still are a

14  pending arbitration.  I don't know, Mr. Schwalb and

15  Mr. Didora, whether the rabbi did ever issue a

16  subsequent decision on the other outstanding disputes.

17  But his March 11, 2020 decision clearly and without any

18  dispute addressed the Graystone funding loan and gave

19  authority to Mr. Rechnitz to contact Graystone directly,

20  direct that Graystone make payments to Mr. Rechnitz and

21  his organizations and directed the Kutners to cooperate

22  and for them not to interfere with any instructions to

23  Graystone regarding making payments to the plaintiff.

24         Now I don't have any evidence in the record

25  that after this decision issued that the Kutners said,

A-333

24

1   wait a minute, Rabbi Cohen, this was never agreed to.

2   We didn't ever arbitrate this.  This was not within your

3   authority to arbitrate.  There's no objection to this

4   order and in fact it appeared that the Kutners

5   acknowledged the order and led Mr. Rechnitz to believe

6   that they were going to honor it.

7            MR. DIDORA:  Your Honor --

8            THE COURT:  When they didn't, Mr. Rechnitz

9   filed this action to confirm the arbitration award.  I

10  don't see any evidence that the rabbi was ever told,

11  look, you made a big mistake, how could you possibly

12  have thought that we submitted the Graystone dispute to

13  your authority.

14           MR. DIDORA:  Your Honor, Mr. Kutner says in

15  his declaration that he was not aware of the March award

16  until it was attached to the papers in this action.  The

17  reason they objected to the rabbi immediately after the

18  award because they didn't know about the award.  There's

19  no evidence in the record that they discussed this award

20  with Mr. Rechnitz when it was issued on March 5 and

21  April 1 when the Kutners found out about this

22  proceeding.  They didn't know about it.  That's why they

23  didn't do anything about it.  They didn't know it until

24  this case came up.

25           THE COURT:  Mr. Schwalb.

A-334

25

```
1           MR. SCHWALB:  It was sent to them.  There is
2   now in the record -- we actually sent the wrong
3   certified receipt.  It was sent to their business
4   address certified on March 11 when it was issued.  They
5   certainly knew that Mr. Rechnitz was submitting a
6   proposed order and they did not object to that proposed
7   order and a month passed and they said nothing about it.
8   Like your Honor said, Mr. Bechhoffer -- he didn't say
9   that the dispute was not submitted to Rabbi Cohen.  What
10  he said was the dispute and the first issue when he said
11  the dispute in the email that he attached was the
12  Graystone lawsuit, he said the dispute was settled.  So,
13  Rabbi Cohen, you don't have to rule?
14          The only other point he makes is we never
15  agreed to arbitrate at all.  He never said we agreed to
16  arbitrate the Mezz but we didn't agree to arbitrate
17  anything else.  The truth is and these are the facts and
18  there's a lot of evidence to this, including the
19  Lipnitsky declaration, the expert that Rabbi Cohen
20  appointed in 2018, right after, right after or that day,
21  like a day later, he appointed Mr. Lipnitsky and he told
22  them there are a lot of disputes here and I need you to
23  go through all the books and records and we sent him a
24  letter and the first item on the letter is the Graystone
25  litigation and trying to figure out amounts, auditing
```

A-335

26

1   the companies, how much was contributed, etcetera.

2           So back to the question your Honor asked, I

3   don't know if they got the item that we sent return

4   receipt requested.  I did not get the green return

5   receipt back.  But they certainly knew that the proposed

6   order was being submitted to Rabbi Cohen and nobody said

7   are you ruling, are you not ruling, don't rule because

8   we didn't submit the Graystone dispute to you, Rabbi

9   Cohen.

10          So what your Honor is saying is correct.

11  Whether they received it or not, I think they did.  But,

12  you know, I was not there when the letters were

13  received.  I think actually, if I'm not mistaken,

14  somebody may have actually dropped it off at their house

15  that day on March 12 or 13 as well.  But the formal

16  sending was through certified mail to their business

17  address.

18          THE COURT:  You know, I'm troubled by the

19  Kutners' behavior here.  I mean it appears to me that

20  they have made representations and then backtracked and

21  promised things to Mr. Rechnitz and then backtracked and

22  it is concerning.  I know that after the lawsuit was

23  filed the Kutners initially denied there was an

24  arbitration and they stated that under penalty of

25  perjury, frankly.  But now they have changed their minds

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

A-336

27

```
1    again and they said there was an arbitration but it just
2    didn't include Graystone.  I would say the evidence is
3    more than a preponderance.  It's clear and convincing
4    that the Graystone dispute was part of the arbitration
5    and they are only raising this dispute now because they
6    don't want to be before a district court of the United
7    States government that is going to exercise jurisdiction
8    to decide whether or not both the arbitration award and
9    the attachment should be affirmed.  The federal
10   arbitration act, which is where we are in now, we are
11   applying federal law and state law to the extent the
12   contract principles apply.
13            The federal arbitration act says that the
14   court may vacate an award if I find the following:
15   Where the award was procured by corruption, fraud or
16   undue means and I specifically find that the award was
17   not procured by corruption, fraud or undue means.
18            Second, where there was evidence of
19   partiality or corruption in the arbitration.  I find
20   that the rabbi in this case was fair.  He was wanting to
21   give the Kutners an opportunity to come back in before
22   him and present their evidence and their documents which
23   they declined to do.  He was not partial.  There's no
24   evidence of partiality or corruption and I don't believe
25   the Kutners have made that argument nor could they on
```

A-337

1   this record.

2           Third, if the arbitrators were guilty of

3   misconduct in refusing to postpone a hearing upon

4   sufficient cause shown or in refusing to hear evidence

5   pertinent and material to the controversy or any other

6   misbehavior by which the rights of any party have been

7   prejudiced.  Here the rabbi urged the defendants to come

8   back and present their case.  He wanted to hear more.

9   He inspired them to do so.  They refused.  The third

10  factor for vacating an arbitration award has not been

11  met and I don't believe the Kutners are arguing that

12  that ground has been met.

13          Fourth, where the arbitrators exceeded their

14  powers or so imperfectly executed them that a mutual

15  final and definite award upon the subject matter

16  submitted was not made.  This is what we have been

17  fighting about.  Factor four, whether the arbitrators

18  here exceeded their powers or so imperfectly executed

19  them that a mutual final and definite award upon the

20  subject matter submitted was not made.  And I agree that

21  this is the nut of the dispute between the parties,

22  whether or not the Graystone loans were part of the

23  arbitration and as we have discussed for the last hour

24  or so, the parties clearly submitted the Graystone

25  dispute to the rabbi.  There's no doubt in my mind and

1    they did not voice any objection to the arbitrator

2    exercising his authority over the Graystone loan

3    dispute.

4              Now, as we know, the United States Supreme

5    Court in the case Mitsubishi Motors Corporation vs.

6    Soler Chrysler-Plymouth Inc., 473 United States 614 at

7    page 626 decided in 1985, held:  "The dispute should be

8    resolved in favor of arbitration, thus as with any other

9    contract the parties' intentions control but those

10   intentions are generally construed as to the issues of

11   arbitrability."  And here based on this record and what

12   the rabbi considered, without any objections from the

13   Kutners, I believe the record accords a finding that the

14   Graystone dispute was before the rabbi and that the

15   parties agreed to have his decision issued on that

16   dispute.

17             Now, as we know, I have issued an order of

18   attachment pursuant to federal rule of civil procedure

19   64 because the remedy of the attachment exists under

20   state law.  Under New York City civil practice law and

21   rules on a motion for an order of attachment or to

22   confirm an order of attachment, the same factors, the

23   plaintiffs must show by affidavit that there's a cause

24   of action.  Here we have an ongoing arbitration that is

25   still pending; two, that is probable that the plaintiff

A-339

1    will succeed on the merits and I have previously found

2    in issuing the order of attachment that the plaintiffs

3    -- I have issued an order of attachment.  I have found

4    previously that the plaintiffs will succeed on the

5    merits in light of the arbitration award in the

6    plaintiff's favor and in light of the evidence in the

7    record that the parties had a full and fair opportunity

8    to present evidence relevant to the matters being

9    arbitrated.  Third, I find that the grounds under

10   Section 7502 of the CPLR exist and, fourth, that the

11   amount demanded from the defendants exceeds all

12   counterclaims known to the plaintiff.  There's no

13   evidence of counterclaims here and I don't believe we

14   should have counterclaims.

15          As I said, I'm applying CPLR section 7502

16   because the attachment is being sought in aid of the

17   arbitration.  The standard that I apply under Section

18   7502 is whether the arbitration award may be rendered

19   ineffectual without the attachment and I have previously

20   determined that that is the case.  So in order to

21   confirm the attachment at this stage, given that I have

22   already issued an order of attachment, I first have to

23   confirm the underlying arbitration award and in addition

24   I must find that there is a cause of action.  Here the

25   ongoing arbitration for which the rabbi will be issuing

A-340

```
 1    additional orders is still pending.  Second, it is
 2    probable that petitioner will succeed on the merits.  He
 3    has already obtained a favorable arbitration award from
 4    the rabbi and that the award will be rendered or may be
 5    rendered ineffectual without the attachment.  I have
 6    already found that that is the case.  And, fourth, that
 7    the amount demanded by the plaintiffs from the Kutners
 8    exceeds all counterclaims -- the amount demanded from
 9    the Kutners exceeds all counterclaims known to the
10    petitioner.
11              Now, we talked about whether the Kutners
12    could vacate the arbitration award and for the reasons
13    that I have stated I believe the record is very clear
14    that the arbitration before Rabbi Cohen included the
15    Graystone loans.  There was evidence presented to the
16    rabbi.  There was no objection to that evidence by the
17    Kutners.  The Kutners never specifically stated to the
18    rabbi that the Graystone loans were not part of the
19    arbitration or that the arbitration was limited only to
20    the Mezzanine loan.  All the parties in their individual
21    capacities -- all parties to the arbitration signed the
22    arbitration agreement and the rabbi was absolutely sure
23    that the arbitration agreement was to arbitrate, not
24    mediate, and that the parties voluntarily signed that
25    agreement.
```

A-341

32

```
1                I see no basis not to confirm the

2    arbitration award and the defendants have not satisfied

3    their burden to vacate the arbitration award.

4                Now, I will issue a full decision on this

5    matter.  But unless the Kutners have other evidence they

6    want to present and want me to consider and they have

7    been given ample opportunity and numerous extensions to

8    do so, I believe this record is complete and I may

9    decide the issues before me based on this record.

10               Mr. Didora, do you disagree with that?

11               MR. DIDORA:  I disagree with the court's

12   interpretation of the evidence.  I'm not aware of any

13   additional evidence that the Kutners would present at

14   this time.

15               THE COURT:  All right.  Then if nobody has

16   anything else they want to present, we can conclude this

17   hearing and I will issue a decision.

18               MR. SCHWALB:  Your Honor, the only point

19   that I would like to make is the award provides that the

20   Graystone money goes to Mr. Rechnitz and the

21   interpleader motion -- since your Honor is confirming

22   the arbitration award, my preference is instead of

23   involving a court deposit and getting the money out of

24   there that we can agree that the money should be sent

25   from Graystone, I guess minus their fees, to
```

A-342

33

1    Mr. Rechnitz and we may make a motion that those fees
2    that Graystone is going to be subtracting should be
3    added and that would be a straight motion, should be
4    attributable to the Kutners and not Mr. Rechnitz because
5    what he has done is completely appropriate in this
6    instance.  But I'm not sure we need to deposit it into
7    the court and perhaps we can have an agreement on that.
8                    THE COURT:  So are you asking for
9    Mr. Didora's response whether he'll agree to that.
10                   MR. SCHWALB:  I guess his response, if he
11   agrees, would make it simpler.  Even if he doesn't
12   agree, I believe your Honor has the power to do that as
13   well, namely, since the award provides that the money is
14   supposed to be going to Mr. Rechnitz, there shouldn't be
15   a need for us to deposit it in the court.  Your Honor
16   could just rule that the interpleader motion was
17   appropriate at the time but now that the decision to
18   confirm has been granted the money will be sent to
19   Mr. Rechnitz by Graystone.
20                   THE COURT:  Do you want it to go directly to
21   him or do you want it to go to you?
22                   MR. SCHWALB:  Either way is fine and I don't
23   remember if the award actually provides what's supposed
24   to happen.
25                   THE COURT:  I think it says to Mr. Rechnitz

ANTHONY M. MANCUSO,    CSR    OFFICIAL COURT REPORTER

A-343

```
1   or to the SYR or something like that.
2              MR. SCHWALB:  So Mr. Rechnitz directly.
3   That would be the way to go.
4              THE COURT:  I'll take that under advisement.
5   I feel badly because I just told Graystone's counsel to
6   proceed in one direction.  I think what we'll do is take
7   your request under advisement.  I suppose making the
8   argument that if I am confirming the award then all
9   aspects of the award should be confirmed and not excise
10  the payment terms or the specific instructions regarding
11  how that award should be paid.
12             MR. SCHWALB:  That's correct.
13             THE COURT:  Is that your argument --
14             MR. SCHWALB:  That's my argument.
15             THE COURT:  All right.  I will take that
16  under advisement.  We hope to issue a decision in the
17  near future.  Thank you, counsel, and if there's
18  anything else, please, speak now or we will conclude the
19  hearing.  Mr. Didora, did you want to say something
20  more?
21             MR. DIDORA:  One point about the arbitration
22  award, the March award that is.  The March award seems
23  to resolve primarily the quote unquote Graystone
24  litigation loan which had certain terms regarding
25  reimbursement of Mr. Rechnitz's out of pockets, plus a
```

A-344

35

```
 1  percentage of the recovery, which would have yielded a
 2  number about four million dollars, which leaves about
 3  two million or so left in additional Graystone
 4  settlement proceeds that Rabbi Cohen has just said, oh,
 5  yeah, that two million goes to Mr. Rechnitz as well for
 6  other loans but never identifies what those other loans
 7  are.  In any respect we have no idea how we would apply
 8  those numbers and now I hear that supposedly an
 9  arbitration that's still ongoing but I have no idea what
10  the disputes are.  I have no idea what disputes have
11  been resolved by this March award which seemingly
12  included there gratuitous 2.2 million dollar to
13  Mr. Rechnitz without any application of the money to a
14  particular dispute.  So if this award is being confirmed
15  and there's an arbitration ongoing, I feel that we're
16  remiss -- very murky, to say the least, environment
17  where we don't know what's left or what has been
18  resolved by this March award because the March award
19  doesn't specify what it is resolving.
20              THE COURT:  Well, the March award has
21  certainly addressed the amounts owed under the Graystone
22  loan.  It did identify certain authorities to be paid
23  directly from Graystone.
24              MR. DIDORA:  I'm primarily concerned with
25  the second to last sentence of paragraph one on page two
```

ANTHONY M. MANCUSO,    CSR    OFFICIAL COURT REPORTER

A-345

36

```
 1   of the March award, which says any additional amounts
 2   from that lawsuit shall be paid to SYR for repayment of
 3   amounts owed to SYR relating to other outstanding
 4   amounts.  That's the language that I am concerned with
 5   at this point.
 6            THE COURT:  Well, my understanding of that
 7   was that the rabbi had said he would issue a separate
 8   decision on the other outstanding disputes that were
 9   presented at the arbitration.  So I think that probably
10   the parties should ask the rabbi to issue a decision on
11   those amounts, given what was before him in the record
12   to resolve at the arbitration.
13            MR. SCHWALB:  Your Honor, we intend to do
14   that.  We intend to call them back at another
15   opportunity.  They know about other amounts, even if
16   their Exhibit P, which was to the Weldler declaration,
17   the alleged purported agreement that we had, there is a
18   reference in there to personal loans of 2.9 million that
19   were supposed to be settled that hasn't been resolved
20   and there are other claims involving Mr. Rechnitz and
21   the Kutners and we will be calling them back for that.
22            THE COURT:  All right.  Thank you.
23            Is there anything else, counsel?
24            Thank you.  If not, we are adjourned.  We
25   will issue a decision in the near future.  Thank you. **
```

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER